# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

IN RE NEW MOTOR VEHICLES   ]
  CANADIAN EXPORT ANTITRUST ]   MDL DOCKET NO. 1532
  LITIGATION       ]

## ORDER ON MOTION FOR CLASS CERTIFICATION:
## EXEMPLAR STATE DAMAGE CLASSES

### INTRODUCTION

On the plaintiffs' motion for class certification, I now make my ruling on the preliminary request for six, separate, statewide 23(b)(3) damage classes for California, Kansas, Maine, New Mexico, Tennessee and Vermont. For each state, the proposed class is:

> All persons in the state . . . (excluding governmental entities, this Court, Defendants, their parents, subsidiaries, and affiliates, and their co-conspirators) who purchased or leased a new motor vehicle manufactured by a Defendant from a United States dealer during the period from January 1, 2001 to the present.[1]

The claim for each state is that the defendants' conduct has violated that particular state's antitrust statute and, for California, Maine, New Mexico and Vermont, that state's consumer protection statute.  On their antitrust claims, the plaintiffs seek damages as indirect purchasers under state law, damages that I have ruled they cannot recover under federal law as a result of <u>Illinois</u>

---

[1] Exemplar State Pls.' Mot. for Class Certification Pursuant to Fed. R. Civ. P. 23 ("Pls.' Mot.") at 2-3 (Docket Item 262).

Brick Co. v. Illinois, 431 U.S. 720, 730-31 (1977).  Their consumer protection claims have no federal equivalent.

There are two primary issues determining the outcome of the motion: whether the proof of the alleged conspiracy's impact, or causation, will be common across the class, or individualized for each class member such that typicality or predominance is defeated; and whether the proof of damages defeats predominance or manageability.  On the impact issue, the plaintiffs' proposed proof is common, although the defendants may have good arguments in some states that it ultimately will be insufficient.  I have some qualms about the plaintiffs' "model" for determining damages and whether it will suffice, so as to avoid individualized hearings.  But under First Circuit caselaw that reservation does not defeat certification at this stage.

Nevertheless, I conclude that the chronological closing point of the classes may need to be shortened.  Therefore, I make no final ruling on damage class certification, pending discovery on that issue.  There is also a problem with the standing of the Kansas named plaintiff, and I defer ruling on the Kansas class.

### PROCEDURAL BACKGROUND

I laid out the procedural background recently in certifying a (b)(2) injunctive class.  See In re New Motor Vehicles Canadian Export Antitrust Litig., No. MDL 1532, 2006 WL 623591, at *1-2 (D. Me. Mar. 10, 2006).  I need not repeat it here, except to note that after discussions with the lawyers, I agreed that we should approach state damage class certification by considering

"exemplar" states, each side being allowed to choose three.[2]  As a result, the plaintiffs chose Kansas, Maine and Vermont; the defendants chose California, New Mexico and Tennessee.  It is important to re-emphasize that there is no effort here to certify a nationwide damage class amalgamating the laws of different states or presenting difficult choice of law issues.  Instead, the issue is the appropriateness of a separate damage class for each single, particular state.

### FACTS

The relevant facts are set forth in my previous Order.  Briefly stated, the plaintiff consumers claim that automobile manufacturers conspired among themselves and with dealer associations to prevent lower priced Canadian cars from being exported to the United States, thereby driving up or maintaining American car prices.  Without the conspiracy, they claim, the arbitrage opportunity would have prompted the opening of a cross-border discount channel.

Much of the analysis in my earlier Order applies here as well.  I focus on the matters that differ.

---

[2] State law damage claims remain for more than twenty separate jurisdictions.  See In re New Motor Vehicles Canadian Export Antitrust Litig., 350 F. Supp.2d 160, 168 (D. Me. 2004).

### A. __Rule 23(a) Threshold Requirements__

#### (1) *Numerosity*

For the individual statewide damage classes, there is no dispute that the members of each of the proposed (b)(3) classes are "so numerous that joinder of all members is impracticable." <u>See</u> Fed. R. Civ. P. 23(a)(1).[3]

#### (2) *Commonality*

As with the (b)(2) class, there is no dispute that *some* claims of the members of each proposed class involve "questions of law or fact common to the class." <u>See</u> Fed. R. Civ. P. 23(a)(2). On the factual level, common questions include whether any of the defendants agreed among themselves to restrict Canadian car exports to the United States so as to protect United States prices and, if so, whether that agreement affected the prices that manufacturers posted as their dealer invoice prices and their suggested resale prices ("Manufacturer Suggested Resale Prices" or "MSRPs"). Within a particular state damage class, common questions of law include whether the defendants' conduct actually violated the antitrust or consumer protection laws of that state.

The defendants contend that the factual and legal claims of both antitrust/consumer protection impact (causation) and damages, on the other hand, are not susceptible to common proof or treatment. I shall examine that argument when I assess typicality and predominance.

---

[3] In describing the composition of the proposed damage classes, the defendants refer to the "millions of consumers who live in the six exemplar states," Defs.' Opp'n to Pls.' Mot. ("Defs.' Mem.") at 2 (Docket Item 305).

### (3) *Typicality*[4]

In my earlier Order certifying the (b)(2) injunctive class, under "typicality" I addressed the defendants' mention of standing as well, because standing is tied so closely to the dispute over impact or causation.  Typicality is also the only section of the defendants' legal memorandum that mentions standing.[5]

Standing, I pointed out, is different for an injunctive class than for a damage class.[6]  For the injunctive class based upon federal law, I concluded that the class representatives had to show "threatened loss or damage by a violation of the antitrust laws."  See 5 U.S.C. § 26.  The class representatives alleged sufficient standing ("threatened loss") to represent the class on the injunction claim.

The damage classes, however, are premised upon state substantive law and thus require that the representative plaintiffs (at least one for each respective state) have suffered compensable injury under the particular state law and that their claims in that respect are typical of the class.  The defendants say that the Kansas plaintiff and the West Virginia plaintiff paid no extra because in the years when they purchased cars, there was no arbitrage opportunity given the U.S./Canadian exchange rates at the time.[7]  The West

---

[4] Much of what I discuss here the parties address under "predominance."  The defendants challenge certification on both predominance and typicality, and in this case the categories do overlap: if the proof of impact is not common across the class, then not only is the named plaintiffs' claim of injury not typical, but the predominance assessment is also affected.  I find it convenient to address the issues surrounding antitrust/consumer protection impact here, although they could also be addressed under predominance and commonality.

[5] Defs.' Mem. at 48.

[6] In re New Motor Vehicles, 2006 WL 623591, at *3 (citing Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 110-11 (1986)).

[7] Defs.' Mem. at 48.

Virginia plaintiff, however, is not relevant to my treatment of these exemplar classes, because West Virginia is not included. The plaintiffs virtually concede that their Kansas representative plaintiff was not injured by the alleged conspiracy.[8] Mindful of Article III's case or controversy requirement, I will neither certify a Kansas class nor discuss Kansas certification further at this time. The Kansas claims will require either a new representative plaintiff or a dismissal.

I do not believe that the defendants' reference to standing goes any further than that. In any event, for the other exemplar states, this is not the time to make any final determination on whether the named plaintiffs or the class have standing in the sense of having sufficient evidence of injury. The Fourth Amended Complaint alleges antitrust and consumer protection injury adequately.[9] The pleadings have already been tested by a number of 12(b)(6) and related motions. We are not yet at the summary judgment stage where I might expect the defendants to assert that the plaintiffs have no proof of actual

---

[8] "In all candor, it is likely that at least Kansas plaintiff Scherzer's new vehicle purchase did not subject him to damages from the conspiracy to stop exports—by 2005 the currency exchange rate temporarily has taken the problem away for defendants." Exemplar State Pls.' Reply Mem. of Law in Support of Pls.' Mot. ("Pls.' Reply") at 24 n.45 (Docket Item 323).

[9] "During the period covered by this Complaint, Plaintiffs and members of the Class purchased or leased one or more new vehicles from the [defendant automobile companies'] United States dealers. As a direct result of [d]efendants' combination and conspiracy, [p]laintiffs and members of the Class were forced to purchase their automobiles in a marketplace that was less competitive than it otherwise would have been and paid higher prices than would have existed absent [d]efendants' conduct. As a result of the alleged misconduct [p]laintiffs and members of the Class have been injured in their business and property. Because [d]efendants' combination and conspiracy is ongoing, [p]laintiffs and members of the Class are threatened with similar injury in the future." Fourth Am. Consolidated Class Action Compl. for Violations of the Sherman Antitrust Act ("Fourth Am. Compl.") ¶ 81 (Docket Item 261). I conclude that the plaintiffs have "satisfied the threshold requirement imposed by Art. III of the Constitution that those who seek to invoke the power of federal courts must *allege* an actual case or controversy." O'Shea v. Littleton, 414 U.S. 488, 493 (1974) (emphasis supplied) (affirming the dismissal of the litigation because of lack of standing prior to any class determination).

injury.  Instead, we are at the point of determining class certification.  I must understand and discuss what each state requires to prove injury in order to assess whether the relevant proof of impact or causation will be common, whether the named plaintiffs' claims are typical, and whether common issues predominate.  In that respect, the "standing" question here is merits-related: did the named plaintiffs and/or the class actually suffer antitrust or consumer protection injury?  I do not have an adequate record to decide the issue yet.  It is true that if, on the plaintiffs' theory and proof, a particular state class lacks standing, Article III will require that I proceed no further on that class.  But I will determine that on a proper evidentiary record—for example, at the time of a motion for summary judgment.  Cf. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974) (courts are not "to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action").[10]

---

[10] For the same reason, I do not at this stage deal with the defendants' merits-based argument that any impact on prices resulted from legal vertical restrictions, and not from any illegal horizontal agreement.  See, e.g., Defs.' Mem. at 7-8, 31, 37.

    I recognize that because of General Telephone Co. of Southwest v. Falcon, 457 U.S. 147 (1982), (and partly in recognition of the high stakes created by the certification decision), recent caselaw urges trial judges to pierce beyond the pleadings and to make factual findings as necessary to determine whether class action status is appropriate.  See, e.g., Robinson v. Texas Auto. Dealers Ass'n, 387 F.3d 416, 420 (5th Cir. 2004) ("To make a determination on class certification, a district court must conduct an intense factual investigation.").  Does that include merits-related determinations?  According to the Fourth Circuit, "[s]uch findings can be necessary even if the issues tend to overlap into the merits of the underlying case."  Thorn v. Jefferson-Pilot Life Ins., ___ F.3d ___, 2006 WL 561505, *5 (4th Cir. Mar. 9, 2006).  The First Circuit believes that it has

> squared the Supreme Court's holdings in Eisen and Falcon, noting that while Eisen prohibits a district court from inquiring into whether a plaintiff will prevail on the merits at class certification, it "does not foreclose consideration of the probable course of litigation," as contemplated by Falcon.  "After all," we [have] explained, "a district court must formulate some prediction

*(continued next page)*

Turning to the classic typicality analysis, I observe that the class representatives' claims must be "typical of the claims . . . of the class."  See Fed. R. Civ. P. 23(a)(3).  The named plaintiffs easily satisfy the typicality standard as to their claims that the conspiracy existed and that it affected the prices the defendant manufacturers posted as their MSRPs and dealer invoice prices.  In these respects, the claim of each state's class representative is typical of the claims of the proposed class.[11]

The difficult question is the issue of antitrust and consumer protection impact or causation.[12]  If under state law the proof of antitrust or consumer protection impact must vary from class member to class member (as the defendants argue), then on that issue the named plaintiffs cannot show commonality or typicality of their claim, and predominance is probably defeated as well.

I begin, therefore, by grappling with the applicable substantive law on impact requirements state by state, and also examine whether there are any

_____

as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case."

In re PolyMedica Corp. Securities Litig., 432 F.3d 1, 6 (1st Cir. 2005).  I believe that I have followed the First Circuit's standard.

[11] Variations among states (e.g., more restrictive state emissions laws that may limit the flow of certain Canadian vehicles into those states, see Defs.' Mem. at 15) do not matter for my purposes here, since I proceed state by state to certify separate damage classes.  But these variations may affect arbitrage opportunities as to a particular state and therefore the amount of damages to purchasers in that state from any illegal conspiracy.

[12] "The requirement of the 'fact of damage,' also called 'impact,' means that the antitrust violation must cause injury to the antitrust plaintiff."  Robinson, 387 F.3d at 422 (quoting Nichols v. Mobile Bd. of Realtors, Inc., 675 F.2d 671, 676 (5th Cir. 1982)).  "[S]ometimes referred to as 'impact' or 'causal link,'" "[t]he term 'fact of damage' can be likened to the causation element in a negligence cause of action.  The term means simply that the antitrust violation caused injury to the antitrust plaintiff."  Alabama v. Blue Bird Body Co., Inc., 573 F.2d 309, 317 & n.18 (5th Cir. 1978).

differences between the antitrust and the consumer protection claims.   Not surprisingly, I start with Maine.

### Maine

The Maine antitrust statute declares "[e]very contract . . . or conspiracy[] in restraint of trade or commerce in this State ... to be illegal."   10 M.R.S.A. § 1101 (2005).   Rejecting the principle of <u>Illinois Brick</u>, it also says: "Any person . . . injured directly or *indirectly* in its business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by section 1101 . . . may sue for the injury in a civil action."   10 M.R.S.A. § 1104 (emphasis supplied).   By itself, that language does not furnish much guidance on what indirect purchaser plaintiffs must show to establish impact or causation.   Maine Law Court cases would provide a definitive answer, but I find no Law Court case addressing the topic.

There are, however, three Maine Superior Court cases from which I draw guidance.   They arise in the context of applying Maine's own class action standards.   Maine's class action standards do not control my decision here, because I am applying the standards of the federal class action rule, and its interpretation by the United States Supreme Court and the First Circuit Court of Appeals.[13]   But in the course of applying Maine procedural requirements,

---

[13] Academic commentary has characterized states according to whether they are "sanguine" or "skeptical" on indirect purchaser class actions, and Maine is labeled as skeptical.   <u>See</u>, <u>e.g.</u>, William H. Page, <u>Class Certification in the Microsoft Indirect Purchaser Litigation</u>, 1 J. Competition L. & Econ. 303, 306-08, 323 (2005) [hereinafter Page, <u>Microsoft</u>].   <u>Cf.</u> William H. Page, <u>The Limits of State Indirect Purchaser Suits: Class Certification in the Shadow of Illinois Brick</u>, 67 Antitrust L.J. 1, 23-27 (1999) [hereinafter Page, <u>Limits</u>] (defining and discussing the "skeptical view"); <u>id.</u> at 21 ("The most important determinant of class certification of indirect purchaser suits appears to be where the suit is filed.").   I emphasize that I am *not* applying *(continued next page)*

these Maine cases provide useful and persuasive guidance concerning Maine's *substantive* antitrust law.

In the first case, then Superior Court Justice (now Law Court Chief Justice) Saufley said:

> The Maine Anti-Trust Statute parallels the Sherman Act. It is well established that, to prevail on a price-fixing claim a plaintiff must demonstrate: (1) an anti-trust violation, (2) proof of a resultant injury to the plaintiffs, (sometimes referred to as "fact of injury," "impact," or "causation"), and (3) the damages sustained by plaintiffs.

Karofsky v. Abbott Labs., No. CV-95-1009, 1997 Me. Super. LEXIS 316, at *13-14 (Me. Super. Ct. Oct. 15, 1997) (citations and footnote omitted).  My concern is with the second element, the antitrust impact or causation.  Concerning this element in the indirect purchaser case before her, Justice Saufley stated:

> Whether or not the higher costs, assumed for purposes of this analysis to have occurred, have been passed on to those indirect purchasers of the manufacturers' product is therefore the focal point upon which much of this court's analysis must turn.  Unless there has been a "pass on" of the allegedly higher costs to Maine consumers, those consumers have not been injured, and no claim will lie.

---

state class action law.  See 7A Charles Alan Wright et al., Federal Practice and Procedure: Civil 3d § 1758 (3d ed. 2005) (noting that in a diversity action, "[f]ederal and not local standards . . . will determine the various procedural elements of the class action").  Cf. Erwin Chemerinsky, Federal Jurisdiction § 5.3, at 317-18 (4th ed. 2003) ("[I]t is now clearly established that the Federal Rules of Civil Procedure . . . are to be applied by the federal court [in diversity cases], even if there is a conflicting state requirement and even if the application of the federal Rule might determine the outcome of the case.") (citing Hanna v. Plumer, 380 U.S. 460 (1965)).  Here, jurisdiction over the state damage claims is premised upon both diversity and supplemental jurisdiction.  See Fourth Am. Compl. ¶5.  Federal procedural law governs in either event.  McDowell v. Brown, 392 F.3d 1283, 1294 (11th Cir. 2004) ("Because the district court exercised supplemental jurisdiction over these claims when it was removed from state court, state law governs substantive issues and federal law governs procedural issues.") (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938) (announcing this principle in the context of a diversity case)).  Cf.  Charles Alan Wright, The Law of Federal Courts § 19 at 109 (4th ed. 1983) ("If a court determines to exercise pendent jurisdiction over a state-created claim, state substantive law is controlling on the pendent claim.") (citing United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)); Baker v. Coughlin, 77 F.3d 12, 15 (2d Cir. 1996) (same).

Id. at *18.  Justice Saufley also observed:

> Because indirect purchasers must demonstrate that any
> over-charges resulting from the illegal action of the
> defendants have been passed on to them, an entirely
> separate level of evidence and proof is injected into
> litigation of indirect purchaser claims.  Proof of an antitrust
> conspiracy may logically lead to a conclusion that the
> subject of the conspiracy, the retailers,  have each been
> harmed.  No such conclusion logically follows without
> specific proof tracing that overcharge on to consumers.

Id. at *37 (footnote and citations omitted).[14]

Next, in Melnick v. Microsoft Corp., Nos. CV-99-709, CV-99-752, 2001

WL 1012261 (Me. Super. Ct. Aug. 24, 2001), Justice Mills applied the Karofsky

analysis in denying certification to a class of indirect purchasers.  Quoting a

federal case, she stated:

> "[T]he fact that a case is proceeding as a class action does
> not in any way alter the *substantive* proof required to prove
> up a claim for relief. . . .   [E]ach plaintiff must still prove
> that [the antitrust violation occurred] and that it did in fact
> cause him injury." . . .   Because indirect purchasers must
> demonstrate that overcharges have been passed on to
> them, such claims present an entirely separate level of
> evidence and proof than that found in a direct purchaser
> claim.

Id. at *6 (emphasis supplied; citations and footnotes omitted).  According to

Justice Mills: "Contrary to the plaintiffs' argument, the court in Karofsky made

clear that the presumption engaged in by some courts regarding injury to

direct purchasers is not available in an indirect purchaser case."  Id. at *7.

Then in 2004, Justice Warren dealt with a standing challenge to an

indirect purchaser antitrust class action.  Justice Warren recognized Maine's

---

[14] Justice Saufley noted that in that respect Maine "and most other states" are unlike
jurisdictions such as D.C. which has created a "statutorily prescribed presumption of injury for
indirect purchasers."  Id. at *39 (footnote omitted).

statutory rejection of <u>Illinois Brick</u>, but concluded that Maine's statutory language permitting indirect purchasers to recover did "not necessarily resolve" the standing issue.   <u>Knowles v. Visa U.S.A., Inc.</u>, No. CV-03-707, 2004 WL 2475284, at *3 (Me. Super. Ct. Oct. 20, 2004).   Instead, he found that Maine would follow the factors set forth in <u>Associated General Contractors v. California State Counsel of Carpenters</u>, 459 U.S. 519 (1983).   <u>Knowles</u>, 2004 WL 2475284, at *5.   Assessing Maine's "passing on" proof requirement, Justice Warren found causation to be "speculative" for the indirect purchasers in his case:

> Depending on their other costs, their competitive position in the market, their profit margins, and the specific products they sold, some merchants could have absorbed a substantial portion of any overcharge instead of passing it on.   To a significant extent, whether an overcharge was passed on would depend on the elasticity of demand in the various product markets in which the merchant sells.

<u>Id</u>. at *6 (footnote omitted).[15]   For that and other reasons, Justice Warren dismissed the indirect purchaser claim for lack of standing.   <u>Id</u>. at *8.[16]

These three cases are persuasive that indirect purchasers in Maine must produce specific proof that they paid higher prices as a result of the conspiracy

---

[15] The consumer class claim was that illegal tying by credit card issuers caused increased costs to merchant retailers that then were reflected in higher prices on products bought by consumers in Maine.

[16] In <u>Knowles</u>, Justice Warren assessed what he identified as the seven <u>Associated General Contractor</u> standards and found that, even if a violation existed and the plaintiffs had been damaged, several "prudential concerns" "weigh[ed] against standing in this case": there was "indisputably a more immediate class of potential plaintiffs motivated to enforce the antitrust laws" (<u>i.e.</u>, the merchants who had already recovered a substantial damage award); "both the asserted damages and the chain of causation [were] speculative"; and "[d]uplicative recovery [was] a major issue . . . in light of the more than $3 billion already recovered by the merchants in a settlement of [a related federal] class action" that would have necessitated "a complex apportionment." <u>Id</u>. at *6-7.

(in the face of the possibility that all such increases were absorbed at the retailer level).  Such an impact (antitrust causal link), under Maine law, cannot simply be inferred from market restrictions at the manufacturer-to-retailer level.

Maine's consumer protection statute, the Unfair Trade Practices Act, 5 M.R.S.A. §§ 205-A to 214, also requires proof of impact.  The statute gives a remedy for damages or restitution to anyone who "suffers any loss of money or property, real or personal, as a result" of an illegal trade practice.  Id. § 213(1). Indirect purchasers can recover damages under that statute, State v. Weinschenk, 868 A.2d 200, 208 (Me. 2005), but the alleged unfair act or practice "must cause, or be likely to cause, substantial injury to consumers," id. at 206.  "The substantial injury requirement is designed to weed out 'trivial or merely speculative harms.'"  Tungate v. MacLean-Stevens Studios, Inc., 714 A.2d 792, 797 (Me. 1998) (citations omitted).  Injury is not presumed. See Weinschenk, 800 A.2d at 208-09 (dealing with recovery in restitution for a statutory violation).  I see no reason to conclude that in consumer protection cases the Maine causation standard differs from that in antitrust cases.

### California

For California antitrust law, neither the statute nor the California Supreme Court furnishes guidance on the impact requirement.  California appellate courts, however, have allowed classes of indirect purchasers to proceed with class claims under the state's antitrust statute, the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq. (West 2006).  As with Maine, I

examine these cases' discussion of state substantive law.   It seems to be significantly different from Maine's.[17]

In B.W.I. Custom Kitchen v. Owens-Illinois, Inc., 235 Cal. Rptr. 228 (Ct. App. 1987), for example, the California Court of Appeal overturned a trial court decision not to certify a class of indirect purchasers.   The Court of Appeal referred to the principle that "when a conspiracy to fix prices has been proven and plaintiffs have established they purchased the price-fixed goods or services, the jury can *infer* plaintiffs were damaged."   235 Cal. Rptr. at 234 (emphasis original).[18]   The California appellate court rejected the trial court's reasoning that an indirect purchaser claim is different (at least in the case where the middleman does not substantially alter or add to the product it receives from the manufacturer).   Id. at 235-36.[19]

Then, in In re Cipro Cases I & II, 17 Cal. Rptr.3d 1 (Ct. App. 2004), the court stated directly that under California law it is "ordinarily a permissible assumption" that "indirect purchasers who buy the product from middlemen in a largely unaltered form" suffer injury from a horizontal market-wide restraint of trade. 17 Cal. Rptr.3d at 8.

---

[17] California is viewed as a "sanguine" state (as opposed to "skeptical") in its certification of indirect purchaser classes.   See Page, Limits, supra, at 23.   But as I stated above, supra note 13, state procedural law does not affect my analysis.

[18] The alleged conspiracy in the case before me is not price-fixing, but supply restrictions.   The California court also cited cases that involved conspiracies extending beyond classic price-fixing.   Id.

[19] Although B.W.I. Custom Kitchen could have been interpreted narrowly (the court referred in a footnote to the plaintiff's statement that "each distributor whose deposition has been taken testified that price increases by the defendants/manufacturers were completely passed on to plaintiff and the members of the class," id. at 235 n.8), later decisions have read it more broadly as I describe in text.   See, e.g., In re Cipro Cases I & II, 17 Cal. Rptr. 3d 1, 8 (Ct. App. 2004).

The same principle appears in Global Minerals & Metals Corp. v. Superior Court, 7 Cal. Rptr.3d 28 (Ct. App. 2003). There the court said: "In the consumer context, at least a portion of the illegal overcharge by a manufacturer will presumably be passed on by the independent distributors to consumer class members in the form of higher prices" (distinguishing the case where products are substantially altered by the middleman). Id. at 44-45.

The evidentiary requirement for impact expressed in these California cases is far less demanding than that articulated by the Maine cases. I conclude that unlike Maine, California substantive antitrust law permits an inference of antitrust impact, even as to indirect purchasers, from the existence of the conspiracy.

I see no reason to conclude that for consumer protection cases, Bus. & Prof. Code § 17200 et seq., the California courts would be more demanding for proof of injury to indirect purchasers.[20]

**New Mexico**

In Romero v. Phillip Morris Inc., 109 P.3d 768 (N.M. Ct. App. 2005), the New Mexico Court of Appeals dealt with a consumer indirect purchaser lawsuit against cigarette manufacturers for price-fixing under the state's Antitrust Act, N.M. Stat. Ann. §§ 57-1-1 et seq. (West 2006). Romero raises proof of impact

---

[20] Neither damages nor disgorgement of profits (except those profits received from the plaintiffs) is an available remedy. That is also true in class action cases. Madrid v. Perot Sys. Corp., 30 Cal. Rptr.3d 210, 225 (Ct. App. 2005) (concluding that "nonrestitutionary disgorgement is not an available remedy in [an unfair competition law] class action") (noting that this remains an "open question" before the California courts). See also Feitelberg v. Credit Suisse First Boston, LLC, 36 Cal. Rptr.3d 592, 606-08 (Ct. App. 2006) (same). Restitution (other than disgorgement of profits obtained from others) is available. Korea Supply Co. v. Lockheed Martin Corp., 63 P.3d 937, 944-45 (Cal. 2003) (interpreting section 17203).

issues very similar to this case and the opinion is comprehensive. In approving class certification, the court found "methodologies, including correlation analysis" satisfactory to prove passing on of an overcharge. 109 P.3d at 793. I do not rely on Romero's class action predominance analysis, since it was applying the New Mexico procedural rule. But I do draw from Romero the conclusion that correlation analysis can suffice to prove antitrust impact in an indirect purchaser case. See id. at 792-93.

New Mexico's consumer protection statute limits recovery to one "who suffers any loss of money or property, real or personal, as a result of" an illegal practice. N.M. Stat. Ann. § 57-12-10(B). Although I have found no New Mexico cases on point, I see no reason to judge proof of impact any differently than for antitrust.

### *Tennessee*

Tennessee's antitrust statute makes illegal conspiracies "made with a view to lessen, or tend to lessen, full and free competition," Tenn. Code Ann. § 47-25-101 (2005). On its face, this language would suggest that Tennessee would follow California's approach. After all, under conventional economic analysis, a conspiracy to restrict supply would at least "tend to lessen" price competition at even the indirect consumer purchaser level, and Tennessee statutes provide that a consumer can recover the full consideration paid. See Sherwood v. Microsoft Corp., No. M2000-01850-COA-R9-CV, 2003 Tenn. App. LEXIS 539, at *98 (Ct. App. July 31, 2003) (quoting Tenn. Code Ann. § 47-25-106). But the Tennessee Court of Appeals has made a statement that seems

16

more limiting.  In <u>Sherwood</u>, while interpreting Tennessee's statute to permit indirect purchaser recovery, the court added: "Of course, [indirect] plaintiffs will be required to prove they were actually damaged by the alleged monopolistic conduct, <u>i.e.</u>, that they paid more for the [product] than they would have been required to pay absent the anticompetitive conduct."  <u>Id</u>. at *100.

There are no consumer protection claims in Tennessee.

### *Vermont*

The Vermont antitrust statute limits recovery to one "who sustains damages or injury as a result of any violation of state antitrust laws."  Vt. Stat. Ann. tit. 9, § 2465(a) (2006).  Thus, antitrust impact or causation is required. The Vermont courts have not addressed the question whether it can be presumed for indirect purchasers, or requires a separate level of proof.[21]

Under Vermont's consumer protection statute, the Vermont Supreme Court has held that the person seeking recovery has the burden of demonstrating damage or injury as a result of the illegal conduct.  Moreover, "there must be some cognizable injury caused by the alleged [conduct]." <u>Greene v. Stevens Gas Serv.</u>, 858 A.2d 238, 244 (Vt. 2004).

\* \* \* \* \*

That, then, is the state substantive law on antitrust and consumer protection impact or causation for the exemplar states, so far as I can

---

[21] The only Vermont Supreme Court case involving indirect purchaser issues is <u>Elkins v. Microsoft Corp.</u>, 817 A.2d 9 (Vt. 2002) (holding that an indirect purchaser could recover in Vermont even before Vermont enacted explicit legislation to this effect).

determine it.  The question for me under Federal Rule 23 is whether, in each state class, the proof of impact or causation is common such that the named plaintiffs' proof will be typical of the class.  I do not at this time determine whether that proof, if typical, will suffice at trial or on summary judgment, the merits part of the case.

The plaintiffs attempt to show that their proof will be both common and typical through their expert, Professor Hall of Stanford University and the Hoover Institute.[22]  Professor Hall relies on economic theory and analysis to assert that, other things being equal, any restrictions on the supply of lower priced Canadian cars in the United States will exert an upward pressure on United States car prices.[23]  That proposition seems unexceptionable as a matter of economic reasoning.[24]  Professor Hall also asserts that the upward pressure will apply not only to the price paid by dealers to manufacturers but also to the price paid by consumers to dealers.[25]  Professor Hall reasons that

---

[22] The defendants make much of the fact that in Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1057 (8th Cir. 2000), the Eighth Circuit vacated a jury damages verdict on the basis that Dr. Hall's expert testimony there should have been excluded.  The Eighth Circuit found that in that case Dr. Hall's opinion "did not incorporate all aspects of the economic reality of the stern drive engine market and . . . did not separate lawful from unlawful conduct."  Id.  Obviously I will have to assess each side's expert testimony at trial to determine whether it then "fits" the evidence.

[23] Aff. of Robert E. Hall, Ph.D., Ex. A (Expert Report of Robert E. Hall, Ph.D.) ("Hall Report") ¶ 47 (Docket Item 272).

[24] The defendants' expert does not controvert this point.  See Pls.' Reply, App. C (Dep. Tr. of Joseph P. Kalt) ("Kalt Dep.") at 18 (Docket Item 323) (affirming that he "stand[s] by as a general economic principle" the statement that "[b]y restricting supply in a market, effective conspirators raise prices").

[25] Hall Report ¶¶ 53-59.  In that respect, this case may differ from the traditional price-fixing/passing-on case, where manufacturers or wholesalers have colluded on the prices they charge retailers, and the question is whether the retailers have passed on to consumers all or part of that higher price.  The plaintiffs here assert that the defendant manufacturers, with the connivance of the dealer associations, illegally restricted the supply of lower priced Canadian vehicles.  To some degree, that asserts a direct impact on the retail market.  Moreover, the *(continued next page)*

although most car purchases are a product of individual negotiation between consumer and dealer, the starting points for the negotiation are the dealer invoice price and the MSRP.[26]  Both these numbers are fixed by the defendant manufacturers, and the defendants' expert agrees that they are available to consumer purchasers.[27]  If there was an illegal conspiracy that constricted the supply of lower priced vehicles, Professor Hall reasons, the manufacturers and thus the dealers were able to set that range at a level higher than otherwise.[28] It is this impact on the negotiating range, the plaintiffs argue, that is the common proof and the proof typical for the class.[29]  Professor Hall has not yet performed an analysis of the defendants' sales and pricing data (discovery is not complete), but he has referred to economic literature, including one article that demonstrates empirically that automobile dealers pass on at least part of certain pricing incentives that manufacturers provide them.   See Meghan Busse et. al., $1000 Cash Back: Asymmetric Information in Auto Manufacturer Promotions 45 (Nat'l Bureau of Econ. Research, Working Paper Series No. 10887, 2004).

The defendants' expert, Professor Kalt of Harvard University's John F. Kennedy School of Government, is emphatic that if there was any impact from the alleged conspiracy, there was no common impact and it is not subject to

---

plaintiffs assert that because of the way automobiles are priced, the manufacturers directly set the range within which dealers establish consumer prices, another direct effect.

[26] Id. ¶¶ 53-54.

[27] See id. ¶ 25; Kalt Report at 15-16.

[28] See Hall Report ¶¶ 51, 53-59; see also Pls.' Reply, Aff. of Robert E. Hall, Ph.D. (Expert Rebuttal Report of Robert E. Hall, Ph.D.) ("Hall Rebuttal") ¶¶ 42-43 (Docket Item 323).

[29] Pls.' Reply at 5.

common proof.[30]   Instead, he maintains, the ultimate purchase price for consumers varied with individual consumer negotiating skills, the competitive environment for particular dealers, the "spottiness" of Canadian cars' presence in the United States (regionally, chronologically and by makes and models) and various targeted pricing incentives.[31]   Proof of an antitrust impact on a consumer's purchase of a particular brand and model in a particular year cannot, therefore, be typical of the proof for other brands, other models, other purchase locations, other consumers or other years, but instead requires "highly individualized inquiry."[32]  He characterizes Professor Hall's analysis as showing only an "ex ante probability" or a possibility of a higher price, neither an actual higher price paid nor one that is typical or common across the class.[33]

Given these experts' presentations,[34] have the named plaintiffs demonstrated that their proof of impact will be common and typical for the class in each state?  I conclude that they have.  There is no reason why, as an

---

[30] Kalt Report at iii.  In the words of the defendants' legal memorandum, "tens of millions of consumers who bought or leased thousands of different vehicles, from thousands of different dealers, in many different geographic locations, and all through individually negotiated, idiosyncratic transactions."  Defs.' Mem. at 1.  That may be somewhat overstated, given that I am examining certification only one state at a time.

[31] Kalt Report at iii ("Neither the fact nor the magnitude of impact, if any, of the alleged unlawful conduct can reasonably or reliably be said to be common and subject to common proof.").  The defendants argue that the alleged "grey-market activity" has been concentrated in just a few regions, whether viewed nationally or within the exemplar states.  Defs.' Mem. at 13; id. at 19 ("There are vast areas within each exemplar state with no grey market activity.").

[32] Kalt Report at 5-8.

[33] Id. at iv, 48-51.

[34] I have the respective experts' reports and depositions.  I saw no need to conduct a testimonial hearing, and none was requested.  The outcome does not depend on credibility from the witness stand.  But see Page, Limits, supra, at 9 (a court "almost always must conduct an evidentiary hearing to examine the plaintiffs' proposed method of proof, which typically includes expert testimony").

abstract proposition, the fact of antitrust (or consumer protection) damage must be proven on an individualized basis.   See, e.g., Bogosian v. Gulf Oil Corp., 561 F.2d 434, 454-55 (3d Cir. 1971) (analyzing existence of common issues).[35]   Here, the plaintiffs plan to show impact on a uniform basis by showing that without the conspiracy, the arbitrage opportunity presented by the lower Canadian prices for new cars would have inspired the opening of a cross-border channel of discount selling.[36]   Keeping this lower priced channel from emerging, they argue, permitted manufacturers to post higher MSRPs and dealer invoice prices than they otherwise could have, thereby elevating the negotiating range: consumers were forced to pay prices "at or based off of an

---

[35] There, the court wrote:

> If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage. . . . Under these circumstances, proof on a common basis would be appropriate. Even if the variation in price dynamics among regions or marketing areas were such that in certain areas the free market price would be no lower than the conspiratorially affected price, it might be possible to designate subclasses to conform with these variations.

Id. at 455 (citations omitted).  This is now known as the "Bogosian short-cut," In re Linerboard Antitrust Litig., 305 F.3d 145, 151 (3d Cir. 2002), and continues to be approved:  "The economic laws of supply and demand run in tandem with the tenets of logic.  A reduction in supply will cause prices to rise." Id. at 152.  A correlation analysis along with the economic theory can prove antitrust impact.  Id. at 152-53; see also Nichols, 675 F.2d at 678-79 (impact can be proven "merely by demonstrating, through generalized proof, that the competitive commission rate for groups of or for individual class members existed at least over a range, the highest point of which was less than the commissions actually paid").  It is true that the Fifth Circuit in Robinson reversed a class certification in a price-fixing lawsuit against car dealers, based merely upon an agreement to itemize and charge for the Texas Vehicle Inventory Tax separately on each sales contract.  387 F.3d at 419.  Apparently that agreement alone was the basis for the plaintiffs' case.  The Fifth Circuit concluded that the court would have to hear evidence about every class member and every transaction to determine whether the separate listing had any effect on the price.  Id. at 424.  But Robinson was not a restriction-on-supply case.  (I recognize that all these cases were direct purchaser cases.)

[36] Pls.' Reply at 5.

artificially high" MSRP.[37]   It is not seriously disputed that those prices set the negotiating range for the ultimate consumer price in the vast majority of transactions.   MSRPs and dealer invoice prices are national (and therefore certainly statewide) and typically are reset only once a year.[38]   It is this alleged elevating of the negotiating range that will be the plaintiffs' proof for antitrust and consumer protection impact.[39]   From that elevated range, higher consumer prices flowed inevitably, they claim.[40]   Thus, the plaintiffs' proof of impact will not only be uniform across an exemplar state; it will also be uniform for all states.

Whether the plaintiffs' proof of impact will be sufficient to withstand a motion for summary judgment or for judgment as a matter of law at trial

---

[37] Pls.' Mem. at 14.

[38] Hall Report at 8; Kalt Report at 15, 52.

[39] Pls. Reply at 5-6.  Similar reasoning has been accepted by a California court:

> The effectiveness of any negotiation by the purchaser must be seen as relative, depending on whether the negotiation commences from a price which is set by a competitive market or from an artificially inflated fixed price.  The good negotiator in the fixed market would presumably have gotten an even better "deal" in a competitive market.  If base prices are raised, generalized injury results regardless of the purchaser's individualized negotiating abilities.

Rosack v. Volvo of America Corp., 182 Cal. Rptr. 800, 811 (Cal. Ct. App. 1982).

[40] Id.  The plaintiffs' reasoning that indirect purchasers paid higher prices does have some support in the literature.  See generally Robert G. Harris & Lawrence A. Sullivan, Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis, 128 U. Pa. L. Rev. 269 (1979).  In fact, "[t]here is a well-developed theory to support a generalized damage model for passing-on damages: the tax incidence theory[.]"  Page, Limits, supra, at 13.  "By itself," however, it does not solve the class certification dispute, because it depends on whether it is "a reliable picture of the process of passing on in the circumstances of the case."  Id.  It predicts that some part of the overcharge will be passed on unless the demand is perfectly elastic (i.e., unless any price increase will result in the retailer losing all sales).  Id. at 14.  "[U]nder the assumptions of the incidence model, the indirect purchaser will bear some of the overcharge, except in extreme circumstances."  Id. at 16.   "If accepted, it is a powerful basis for inferring at least some passing on, because it predicts that the intermediate purchaser will only absorb the increase in extreme, and therefore rare, circumstances."  Id. at 17.  It does not address the practical realities of proof of damages, however, id. at 17-18, a topic to which I turn in the section on predominance.

remains to be seen.  Certainly the plaintiffs' case for antitrust and consumer protection injury seems more difficult for a state like Maine than it does for a state like California.  If all the plaintiffs have at the end of the day is an inference of injury, the Maine class action may be in trouble.[41]  Moreover, the defendants may be able to prove that the arbitrage opportunities in certain years were so limited that there could be no antitrust impact from a horizontal conspiracy.  If so, the summary judgment or the jury verdict will exclude those years.  Nevertheless, the plaintiffs' proof does meet the commonality and typicality standard.

Professor Kalt's challenges to Professor Hall remain relevant in two ways.  First, they can be seen as an affirmative defense to the plaintiffs' impact/causation case.  First Circuit caselaw teaches that affirmative defenses are to be taken into account at the certification stage, Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 295 (1st Cir. 2000), and if impact has to be evaluated purchaser by purchaser as a matter of defense, that could destroy typicality and/or predominance.  The essence of the defendants' argument, however, is that Professor Hall's negotiating range elevation is not antitrust impact at all.[42]  That dispute will be tested as a matter of law for each state at

---

[41] The claims here arguably are stronger than those in the Maine indirect purchaser precedents in these respects: although the plaintiffs are "indirect purchasers" as to the manufacturers (on the class certification motion none of the parties has addressed the purchasers' status as to the dealers' associations), (1) manufacturers actually set both the MSRP and the dealer invoice price, the two numbers that set the context in which individual consumers negotiate with dealers over the ultimate purchase price, and (2) restrictions on supply of lower priced vehicles (rather than mere price fixing at the manufacturer level) logically affects price competition at the consumer level as well.

[42] The defendants insist that the plaintiffs must prove that each member of the class actually paid a higher price than he/she would have paid if there were no conspiracy, and if so, in what *(continued next page)*

the appropriate stage.   Since that is the plaintiffs' premise for their liability case, it should not be necessary to explore each individual transaction.   Either the plaintiffs can persuade the jury (or me) that it is sufficient, or they will lose. Second, Professor Kalt's reasoning may affect the damage calculations, a subject to which I turn under the heading of predominance.

To sum up, not all car buyers in a particular state may have suffered the same damages (for example, different models; different trim options; different dealers and locations; different negotiating skills).   Nevertheless, the named plaintiffs' claims (and defenses) are typical of the class.   I have seen no suggestion that the conspiracy here (if it existed) was limited to particular brands, models or years.   Instead, the plaintiffs claim that the defendants engaged in a general conspiracy to dry up Canadian exports to the United States.[43]   For each state, this remains a state antitrust (and, for some states, a consumer protection) claim that the defendants conspired to reduce price competition in the United States market, producing generally higher consumer prices, even though individual plaintiffs' damages may vary.[44]

_____

amount.  Such proof, they say, would have to be examined purchaser by purchaser.  Defs.' Mem at 1.

[43] The plaintiffs' expert maintains that export restrictions would have an effect on both *inter*- and *intra*-brand competition.   Hall Report ¶¶ 49-51.   "Inter-brand competition, that is[,] competition between manufacturers," would be affected be cause a price change in one particular manufacturer's model would necessarily cause other manufacturers to change the prices of competing models (the expert gave as an example of competing models from different manufacturers the Honda Civic and the Toyota Corolla).   Id. at ¶ 49.   "Intra-brand competition[,] refer[ring] to competition between models produced by the same manufacturer," would suffer as well because "a change in the price of [one model] would still imply a profit-maximizing change in the price  of [other models] to maintain the optimal price difference between" them. Id. at ¶ 50.

[44] See, e.g., In re Screws Antitrust Litig., 91 F.R.D. 52, 56 (D. Mass. 1981) ("mere disparity in damage awards will not destroy . . . typicality"); see also 6 Alba Conte & Herbert B. Newberg, *(continued next page)*

One final issue that comes up under typicality, however, raises concern about the ending date for the proposed classes: that particular named plaintiffs' claims (or the defenses to those claims) may not be typical of those of the class.   As I have already noted, the plaintiffs virtually concede that their Kansas plaintiff bought a car at a time, 2005, when the exchange rates were such that Canadian cars were priced higher than American cars; since there was no arbitrage opportunity, the conspiracy could not have increased American prices.[45]  This concession calls into question the chronological scope of the damage class: when should the class end?[46]   The plaintiffs' reply memorandum suggests that this is a discovery problem; that some defendants used data in their response to the plaintiffs' certification motion that the plaintiffs had not seen previously; that the plaintiffs need to see comparable data for all the defendants; and that therefore I should not deny certification based on a merely "speculative conflict."[47]   Essentially, the plaintiffs ask me to

---

Newberg on Class Actions § 18:9 (4th ed. 2002) ("The typicality requirement can be met even though there were many products sold at varied prices and conditions . . . ."); id. ("The overriding considerations typifying many antitrust claims are the need to prove that there is a conspiracy to fix prices in violation of the antitrust laws, that the prices are fixed pursuant thereto, and that the plaintiffs purchased products at prices which, as a result of the conspiracy, were higher than they should have been.").

[45] See supra note 8.

[46] At oral argument, the defendants also challenged the opening date of the class, arguing that if the conspiracy began on January 1, 2001, there would be some necessary delay before there was any effect on individual consumer prices, and more delay before there was a nationwide impact on MSRPs.  See Hr'g Tr. at 79-80, Jan. 31, 2006 (Docket Item 340).  But although the Fourth Amended Complaint seeks damages only for injuries beginning in 2001, it is broad enough to permit proof that the conspiracy had begun earlier and thus that impact could have started January 2001.  See, e.g., Fourth Am. Compl. ¶61 ("Beginning in approximately the 1990s, the [defendants] created and shared 'blacklists' . . . .").  Whether that assertion can be proven will await summary judgment or trial.

[47] Pls.' Reply at 23-24.

certify the class now at its broadest and worry later about its proper scope and whether the named plaintiffs' claims are typical.

I do not believe that is the proper way to proceed. Instead, as to certification of the individual state damage classes, I defer decision until the pertinent discovery problems are resolved and I request Magistrate Judge Kravchuk to hold a prompt conference and set appropriate deadlines. Then I will determine the class definition (and whether the named plaintiffs are representative).

### (4) Adequacy

The plaintiffs must demonstrate that the class representatives "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).[48] As I said in my earlier Order certifying a federal injunctive class, the defendants argue that the named plaintiffs are not adequate class representatives because:

(1)    the named plaintiffs for the Kansas and Tennessee state damage classes were not injured, because they purchased 2004 and 2005 model year vehicles when exchange rates made Canadian car prices higher than American (the defendants do not assert that there is any comparable problem with the other four state damage classes);

(2)    some purchasers benefited from the alleged antitrust conspiracy (an economic argument based upon "re-equilibration");

---

[48] The parties do not argue whether the named representatives will "fairly" protect the interests of the class. Neither the Rule nor Advisory Committee Notes shed light on the definition of "fairly," nor how I should determine whether a named plaintiff "fairly" represents the class. I shall confine my analysis to the well-recognized "adequacy" doctrine, which is argued.

(3)    those purchasers who traded in a vehicle gained from the higher prices (i.e., higher trade-in value);

(4)    the conspiracy promoted dealer investment and inter-brand competition and therefore was good for purchasers who value dealership services.

See In re New Motor Vehicles, 2006 WL 623591, at *4-5.

Arguments 2 and 4 go to the merits of the plaintiffs' antitrust claim. The defendants apparently contend that the conspiracy alleged here is not *per se* illegal, but subject to a rule of reason analysis, and that they can justify any horizontal agreement. That will be determined at trial or on summary judgment. In the meantime, the argument that some consumers may prefer the existence of an antitrust conspiracy does not mean that there cannot be a class action.[49]

As for argument 3, perhaps there are car buyers whose trade-in vehicles were priced higher because of the conspiracy and perhaps the higher trade-in value reduced or eliminated any damages these buyers otherwise would have incurred in paying a higher price for their new cars. If that turns out to be a realistic and significant assertion, perhaps I will need to certify damage subclasses when we get to that stage or narrow the definition of the class. See Fed. R. Civ. P. 23(c)(1)(C) ("An order [certifying a class] may be altered or

---

[49] See 1 Conte & Newberg, supra, § 3:30 ("As a general rule, disapproval of the action by some class members should not be sufficient to preclude a class on the ground of inadequate representation."); id. ("In other words, the class member who wishes to remain a victim of unlawful conduct does not have a legally cognizable conflict with the class representative."). In part, this is because "under Rule 23(b)(3), class members have the right to exclude themselves from the action." Id.

amended before final judgment."); id. 23(c)(4) ("When appropriate . . . a class may be divided into subclasses . . . ."). But there is no record on which I can make such a determination now, state by state. There is also no assertion that the named plaintiffs have this problem.

As for argument 1, I am not proceeding on the Kansas certification at this time. For Tennessee, I will await the outcome of the discovery issue I described under the typicality analysis.

Finally, the defendants argue that the named plaintiffs are not adequate class representatives because they do not sufficiently understand the core allegations of the complaint and have little understanding of their duties as class representatives. I rejected that argument in my earlier Order. In re New Motor Vehicles, 2006 WL 623591, at *6.

Thus, I conclude that but for Kansas the named plaintiffs satisfy the requirements of Rule 23(a).

**B.** **_Rule 23(b)(3) Requirements for the Exemplar State Damage Classes_**

Once Rule 23(a) requirements are met, Rule 23(b)(3) provides for class certification if "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and if "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). I address first predominance, then superiority.

### (1) *Predominance*

"Predominance is a test readily met in certain cases alleging consumer . . . fraud or violations of the antitrust laws."  Amchem Prods., Inc., 521 U.S. 591, 625 (1997).  This is one of those cases: common questions predominate here.

The questions affecting only individual members, according to the defendants, are:

(a)    (contrary to my ruling above) antitrust or consumer protection impact or causation; and

(b)    how much a given consumer should recover (this in turn involving questions of the date of purchase, the manufacturer and model, the region within the state, the individual consumer's negotiating skills, etc.).

According to the defendants, these questions defeat predominance.  But the common questions of law or fact in this case include the following:

(a)    Was there a horizontal agreement to restrict supply?

(b)    Was it illegal under that particular state's laws?[50]

(c)    (Based upon my ruling rejecting the defendants' argument) Did the illegal agreement have antitrust or consumer protection impact in that state as the plaintiffs propose to prove it?

---

[50] For their state consumer protection claims, the plaintiffs are relying upon state statutes that require "unfair methods of competition," or "unfair or deceptive" trade practices.  The factual proof will be basically the same as for their antitrust claims, see Pls.' Mem. at 36, but the jury instruction on the law may be different.

29

(d)     If so, is that impact sufficient to confer standing under the particular state's laws?

(e)     How long did the conspiracy and its impact last?

With respect to the dispute over proof of impact, in addition to my ruling that the plaintiffs' proof satisfies commonality and typicality, I note that sometimes it is sufficient to observe that there is a disputed issue, common to the class.  If so, that common dispute may be a factor that weighs in favor of class certification.  Tardiff v. Knox County, 365 F.3d 1, 5 (1st Cir. 2004).  In Tardiff, the dispute between the parties concerned whether a rule, policy or custom existed; because this issue was common to all class members, this common dispute weighed in favor of class certification.  Id. at 4-5.  Here the disputes are whether the conspiracy affected the supply of lower priced Canadian vehicles and the nationwide pricing mechanism that manufacturers and dealers use for motor vehicles (the MSRP and dealer invoice price), and if so, whether that constitutes antitrust impact.  Those disputes are merits determinations that are common in each class, and indeed across the exemplar classes.  The defendants may be able to show that the plaintiffs' proof is insufficient to establish antitrust or consumer protection impact under a particular state's law, but if so, then they win.  It is not enough to say that

additional proof of impact would have to be individualized, because the plaintiffs do not choose to rely upon individualized proof of impact.[51]

As to damages,[52] the defendants argue that the jury will have to determine them on an individualized basis, consumer by consumer, to arrive at any total award. They contend that the volume and complexity of those determinations in any given state will defeat predominance and defy manageability. But First Circuit precedent counsels strongly against denying certification merely because damages may vary:

> The individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3). Where, as here, common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain.

Smilow v. Sw. Bell Mobile Sys., 323 F.3d 32, 40 (1st Cir. 2003) (reversing decertification of a class).[53]

---

[51] If individualized proof of impact is necessary, there is strong caselaw against certifying a class. See, e.g., Blades v. Monsanto Co., 400 F.3d 562, 571 (8th Cir. 2005) (denying certification where "not every member of the proposed classes can prove with common evidence that they suffered impact," for "[t]he ability to use common evidence to show impact on all class members cannot always be assumed"); Robinson, 387 F.3d at 424 (denying certification where class members' individual negotiation styles prevented common proof of antitrust injury); Blue Bird Body Co., 573 F.2d at 327-8 (cautioning that while cases exist where impact can "be established by some sort of classwide proof," in some cases where "particularized proof" is necessary, "generalized proof of impact would be improper"; however, the court did affirm a statewide damage class).

[52] The parties have not argued that restitutionary damages would be any harder or easier to prove than conventional damages. As a result of previous rulings, restitution is no longer open as a substantive claim, but only as a remedy if a statutory violation is proven. See In re New Motor Vehicles, 350 F. Supp.2d at 207-14.

[53] See also Tardiff, 365 F.3d at 6 ("[T]he need for individual damage decisions does not ordinarily defeat predominance where there are still disputed common issues as to liability."); 6 Conte & Newberg, supra, § 18:27, at 18-89 (for antitrust class actions, "[a] particularly significant aspect of the Rule 23(b)(3) approach is the recognition that individual damages questions do not preclude a Rule 23(b)(3) class action when the issue of liability is common to the class"); II Phillip E. Areeda et al., Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 331d (2d ed. 2000) ("Although the evidence establishing damages usually varies from class member to class member, this fact alone does not defeat certification."). The
(continued next page)

The defendants also charge that the plaintiffs' damage model will end up compensating purchasers who paid no extra on account of the alleged conspiracy. The plaintiffs deny the charge. In part, this is a dispute over the appropriateness of the plaintiffs' proposal for an "aggregate award,"[54] sometimes called "fluid recovery." Under such an approach, the jury determines the entire damage to the class without deciding how much each individual class member is to receive. Allocation of the award is made later, administratively, upon the submission of claims, and often according to a formula.[55] See generally 3 Conte & Newberg, supra, § 10:17. Judge Weinstein recently canvassed the authorities on this approach and found it permissible. Schwab v. Philip Morris USA, Inc., No. CV 04-1945, 2005 WL 3032556, at *5-9 (E.D.N.Y. Nov. 14, 2005). I shall not repeat his efforts.[56]

---

District of New Jersey followed this principle in finding predominance despite individual price negotiation in a direct purchaser class action against an automobile manufacturer's distributor and its car dealerships. In re Mercedes-Benz Antitrust Litig., 213 F.R.D. 180, 190 (D.N.J. 2003). Moreover, some states permit consumers to recover the full purchase price once liability is proven. See, e.g., Tenn. Code Ann. § 47-25-106. That measure of recovery would certainly ease proof of damages.

[54] Pls.' Mem. at 35 (discussing distribution of requested "aggregate award").

[55] The plaintiffs' expert says that his damages model will differentiate according to "differences over time, over vehicle type, over location, and in price . . . ." Hall Rebuttal ¶ 52. The defendants apparently prefer many more variations that include trim on the vehicle, negotiating style, value of trade-ins or service contracts, etc. See Defs.' Mem. at 39-40. There is a certain irony in this dispute. If the plaintiffs have an adequate model to award aggregate damages, the defendants' concern that some class members may be over-compensated at the expense of other class members seems a little suspect. Under the guise of fairness, the defendants' real objective is to avoid recovery by anyone.

[56] It is an interesting question where the availability of fluid recovery fits under the Rules Enabling Act, 28 U.S.C. § 2072, and Erie R.R. Co., 304 U.S. at 78. Damages are generally considered substantive law, but fluid recovery is an artifact of the class action procedure, state or federal. In any event, none of the exemplar states forbids it. For California, see Cal. Civ. Proc. Code § 384 (permitting the use of fluid recovery in class actions) and State v. Levi Strauss & Co., 715 P.2d 564, 570-71 & n.7 (Cal. 1986) ("The propriety of fluid recovery in a particular case depends upon its usefulness in fulfilling the purposes of the underlying cause of action. . . . The parties do not dispute . . . . [and t]he concurring and dissenting opinion concedes that fluid recovery may be employed in an appropriate Cartwright Act case.") (internal *(continued next page)*

In essence, the defendants say that what the plaintiffs and their expert offer me amounts to no model at all; and, since the plaintiffs carry the burden of meeting all of the requirements for certification under Rule 23, their "speculative promise" that "they will figure it all out later" simply does not suffice.[57]  To counter this, the plaintiffs say that their expert has shown that there are "standard, economic models that have been developed to predict market outcomes in the auto industry," and that "[t]hese statistical models take into account relevant economic factors, have been tested in the automobile industry and researchers have published their research in peer-reviewed journals."[58]  Alternatively, the plaintiffs offer to use "benchmarking," i.e., the experience of other comparable markets without the illegal

_____

citations omitted).  (However, as I noted above, entitlement to fluid recovery in California may be qualified: under Bus. & Prof. Code § 17203 (unfair competition law) nonrestitutionary damages or disgorgement of profits are not available remedies, and this remains true even for fluid recovery awards in class actions.  See supra note 20.)  For Maine, see Pease v. Wyman & Son, 845 A.2d 552 (Me. 2004) (tacitly approving the use of an aggregate damage award in a class action lawsuit by wild blueberry growers against blueberry processors).  For New Mexico, see Romero, 109 P.3d at 794 ("Defendants' cases and arguments [do not] persuade us that, as a matter of law, an aggregate damages methodology with a certain amount of individualized proof cannot produce a fair result if, in fact, a price-fixing conspiracy has been proven.").  For Tennessee, see Meighan v. U.S. Sprint Communications Co., 924 S.W.2d 632, 638 (Tenn. 1996) ("In a class action, courts are not required to conduct separate damage inquiries for each class member.  Instead, the court may determine an aggregate damage amount for the class as a whole.  The trial court may simply choose to divide the award among members or may allow each plaintiff to recover by proving his or her claim against the entire judgment.").  I have found no caselaw on point in Vermont; however, I see nothing in Vermont's antitrust or consumer protection laws, or the language of its class action caselaw indicating any prohibition of such awards.

[57] Defs.' Mem. at 39.

[58] Pls.' Mem. at 34-35 (quoting Hall Report ¶ 60).  Using statistical techniques to determine damages has widespread use in antitrust cases: "Antitrust damage calculations require the determination of the economic circumstances that would have existed 'but for' the antitrust violation. . . . Given sufficient data, very sophisticated statistical analyses are possible."  II Areeda, supra, ¶ 393. Regression analysis is "a staple" in damage calculations, for it allows economists to build economic models that can, with enough data, predict the "but for" price.  Id.

restrictions.[59]    Finally,   they   say   that   the   defendants   have   abundant

computerized data about automobile transactions and actual prices to provide

input for these models.[60]

I   do   not   determine   at   this   class   certification   stage   whether   Professor

Hall's methods of proving damage are adequate.  The caselaw makes clear that

the hurdle at this stage is low, because decertification remains open if it turns

out   that   damages   require   individualized   hearings.     See   Fed.   R.   Civ.   P.

23(c)(1)(C)   ("[a]n   order   [certifying   a   class]   may   be   altered   or   amended   before

final judgment).[61]  In Smilow, for example, the plaintiffs' expert testified merely

that he "could fashion" a damages model using mathematical or computerized

processes   to   establish   aggregate   damages.     Smilow,   323   F.3d   at   40-41.    In

reversing   the   district   court's   decertification,   the   First   Circuit   held   that

"[c]ommon issues predominate where individual factual determinations can be

accomplished using computer records, clerical assistance, and objective criteria

—thus rendering unnecessary an evidentiary hearing on each claim."  Id. at 40.

The court did not enquire into the expert's methodology, nor did it evaluate the

---

[59] Pls.' Mem. at 35.   According to Professor Hall, his two approaches are (a) demand and market equilibrium in the auto industry "but for the enforcement of the export restraints"; and (b) benchmarking another, similar, market without the challenged conduct.  Hall Report ¶¶ 17-18, 60-61. He purports to take into account the defendants' legal vertical restraints and illegal horizontal restraints.  Pls.' Reply, App. B (Dep. Tr. of Robert E. Hall, Ph.D.) ("Hall Dep.") at 287-90 (Docket Item 323).

[60] Pls.' Mem. at 35.  Some of these data sources are detailed in Hall's Report, at ¶ 63 and nn. 64-76.

[61] See also Mowbray, 208 F.3d at 297 n.6 ("[S]hould [the defendant] demonstrate in the future that individualized [issues] actually shift the balance and undercut the predominance of common issues, the district court may modify its class certification order (or even decertify the class).");  In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 141 (2d Cir. 2001) ("There are a  number of management tools available to a district court to address any individualized damages issues that might arise . . . [including] decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages[.]").

probability that the model would survive at trial; instead, the court found it sufficient while simultaneously contemplating the possibility of "later evidence disprov[ing the expert's] proposition."  Id. at 41.[62]

I certainly am not overwhelmed by the plaintiffs' offer of damage calculation models here.[63]  But we are still early in the litigation so far as damages are concerned.   Following Smilow, I conclude that damages are not yet a ground to deny certification.[64]

---

[62] Other cases have held that a model will generally suffice at the class certification stage.  See, e.g., In re Linerboard, 305 F.3d at 155 (affirming certification where district court, "recognizing that the certification stage is early in the overall litigation process," was presented with multiple damage models and "did not require the experts to pick one particular [economic] method over another . . .").

[63] There are a number of problems still to be confronted.  For example, "[t]he relative elasticities of demand and supply on which incidence theory depends are extremely difficult to estimate." Page, Limits, supra, at 17-18.  Moreover, the rate of passing on is said to be unpredictable if the dealers are oligopolistic.  Id. at 16.  Because of these difficulties, plaintiffs seeking to use a theory of passed-on damages must

> formulate and support a but-for scenario--a sequence of events that would plausibly result in the sort of harm that the plaintiff alleges.    Courts evaluate these scenarios based upon the plausibility of their theoretical and evidentiary bases.    The strength of the models' theoretical implications is crucial on this point: the more determinate and robust the model, the more persuasive the suggested scenario.  If the perceived tendency of the practice is to harm the plaintiff in the way the plaintiff alleges, the proof that the practice has occurred tends to support the damage model.  The model must also account in plausible ways for the actions of the defendant and others.  At a minimum, it must assume that those in the causal chain would act rationally.

Id. at 8-9.  Other commentators agree that "[t]he amount of damages incurred by the indirect-final consumers, as well as the fact of damage, is often very difficult to prove, even considering the lesser standards of proof required for antitrust damage assessment."  George J. Benston, Indirect Purchasers' Standing to Claim Damages in Price Fixing Antitrust Actions: A Benefit/Cost Analysis of Proposals to Change the Illinois Brick Rule, 55 Antitrust L.J. 213, 220 (1986).  It is said to be affected by the speed in price adjustments; the consumers' elasticity of demand; and the elasticity of the demand by the intermediate producers, here the dealers.  Id. at 220-21.

[64] The First Circuit has also said that "even if individualized determinations [are] necessary to calculate damages, Rule 23(c)(4)(A) would still allow the court to maintain the class action with respect to other issues."  Smilow, 323 F.3d at 41; accord Mejdrech v. Met-Coil Sys. Corp., 319 F.3d 910, 911-12 (7th Cir. 2003) (affirming district court's certification of class for "core questions" of liability, but leaving for individual hearings the issues of "[w]hether a particular class member suffered any legally compensable harm and if so in what dollar amount"); Chiang (continued next page)

Thus, assessing all the issues of fact and law, I find that the common issues predominate.

### (2) *Superiority*

The plaintiffs must demonstrate that "a class action is superior to other methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). According to the Rule, I should consider at least four factors in determining whether a class action is superior.[65] I address each in turn.

#### (A) *the interest of members of the class in individually controlling the prosecution or defense of separate actions*

The plaintiffs assert that "each [c]lass member's individual claim while substantial, is simply too small to economically justify complex antitrust litigation on an individual basis . . . ."[66] The defendants make no effective

_____

v. Veneman, 385 F.3d 256 (3d Cir. 2004) (recognizing that if "there would be problems involved in proving damages which would outweigh the advantages of class certification, [the district court] should give appropriate consideration to certification of a class limited to the determination of liability") (quoting Bogosian, 561 F.2d at 456).

[65] The plain language of Rule 23(b)(3) instructs that these factors are "pertinent" to my "findings," seeming to imply that I ought to consider them in my analysis of both superiority *and* predominance. See also Rule 23(b)(3) Advisory Committee Notes (1966 Rule Amendment) (describing separately a court's predominance and superiority analysis, and then noting that "[f]actors (A)-(D) are listed, non-exhaustively, as pertinent to the *findings*") (emphasis supplied). Yet, while these factors seem directly relevant to any analysis of superiority, I have trouble discerning how to apply them in the context of predominance. Authorities discussing Rule 23 offer little additional insight on how to apply these factors to the predominance analysis. Compare 2 Conte & Newberg, supra, § 4:28 (the "four factors [are] to be considered by the court in determining whether a class action is *superior*") (emphasis supplied), and 7AA Wright et al., supra, § 1777 (noting that "subdivision (b)(3) lists four factors" "[t]o aid the court in determining whether class-action treatment of common questions would be *superior*") (emphasis supplied), with Amchem Prods., Inc., 521 U.S. at 615 (stating that "Rule 23(b)(3) includes a nonexhaustive list of factors pertinent to a court's 'close look' at the *predominance* and *superiority* criteria," but then failing to apply factors in predominance analysis) (emphasis supplied), and 7AA Wright et al., supra, § 1777 n.17 (Rule 23(b)(3) "enumerat[es] some of the matters that are pertinent to the court's findings of *predominance* of common questions and *superiority* of the class action device" (emphasis supplied) (quoting Adolf Homburger, State Class Actions and the Federal Rule, 71 Colum. L. Rev. 609, 636 (1971))). The parties limit their discussion of these factors to the superiority analysis, and I shall do the same.

[66] Pls.' Mem. at 38.

response.  The First Circuit recognizes that "[t]he core purpose of Rule 23(b)(3) is to vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation."  Smilow, 323 F.3d at 41.[67]  I agree with the plaintiffs that such is the case here.  As the plaintiffs suggest, "a class action stands as the only practicable means by which [the p]laintiffs and the [c]lass can litigate their antitrust claims against [the d]efendants."[68]  I have little difficulty determining that for each exemplar state damage class there is virtually no interest in individual control of the litigation by a car purchaser or lessee because the stakes are small and the expense is great.

### (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class

So far as I have been informed, any parallel proceedings in state courts are looking to this multidistrict proceeding to lead the way.  A number of state courts have adopted Joint Coordination Orders prepared by California Justice Richard Kramer and me.  The state lawsuits also seek status as class actions.[69]  Thus, this factor (B) does not reduce the superiority of class action

---

[67] See also Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809 (1985) ("Class actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually"; small individual damages claims would ensure that "most of the plaintiffs would have no realistic day in court if a class action were not available").

[68] Pls.' Mem. at 39; see also Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004) (Posner, J.) ("The more claimants there are, the more likely a class action is to yield substantial economies in litigation. . . .   The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.") (emphasis original).

[69] See, e.g., Defs.' & Pls.' Joint Submission on Class-Certification Scheduling at 5 (Docket Item 191)  ("[H]ere, many parallel state cases are stayed and/or the state courts are watching or awaiting the proceedings in this Court.").  The plaintiffs have promised that "[i]t will be brought to the Court's attention if state-wide classes are certified in any of these proceedings."  Pls.' Mem. at 38 n.54.

adjudication in this court as the fairest and most efficient way to resolve the controversy in any of the proposed states.[70]

### (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum

In discussing this factor, the plaintiffs appear to focus on the benefits of multidistrict litigation (MDL) concentration here in Maine, arguing that "because a nationwide scheme has been alleged, it is highly desirable and efficient to proceed with a class action in the [MDL] forum."[71]  I am not sure that is the proper way to frame the issue before me, however; Rule 23 does not appear to be concerned with the law of multidistrict litigation and the consolidation that may occur through use of that device.[72]  Instead, the question under Rule 23 is whether concentrating these claims for any given state in one court is desirable or undesirable as compared with leaving them unconcentrated, i.e., spread out, consumer by consumer, within the courts of that state or elsewhere.  From that perspective, concentration is desirable.  If it were relevant, I would observe that the multidistrict component only adds to the superiority.[73]

---

[70] Perhaps the federal injunctive claim that is proceeding as a class action in this court, see In re New Motor Vehicles, 2006 WL 623591, should also count as "litigation concerning the controversy already commenced by . . . members of the class."  If so, it certainly does not militate against certifying state damage classes here.

[71] Pls.' Mem. at 38.

[72] The parties here have all consented to this court's jurisdiction up through final judgment.  See Joint Stipulation Regarding Application of Lexecon to Pls.' Consolidated Am. Compls. at 2 (Docket Item 207).  Without that consent these various classes would be sent back to their respective districts for trial, pursuant to Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 40 (1998).

[73] Moreover, since the injunctive claim is proceeding as a class action regardless, failure to certify the damage classes could deprive the individual consumers of a jury trial on the existence of an illegal conspiracy.  In other words, a bench trial here might reach a conclusion (continued next page)

***(D) the difficulties likely to be encountered in the management of a class action***

The defendants center their argument against superiority on the difficulties that they claim this case will face at trial.  First, I emphasize that we are talking about the trial of one state class action at a time.  Given the need to analyze local markets within each exemplar state (each with its own unique supply and demand factors), however, the defendants say, "plaintiff-by-plaintiff mini-trials would be required to establish both liability and damages."[74]  Such a "class action would be hopelessly unmanageable," especially since the "plaintiffs have offered . . . no trial plan to explain how they would present to any jury the myriad individual facts necessary to determine if each plaintiff paid an overcharge, and if so, in what amount."[75]

The plaintiffs themselves recognize that "[n]o doubt such a trial will be complex," but counter that it would still remain "manageable."[76]  They do fail to advance much of a trial plan.

Nevertheless, I agree with the plaintiffs, at least until events prove me wrong.[77]  In any given state, there will be no unusual complexity in proving or failing to prove a horizontal agreement; proving or failing to prove that the agreement was illegal; proving or failing to prove that it had antitrust or consumer protection impact or causation according to the plaintiffs' theory; the

---

before any individual trial in state court, and might well have collateral estoppel effect, at least as to some issues.

[74] See Defs.' Mem. at 43.

[75] Id. at 43-44.

[76] Pls.' Reply at 22.

[77] The trial of the first state class should be a good test.  If it is unmanageable, other state damage classes can be decertified.

length of any agreement and of its impact.  If the plaintiffs' aggregate damage model works, damages too will not be unusually complex.[78]

The plaintiffs propose to prove damages using "customer-specific and transaction-specific electronic data in the possession of the defendant automakers and the reporting services they patronize—and then applying recognized econometric analyses and a common formula to determine the prices that such customers would have paid absent the unlawful conspiracy."[79] Frankly I cannot tell yet whether they have a model that will prove adequate.[80]

---

[78] The same holds true for a mechanism for allocating and distributing damages if any are awarded.  The plaintiffs have proposed that the "[d]efendants' computerized records, supplemented by [c]lass members' claims forms, will provide an adequate basis to distribute an aggregate award . . . ."  Pls.' Mem. at 35.

[79] Pls.' Reply at 16 (citing Hall Report ¶¶ 60, 63-64; Hall Rebuttal ¶¶ 50-55).

[80] Although it is federal law and therefore not determinative as to state damage recoveries, I observe that the Supreme Court in Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100 (1969), and Bigelow v. RKO Pictures, Inc., 327 U.S. 251 (1946), has been liberal on proof of damages in some antitrust contexts:

> Trial and appellate courts alike must also observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.  The Court has repeatedly held that in the absence of more precise proof, the factfinder may "conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs."

Zenith Radio Corp., 395 U.S. at 123-24 (quoting Bigelow, 327 U.S. at 264).  Bigelow also said:

> [T]he jury may not render a verdict based on speculation or guess work.  But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly.  In such circumstances "juries are allowed to act on probable and inferential as well as [upon] direct and positive proof."  Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim.  It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain.

*(continued next page)*

If their model fails, the plaintiffs will lose at the first trial or I will decertify.  Cf. Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004) ("[A] class action has to be unwieldy indeed before it can be pronounced an inferior alternative . . . to no litigation at all.").

Considering all the factors, therefore, I conclude that a class action is the superior method for fairly and efficiently adjudicating the controversy.

## CONCLUSION

Review of the Rule 23 factors shows that at least for now all of the (a) and (b)(3) criteria are satisfied.  A class action is the superior method of adjudicating each state's claims.  Thus the exemplar classes qualify for certification under the standards of Rule 23.

I am asking Magistrate Judge Kravchuk to set appropriate discovery deadlines so that the parties can determine the closing date(s) for the exemplar state damage classes.  I am not making a final certification ruling, because until I know the closing date for each (b)(3) class, I cannot determine if the class representatives are adequate.  I also delay ruling on the Kansas certification issue until I am informed whether there is a representative plaintiff with standing.

---

Bigelow, 327 U.S. at 264 (quoting Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 564 (1931)) (citations omitted; brackets original).

**SO ORDERED**.

**DATED THIS 12TH DAY OF MAY, 2006**

/s/D. Brock Hornby
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

**U.S. DISTRICT COURT**
**DISTRICT OF MAINE (PORTLAND)**
**CIVIL DOCKET FOR CASE #: 2:03-MD-1532-DBH**

### Liaison Counsel

**For Plaintiffs**
Robert S. Frank
Harvey & Frank
P.O. Box 126
Portland, ME  04112
(207) 775-1300

**For Defendants**
William J. Kayatta, Jr.
Pierce Atwood
One Monument Square
Portland, ME  04101-4033
(207) 791-1100

### Plaintiffs' Executive Committee

**Chair**
Joseph J. Tabacco
Sharon T. Maier
R. Scott Palmer
Law Firm of Berman, DeValerio, Pease, Tabacco, Burt & Pucillo
425 California Street, Suite 2100
San Francisco, CA  94104
(415) 433-3200

**Vice-Chair**
Michael M. Buchman
Law Firm of Milberg, Weiss, Bershad, Hynes & Lerach, LLP
One Pennsylvania Plaza, 49th floor
New York, NY  10119-0165
(212) 594-5300

**Additional Executive Committee Members**

Bernard Persky
Hollis L. Salzman
Chris McDonald
Goodkind Labaton, Rudoff & Sucharow, LLP
100 Park Avenue, 12th floor
New York, NY  10017
(212) 907-0700

Robert J. LaRocca
William E. Hoese
Kohn, Swift & Graf, PC
One South Broad Street, Suite 2100
Philadelphia, PA  19107
(215) 238-1700

43

Patrick E. Cafferty
Jennifer Winter Sprengel
Miller, Faucher & Cafferty, LLP
30 North LaSalle Street, Suite 3200
Chicago, IL  60602
(312) 782-4880

H. Adam Prussin
Don Davis
Pomerantz, Haudek, Block, Grossman & Gross, LLP
100 Park Avenue, 26th floor
New York, NY 10017
(212) 661-1100

Samuel D.  Heins
Alan I. Gilbert
Heins, Mills & Olsen, PLC
3550 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
(612) 338-4605

Stephen Lowey
Peter St. Phillip
Lowey, Dannenberg, Bemporad & Selinger, PC
The Gateway
One North Lexington Avenue
White Plains, NY  10601
(914) 997-0500

Robert S. Frank
Harvey & Frank
P.O. Box 126
Portland, ME  04112
(207) 775-1300

**Defendants' Counsel**

Margaret M. Zwisler
William R. Sherman
Howrey Simon Arnold & White, LLP
1299 Pennsylvania Avenue N.W.
Washington, D.C.  20004
(202) 783-0800

Richard C. Godfrey
David J. Zott
Brett A. Bakke
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601
(312) 861-2000

Michael R. Lazerwitz
Cleary Gottlieb Steen & Hamilton
2000 Pennsylvania Avenue N.W.
Suite 9000
Washington, D.C.  20004
(202) 974-1500

Robert A. Van Nest
Keker & Van Nest, L.L.P.
710 Sansome Street
San Francisco, CA  94111
(415) 391-5400

Peter Sullivan
Gibson Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7000

Daniel L. Goldberg
Daniel S. Savrin
Bingham McCutchen LLP
150 Federal Street
Boston, MA  02110
(617) 951-8000

Glenn A. Mitchell
Stein Mitchell & Mezines
1100 Connecticut Avenue
Suite 1100
Washington, D.C.  20036
(202) 737-7777

Deborah A. Garza
Fried, Frank, Harris, Shriver & Jacobson LLP
1001 Pennsylvania Avenue, NW
Suite 800
Washington, D.C. 20004
(202) 639-7000