# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

| | | |
|---|---|---|
| IN RE NEW MOTOR VEHICLES | ] | |
| CANADIAN EXPORT ANTITRUST | ] | MDL DOCKET NO. 1532 |
| LITIGATION | ] | |

_____

| | | |
|---|---|---|
| BARRY COHEN, ET AL., | ) | |
| PLAINTIFFS | ) | |
| | ) | |
| v. | ) | CIVIL NO. 06-216-P-H |
| | ) | |
| GENERAL MOTORS CORP., ET AL., | ) | |
| DEFENDANTS | ) | |

_____

| | | |
|---|---|---|
| SURI SKORSKI, ET AL., | ) | |
| PLAINTIFFS | ) | |
| | ) | |
| v. | ) | CIVIL NO. 07-07-P-H |
| | ) | |
| GENERAL MOTORS ACCEPTANCE | ) | |
| CORP., ET AL., | ) | |
| DEFENDANTS | ) | |

_____

| | | |
|---|---|---|
| SEAN GREGOR & ASSOCIATES CO., LPA, | ) | |
| PLAINTIFF | ) | |
| | ) | |
| v. | ) | CIVIL NO. 07-16-P-H |
| | ) | |
| DAIMLERCHRYSLER FINANCIAL SERVICES AMERICAS LLP, ET AL., | ) | |
| DEFENDANTS | ) | |

_____

# DECISION AND ORDER ON DEFENDANTS' MOTION TO DISMISS AND DEFENDANT BASS-FINEBERG LEASING, INC.'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

In this MDL proceeding, purchasers and lessees of new automobiles in the

United States have claimed that automobile manufacturers conspired to prevent

lower priced Canadian cars from entering the American market during certain periods, thereby illegally driving up or artificially maintaining American prices. I ruled in 2004 that these purchasers and lessees were indirect purchasers (dealers were the direct purchasers), and dismissed federal damage claims under the Sherman and Clayton Acts accordingly, because of <u>Kansas v. Utilicorp United, Inc.</u>, 497 U.S. 199 (1990), and <u>Illinois Brick v. Illinois</u>, 431 U.S. 720 (1977). <u>In Re New Motor Vehicle Canadian Export Antitrust Litig.</u>, 307 F. Supp.2d 136 (D. Me. 2004).

In a more recently transferred group of cases from the Northern District of Ohio, the plaintiffs are lessees only. They seek to pursue a federal damage claim despite <u>Utilicorp</u>, <u>Illinois Brick</u> and my earlier ruling. They have also named three new defendants, namely, leasing companies Bass-Fineberg Leasing, Inc.; DaimlerChrysler Financial Services Americas, LLC; and GMAC LLC.

In my earlier Order, I stated:

> There is only one way for the plaintiffs to avoid <u>Illinois Brick</u>'s and <u>Utilicorp</u>'s prohibition of multiple recoveries, and that is to proceed in a way that ensures that there can be no multiple recoveries. The possibility of multiple recoveries exists so long as American dealers themselves can sue the manufacturers/distributors for the conspiracy. They can do so even if the dealers themselves were members of the conspiracy, <u>see</u> <u>Perma Life Mufflers, Inc. v. Int'l Parts Corp.</u>, 392 U.S. 134, 139 (1968), unless the dealers engaged in complete, voluntary and substantially equal participation in the conspiracy. <u>See</u> <u>Sullivan v. Nat'l Football League</u>, 34 F.3d 1091, 1107 (1st Cir. 1994) (citations omitted). Because the dealers are not parties to this lawsuit, the possibility of inconsistent adjudications leaves

> the defendant manufacturers subject to the risk of liability that <u>Illinois Brick</u> found unacceptable.  <u>In re Beef Antitrust Litig.</u>, 600 F.2d 1148, 1163 (5th Cir. 1979).

307 F. Supp.2d at 141 (footnotes omitted).

The Ohio lessee plaintiffs seek to escape this limitation primarily by relying upon a 2005 summary judgment denial from the District of New Jersey, <u>In re Mercedes-Benz Antitrust Litigation</u>, 364 F. Supp.2d 468 (D.N.J. 2005).  There, the court allowed lessees to pursue federal antitrust claims against car manufacturers and dealers.

Whether the reasoning of <u>Mercedes-Benz</u> is correct or incorrect, there is a critical distinction in that case that makes its reasoning inapplicable here.  In <u>Mercedes-Benz</u>, the lessee plaintiffs named the *dealers* as defendants and alleged that the *dealers* had conspired with a manufacturer to fix prices.  <u>Id</u>. at 469. Upon the premise that the dealers and manufacturer were equal co-conspirators, there was no higher price to the dealer that was then "passed on" to the lessee and no <u>Utilicorp</u>/<u>Illinois Brick</u> concern at that level.[1]  Instead, the <u>Mercedes-Benz</u> court was concerned only about possible overlap that might occur between damages suffered by leasing companies and damages suffered by lessees.   It concluded that the conspiring defendants (manufacturer and dealers) "sold the vehicle to the leasing companies and . . . sold the use of the vehicle to the

---

[1] <u>See</u> <u>Lowell v. American Cyanamid Co.</u>, 177 F.3d 1228, 1228 (11th Cir. 1999) ("<u>Illinois Brick</u> has *(continued next page)*

lessees," id. at 480, two distinct markets and two distinct injuries, not subject to the restrictions of Utilicorp and Illinois Brick.[2]

Mercedes-Benz does not match the factual allegations of this case. The lessees here recognize that the dealers purchase from the manufacturers the vehicles that they ultimately lease,[3] but unlike Mercedes-Benz they have not named those dealers as defendants, and they have not attempted to meet the standards I enunciated in 2004 for ensuring that those dealers would have no claims against manufacturers for the alleged conspiracy. The conspiracy they allege among manufacturers would affect the price the independent dealers pay. In turn, that price would affect the lease terms the dealers negotiate with the

_____

no application in a vertical conspiracy with no allegations of 'pass-on'").

[2] Compare Blue Shield of Virginia v. McCready, 457 U.S. 465 (1982), permitting employee subscribers to sue a group health plan for antitrust injury for medical services that were not covered, regardless of any antitrust effect on the employer who purchased the plan. In Mercedes-Benz, the court treated both the leasing companies and the lessees as innocent victims of a manufacturer-dealer conspiracy:

> [I]t could be said here that both the leasing company and the lessees are the first non-conspirators in the chain. . . . [T]o the extent that plaintiffs argue that lessees are the only first non-conspirators, this is problematic because there is no indication or allegation that the leasing companies were part of the price-fixing conspiracy.

Mercedes-Benz, 364 F. Supp.2d at 479.

[3] Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss at 7 ¶ 18 ("Pls.' Opp'n") (Docket Item 589). "DCFS and GMAC purchase the to-be-leased vehicle from the dealer which serves as the intermediary between lessee and leasing company. The dealer must first buy the vehicle from its parent-manufacturer in order to sell it to DCFS or GMAC." I construe the reference to "parent-manufacturer" to be referring to the parent of the DaimlerChrysler and GM financing companies. There is no allegation in the Second Amended Complaint (or for that matter in the consolidated Fifth Amended Complaint) to support the assertion that the manufacturers are "parent" corporations to dealers.

plaintiff lessees.[4]   This is a case of "passing on" the inflated price paid by the dealers.

It is true that the lessees here name three leasing companies as defendant co-conspirators.  One of those companies, Bass-Fineberg, is independent of the manufacturers.  The plaintiffs have now conceded "that Bass-Fineberg was not a member of the conspiracy," Pl.'s Mem. in Opp'n to Bass-Fineberg Inc.'s Mot. to Dismiss Complaint at 2 ("Pls.' Opp'n to Bass-Fineberg") (Docket Item 588).  They assert only that its president had "actual knowledge of the other defendants' unlawful conduct."  Id.  They agree that "Bass-Fineberg's culpability in this matter is not on a par with that of the manufacturing defendants."  Id.  Bass Fineberg, therefore, could make a claim against the manufacturers (if it were not already barred from doing so by the fact that it too was an indirect purchaser), risking yet another layer of overlapping recovery.  The only way that lessees could recover from Bass-Fineberg would be if *both* the dealers *and* Bass-Fineberg "engaged in complete, voluntary and substantially equal participation in the conspiracy," 307

---

[4] According to Mercedes-Benz, lessees "usually negotiate the monthly lease payment as well as other lease terms such as duration and mileage allowance with the dealer," 364 F. Supp.2d at 472, and

> [t]here is no substantive difference regarding the negotiation of a price between a customer who wants to finance the purchase of a vehicle and a customer who wants to lease a vehicle. . . . The final selling price of a vehicle is not affected by whether someone is leasing the vehicle or financing the purchase of it.

Id. at 474.  If there is some allegation in these complaints that the leasing companies insert still an additional price inflation as a result of the conspiracy, I have missed it.

F. Supp.2d at 141, so that the lessees would be the first non-conspirators in the distribution chain.  The plaintiffs have not alleged so much as to either the dealers or Bass-Fineberg; therefore, Bass-Fineberg's motion to dismiss is granted.

The DaimlerChrysler and GM leasing companies, on the other hand, are wholly owned subsidiaries of their respective manufacturers.[5]  They could not conspire with their parents,[6] but I suppose they might be treated as integrated with their parent corporations and thereby guilty of conspiring with other manufacturers.[7]  Presumably, therefore, these lessee plaintiffs argue that they

---

[5] GMAC LLC (previously General Motors Acceptance Corporation) and DaimlerChrysler Financial Services Americas LLC, are alleged to be wholly owned subsidiaries of the Automobile Companies. Some detail about the relationship between GMAC and GM is provided in the complaints. Skorski Compl. at ¶¶ 12-13 (GMAC is a "wholly owned subsidiary of General Motors"; its "primary line of business is automotive financing" of GMC-manufactured motor vehicles; it helps GMC market motor vehicles; caselaw has treated it as GMC's agent). Somewhat less detail is provided about the Daimler/Chrysler leasing company. Gregor Compl. at ¶¶ 12-13 (It too is a "consolidated, wholly owned subsidiary" whose "primary business is automotive financing" of DaimlerChrysler vehicles; and it has focused on DaimlerChrysler's "core automotive business with tailored financial services.'").

[6] Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984). Compare Pls.' Opp'n at 8 ("Plaintiffs leased automobiles directly from . . . leasing companies who conspired with their supplier to restrain trade.").

[7] The factual allegations in the complaint do not establish that the leasing companies independently conspired with other manufacturers. In a recent Supreme Court decision, Bell Atlantic Corporation v. Twombly, 127 S.Ct. 1955, 1965-66 (2007), the Court held that pleading a conspiracy under section 1 requires "enough factual matter (taken as true) to suggest that an agreement was made . . .  [A] naked assertion of conspiracy in a §1 complaint . . . gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line . . . ."). The plaintiffs' complaint as to the leasing companies (if they are not viewed as an integrated whole with their parent corporations) falls short of alleging a conspiracy under section 1 of the Sherman Act. See, e.g., Gregor Compl. ¶ 13 ("On reasonable belief, at relevant times, DCFS, as was the case with the related-case defendants Bass Fineberg Leasing and General Motors Acceptance Corporation, knew of its co-defendants' anti-competitive conduct, assisted therein, and knew that its profits derived in part therefrom.").

are *direct* purchasers (lessees) from these integrated members of the conspiracy, and not subject to <u>Utilicorp</u> and <u>Illinois Brick</u>.[8]  Technically and superficially, they do appear to be "direct" purchasers in that respect.  But that characterization overlooks the actual economics of the transactions.  As established in <u>Mercedes-Benz</u> (the plaintiffs ask me to accept the facts found there for purposes of ruling on the motion here, Pls.' Opp'n at 6 n. 4), and as alleged in these Ohio complaints, the pricing effects of the conspiracy are exhibited first in the price that the dealers pay the manufacturers.[9]  It is that price that imparts any antitrust injury to the lessees, because it affects the monthly lease amount that the dealers thereafter negotiate with lessee customers.  Although a conspiring manufacturer may then 'reappear' as the party to the lease through its leasing company subsidiary, the lessee obtains his/her monthly payment terms from the dealer and is hardly aware of the leasing company.  The only antitrust injury in the case is passed on from the dealer to the lessee.  <u>Utilicorp</u> and <u>Illinois Brick</u>, therefore, apply.

---

[8] The plaintiffs' argument, however, is not that these subsidiaries fit the ownership or control exception to <u>Illinois Brick</u>, 431 U.S. at 736 n.16.  Even if they did, the actual economics of the allegations require that only the dealers can recover for direct antitrust injuries resulting from the conspiracy among the car manufacturers.

[9] For example, "[t]he Automobile Companies have charged their dealers in the United States 10-30% more for their motor vehicles than they charge their Canadian dealers for the same make and model motor vehicle.  Similarly, the Manufacturers Suggested Retail Price ("MSRP") at which dealers have sold and leased new motor vehicles to consumers has been higher in the United States than in Canada."  Gregor Compl. ¶ 26.  See notes 2 & 3 supra for what <u>Mercedes-Benz</u> found about how leasing transactions occur.

Accordingly, the defendants' motions to dismiss are **GRANTED**.[10]

**SO ORDERED.**

**DATED THIS 15TH DAY OF JUNE, 2007**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

[10] I have not relied upon the documents supplied by the defendants in their motions to dismiss. The Plaintiffs' Motion Requesting Procedures Appropriate to the Disposition of Defendants' Motion to Dismiss (Docket Item 545) is **MOOT**.