**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

|  |  |  |
|---|---|---|
|  | ) |  |
| IN RE: NEW MOTOR VEHICLES | ) | MDL Docket No. 03-md-1532 |
| CANADIAN EXPORT ANTITRUST | ) | ALL CASES |
| LITIGATION | ) |  |

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION
SETTLEMENTS WITH DEFENDANTS TOYOTA MOTOR SALES, U.S.A., INC. AND
CANADIAN AUTOMOBILE DEALERS' ASSOCIATION
WITH INCORPORATED MEMORANDUM OF LAW**

# TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION ........................................................................................................2

BACKGROUND ................................................................................................................3

II.    PROCEDURAL HISTORY ...................................................................................3

III.   THE SETTLEMENT AGREEMENTS ..............................................................6

      A.    Monetary Components ..............................................................................7

      B.    Prevention of Future Anticompetitive Conduct .....................................7

      C.    Discovery Cooperation Obligations.........................................................8

      D.    Releases.....................................................................................................9

ARGUMENT .....................................................................................................................9

IV.   LEGAL STANDARD ............................................................................................9

V.    ASSESSMENT OF THE FACTORS GOVERNING APPROVAL SHOWS THE
SETTLEMENTS ARE FAIR AND REASONABLE ......................................10

      A.    Compared with the Actual Outcome of the MDL Action, the Settlements
Represent Exceptional Value..................................................................10

      B.    The Fact Plaintiffs Reached the Settlements After Extensive Litigation and
Discovery Supports Approving Them as Fair .......................................13

      C.    Counsel Are Highly Qualified and Experienced ...................................14

      D.    The Fact Plaintiffs Reached the Settlements After Substantial and
Arm's-Length Negotiations Makes the Settlements Presumptively Fair .............15

      E.    The Complexity and Ultimate Duration of the Litigation Support Approval
of the Settlements as Fair And Reasonable...........................................15

      F.    Class Reaction Supports Approval of the Settlements as Fair..............16

VI.   CONCLUSION.....................................................................................................17

i

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE(s)</u>

**CASES**

*Bussie v. Allmerica Financial Corp.*, 50 F. Supp. 2d 59 (D. Mass. 1999) ................................... 16

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).................................................... 10

*City P'Ship. Co. v. Atl. Acquisition Ltd. P'Ship.*, 100 F.3d 1041 (1st Cir. 1996).................. 10, 15

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197
   (D.Me. 2003) ........................................................................................................... 10, 11

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 241 F.R.D. 77 (D. Me. 2007) ............. 4

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 269 F.R.D. 80 (D. Me. 2010) .......... 12

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6 (1st Cir. 2008) ................. 4

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, MDL Docket No. 1532, 2010 U.S.
   Dist. LEXIS 37955 (D. Me. Apr. 16, 2010) ................................................................. 5

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, MDL No. 1532, 2006 U.S. Dist.
   LEXIS 10240 (D. Me. Mar. 10, 2006) ......................................................................... 4

*In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005) ............................................. 15, 16

*New England Carpenters Health Benefits Fund v. First Databank, Inc.*,
   602 F. Supp. 2d 277 (D.Mass. 2009) (Saris, J.) ...................................................... 9, 13

**STATUTES**

28 U.S.C. § 1332(d)(2) .................................................................................................... 15

Rule 23(b)(2)....................................................................................................................... 4

Rule 23(b)(3)..................................................................................................................... 4, 5

Rule 23(c)(2)(B).................................................................................................................. 5

Rule 23(e) ........................................................................................................................... 1

Rule 23(e)(2) ...................................................................................................................... 9

Rule 23(g) ...................................................................................................................... 5, 14

Plaintiffs move, pursuant to Fed. R. Civ. P. 23(e), for approval of the class action settlements with defendants Toyota Motor Sales, U.S.A., Inc. ("Toyota") and the Canadian Automobile Dealers' Association ("CADA"). The undersigned Chair of the MDL Executive Committee makes this motion on behalf of plaintiffs in the MDL Action and the various parallel State Actions, including the California Action (together, "Litigated Actions").[1]

This motion is accompanied by Plaintiffs' Motion for Approval of the Allocation Plan and Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Expenses.[2] The motions are supported by the Declaration of Joseph J. Tabacco, Jr. ("Tabacco Declaration" or "Tabacco Decl."), Declaration of Todd A. Seaver ("Seaver Declaration" or "Seaver Decl."), Declaration of Dennis Gilardi Reporting on Notice and Claims Administration ("Gilardi Declaration" or "Gilardi Decl."), and [Proposed] Orders for Final Judgment and Order of Dismissal with Prejudice, Granting Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, Awarding Incentive Payments to Certain Named Plaintiffs, Approving Plan of Allocation of Net Combined Settlement Fund and Approving *Cy Pres* Distribution as a Component of Plan of Allocation and Setting Schedule to Organize *Cy Pres* Distribution.

For the reasons set forth below, plaintiffs respectfully request that the Court grant the relief requested herein.

---

[1] "State Actions" refers to the parallel state court proceedings listed in Appendix B to the Toyota Agreement and Appendix B to the CADA Agreement, attached as Exhibits 1 and 3, respectively, to the Tabacco Declaration filed herewith. The "California Action" refers specifically to the State Action captioned *Automobile Antitrust Cases I & II*, JCCP Nos. 4298 & 4303, currently pending in the Superior Court of California, County of San Francisco, before the Honorable Richard A. Kramer.

[2] Declarations from counsel in the MDL Action and State Actions concerning fees and unreimbursed costs are submitted in support of Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Expenses.

## I.      <u>INTRODUCTION</u>

In 2006, plaintiffs entered into two separate settlements—one with Toyota for $35 million and one with CADA for $700,00 (together, the "Settlements")—for a combined $35.7 million.  The Settlements resolve the federal MDL Action and all State Actions as to Toyota and CADA only.  Plaintiffs request final approval of the Settlements in order to distribute the net settlement proceeds to qualified Class Members.

The Settlements represent an excellent recovery for automobile purchasers injured by defendants' alleged conspiracy.  The Toyota Settlement represents 25.7% of Toyota's share of the single damages, as determined by the damages analysis completed by plaintiffs' expert, Professor Robert E. Hall, Ph.D.  The Settlements are an exceptional value given the significant risks plaintiffs faced at the time the Settlements were entered, and undeniably so when viewed in light of subsequent litigation events that saw the non-settling defendants obtain summary judgment.

During the period of over four years since the Settlements were entered, the enormous litigation risks borne by plaintiffs became manifest.  Like the non-settling defendants, Toyota and CADA possessed numerous legal defenses.  To succeed plaintiffs had the burden to prove an unlawful horizontal agreement that caused class-wide injury, justified money damages, and that posed an imminent threat that justified injunctive relief.  Plaintiffs went up against some of the largest corporations in the world, which retained world class legal representation.  As the Court is aware, the Litigated Actions have been prosecuted start to finish without the benefit of any federal or state antitrust enforcement actions.  The undertakings of discovery, motion practice and presentations of evidence in connection with class certification, expert testimony, and summary judgment were time consuming and expensive.

2

Numerous additional factors that are relevant to assessing the fairness of class action settlements further support approving the Settlements. The Settlements were reached after substantial discovery and were the product of intensive, arm's-length negotiations. At the time each was entered, the Settlements reflected the informed evaluations of each party's experienced counsel as to the risks and costs of litigating the claims.

This case is undeniably complex. As the passage of time since 2006 has shown, any adjudicated judgment in plaintiffs' favor could only have been achieved after several additional years of litigation conducted at substantial expense.

Finally, although the events causing injury occurred several years ago, the Class's reaction to the Settlements has been positive.

In short, the relevant factors used to weigh the fairness of class action settlements fully support granting plaintiffs' motion.

## BACKGROUND

## II.   PROCEDURAL HISTORY

The Court is intimately familiar with the long history of this litigation, which is described in detail in the accompanying Seaver Declaration.

The events in the MDL Action were extensive and hard-fought between plaintiffs and fourteen defendant corporations and trade associations, involving strenuous written and oral advocacy. Those events included: appointment of lead counsel and coordinating counsel, coordination with various state courts, a comprehensive protective order, deep and complex party discovery, international third-party discovery, massive amounts of document review and data analysis, over 130 depositions, and expert witness reports and attendant discovery from more than a dozen economists and industry experts.

3

Complex motion practice took place on topics such as motions to dismiss for lack of personal jurisdiction; motions to dismiss the federal antitrust damages claim on *Illinois Brick* grounds; motions to dismiss asserted state law claims for damages of over thirty states; motion to certify a federal injunctive class; staged motions to ultimately certify twenty statewide damage classes; motion practice to determine the damage class period's end date; discovery disputes of all kinds; motions to intervene; a motion to disqualify counsel; letters rogatory; a Rule 11 motion for sanctions; interlocutory appeal of class certification orders and renewed class certification motions following remand; six separate motions for summary judgment; *Daubert* motions to exclude expert testimony; bills of costs; and a motion to attach settlement funds.

The Court previously certified a nationwide injunctive class under Fed. R. Civ. P. 23(b)(2), *see In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, MDL Docket No. 1532, 2006 U.S. Dist. LEXIS 10240 (D. Me. Mar. 10, 2006), and twenty state damage classes under Fed. R. Civ. P. 23(b)(3), *see In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 241 F.R.D. 77 (D. Me. 2007). On interlocutory appeal, the First Circuit declared the case "novel and complex." It vacated and remanded the class certification orders and dismissed plaintiffs' Clayton Act injunctive relief claim on Article III standing grounds, finding it moot. *See In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 26 (1st Cir. 2008). Plaintiffs subsequently renewed their motion for class certification of nineteen state damage classes, and defendants moved for summary judgment on the state law claims.

On July 2, 2009, this Court granted defendants' joint summary judgment motion on the element of causation, mooting plaintiffs' renewed class certification motion. *See* Decision and Order on Defs.' Mots. for Summ. J. (Docket Item 1024) at 2-3. The Court had found evidence of defendants' conspiracy sufficient to go to trial, and likewise found evidence sufficient to go to

4

trial on most facets of the causation element.  The Court summarized this way: "This was a difficult antitrust case.  The class action questions were exceedingly difficult, as recognized by me and the Court of Appeals. I found enough evidence to deny summary judgment as to the conspiracy charge, but ultimately found not enough to prove causation by the method of proof the plaintiffs chose in seeking to preserve their claim for class treatment." *See In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, MDL Docket No. 1532, 2010 U.S. Dist. LEXIS 37955, at *17 (D. Me. Apr. 16, 2010).

On August 24, 2009, the Court entered final judgment in favor of the non-settling, non-bankrupt defendants, dismissing them from the MDL Action.  *See* Order Granting Final Judgment in Favor of Non-Settling, Non-Bankrupt Defs. (Docket Item 1034).  After careful consideration, the MDL plaintiffs determined not to appeal this Court's decision but, instead, to pursue remedies available in several of the pending State Actions, which continue today against defendants.

The Court has certified the nationwide Toyota and CADA Settlement Classes under Rule 23(b)(3) by order dated October 4, 2010 (Docket Item 1123).  *See In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 270 F.R.D. 30, 2010 U.S. Dist. LEXIS 106400 (D. Me. 2010). The order appointed the MDL Executive Committee firms as class counsel pursuant to Rule 23(g).  *Id.*  The Court further approved the Notice Plan with findings that the Notice Plan satisfied Rule 23(c)(2)(B) and due process standards by providing the best notice that is practicable under the circumstances, and found the proposed forms of notice satisfy Rule 23(c)(2)(B).  *Id.*  Thus this memorandum will not address these issues.

### III.    THE SETTLEMENT AGREEMENTS

The Toyota and CADA Settlements were each the result of extensive arm's-length negotiations between plaintiffs' MDL and state court lead counsel and counsel for Toyota and CADA, respectively.  *See* Tabacco Decl. ¶¶ 2-3.  The parties entered the Toyota settlement agreement ("Toyota Agreement") on February 24, 2006, and the CADA settlement agreement ("CADA Agreement") on  September 6, 2006.[3]

In August 2009, the parties amended their respective agreements to more clearly express the parties' original intentions concerning the settlement class period end date and the duration of injunctive provisions.  Tabacco Decl. ¶¶ 4, 7, 11, 14.  Specifically, the amendments (1) modified the Class Period (defined below) by ending the Class Period on a date certain (December 31, 2006), and (2) modified the injunctive relief provisions so that the parties' obligations end on a date certain (December 31, 2011).  *See* Amendment to February 24, 2006 Settlement Agreement Between Plaintiffs and Toyota Defendants ("Toyota Amendment") (Tabacco Decl. Ex. 2); Amendment to September 6, 2006 Settlement Agreement Between Plaintiffs and Defendant Canadian Automobile Dealers' Association ("CADA Amendment") (Tabacco Decl. Ex. 4).

Both Settlements include cash and non-cash components, and have co-extensive Settlement Classes.  The Settlement Classes are defined as:

> All persons (excluding government entities, the Courts in the Litigated Actions, Defendants, their parents, subsidiaries, and affiliates, and their alleged co-conspirators) who purchased or leased a new motor vehicle manufactured by any Defendant from a United States Dealer in the United States during the period from January 1, 2001 to December 31, 2006.

---

[3] The Toyota Agreement and the CADA Agreement are attached as Exhibits 1 and 3, respectively, to the Tabacco Declaration.

Toyota Agreement ¶ 1(j), as amended (Toyota Amendment ¶ A); CADA Agreement ¶ 1(n), as amended (CADA Amendment ¶ A).

### A.    Monetary Components

Under the Toyota Agreement, Toyota agreed to pay thirty-five million dollars ($35,000,000) into a common fund for the benefit of the Toyota Settlement Class.   Toyota Agreement ¶¶ 1(ll), 15.   In 2006, Toyota paid this amount into an interest bearing escrow account maintained at Citibank, N.A. in accordance with the Toyota Agreement.  Tabacco Decl. ¶ 5.  Also in 2006, CADA paid seven hundred thousand dollars ($700,000) for the benefit of the CADA Settlement Class.  CADA Agreement ¶¶ 1(mm), 15.  The $35 million Toyota payment was invested in an interest-bearing account on March 24, 2006.  The $700,000 CADA payment was invested in an interest-bearing account on September 18, 2006.  Tabacco Decl. ¶ 12.  Prior to deduction of Court-approved notice costs, these amounts combined, with interest, exceeded $37,300,000.  *See* Tabacco Decl. ¶ 18.

Without these Settlements, Class Members in many states have no chance of ever seeing any recovery at all.  The Settlements also offered valuable non-monetary benefits to all Class Members.  For these reasons, the Toyota and CADA Settlements are significant achievements that are within the range of being fair, reasonable and adequate, justifying the Court's approval of the dissemination of notice to the Settlement Classes.

### B.    Prevention of Future Anticompetitive Conduct

The Toyota Agreement prohibits Toyota from engaging in conduct that is at the center of this lawsuit, namely, forming an agreement with the other defendants that violates the Sherman Act.  For example, Toyota agreed it would not share with other automakers the "Blacklists" and due diligence procedures meant to stop Canada-to-United States new vehicle exports.   Toyota

7

Agreement ¶ 12.  Even without final approval of the Settlement, Toyota represents that it has abided by this provision since entering the Toyota Agreement.  *See* Toyota Amendment at 1. Consequently, the Settlement Classes have been the beneficiaries of the Toyota Agreement for over four years already.  Upon execution, Toyota undertook to comply with these proscriptions. The agreement provides that such proscriptions will run for a period of five years from final approval.  When the agreement was amended in August 2009, the parties agreed, reflecting their intent at the time the Settlement was executed in 2006, that given Toyota's compliance as evidenced by its affirmative representations (*see* Toyota Amendment at 1) that the contractually prescribed provision will expire on December 31, 2011.

The CADA Agreement provides the same contractual prohibitions on anticompetitive conduct.  CADA commits to not provide information, data or know-how to automakers and certain industry trade associations for the purpose of preventing new Canadian vehicle exports to the United States.  CADA Agreement ¶ 12, App. E, and CADA Amendment at 2 (modifying Class Period and injunction end dates).  CADA is also prohibited from meeting, communicating with or sharing information with other trade associations with the purpose of facilitating the reduction or prevention of new vehicle exports from Canada to the United States.  CADA Agreement ¶ 12.

Like Toyota, CADA represents that it has conformed its conduct to the CADA Agreement's behavioral provisions since signing the CADA Agreement, despite the unanticipated delay in settlement approval.  *See* CADA Amendment at 1.

## C.    Discovery Cooperation Obligations

The Toyota  and CADA Agreements both required cooperation with plaintiffs, including evidence preservation, production of documents from third-party Toyota Canada (Toyota

8

Agreement only), provision of witnesses for pre-trial and trial testimony, and other cooperation. *See* Toyota Agreement ¶ 25; CADA Agreement ¶ 25.

The discovery cooperation provisions in the Toyota and CADA Agreements were instrumental in assisting plaintiffs develop discovery against the non-settling defendants, obtain class certification in the district court and defend against summary judgment—all directly benefiting the Settlement Classes. That discovery is available to be utilized in the continuing State Actions.

### D.    Releases

Paragraphs 11 through 14 of the Toyota Agreement provide, *inter alia*, for the release by Class Members of all claims against Toyota arising under the Antitrust Laws (a defined term), from January 1, 2001 up to and including December 31, 2006. *See* Toyota Amendment (modifying Class Period).

Paragraph 11 of the CADA Agreement provides a similar release by Class Members of all claims against CADA arising under the Antitrust Laws for the identical Class Period as the Toyota Agreement. *See* CADA Amendment (modifying Class Period).

The releases are global releases of all claims in state and federal court, as set forth in detail in the Agreements.

## ARGUMENT

## IV.    LEGAL STANDARD

Rule 23(e)(2) requires a class action settlement to be fair, reasonable and adequate. There is no fixed test in the First Circuit for evaluating the fairness of a settlement. *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, 602 F. Supp. 2d 277, 280 (D. Mass. 2009) (Saris, J.). As a threshold matter, a settlement agreement is presumed to be fair

if it follows sufficient discovery and genuine arm's-length negotiations. *See City P'Ship. Co. v. Atl. Acquisition Ltd. P'Ship.*, 100 F.3d 1041, 1043 (1st Cir. 1996); *In re Compact Disc Minimum Advertised Price Litig.*, 216 F.R.D. 197, 207 (D. Me. 2003).

In general terms, courts assess the fairness of proposed class action settlements by considering both their substance and the process that produced the parties' compromise. In this Circuit, courts have relied on factors set forth by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). This Court has in the past molded versions of the *Grinnell* factors into a six-factor test: (1) comparison of the proposed settlement with the likely result of litigation; (2) stage of the litigation and the amount of discovery completed; (3) quality of counsel; (4) conduct of the negotiations; (5) the risk, complexity, expense and duration of the case; and (6) reaction of the class to the settlement. *Compact Disc*, 216 F.R.D. at 206. That test is argued below.

## V.   ASSESSMENT OF THE FACTORS GOVERNING APPROVAL SHOWS THE SETTLEMENTS ARE FAIR AND REASONABLE

### A.   Compared with the Actual Outcome of the MDL Action, the Settlements Represent Exceptional Value

Typically, the question of what the outcome of litigation would have been is not answerable at the time a proposed class action settlement is presented for approval. Here, because of the passage of time since the Settlements were entered, the answer is known. The outcome in the MDL Action can be summed up as "close but no cigar." The MDL Action ended at summary judgment. The Court determined that plaintiffs' evidence of an unlawful horizontal conspiracy and plaintiffs' proof of most of the facets of causation were strong enough to go to trial. However, plaintiffs were unable to clear the last pre-trial obstacle with common proof, i.e., that all class members experienced a pass-through from supra-competitive list prices to their

10

actual transaction prices.  The result was summary judgment for the non-settling defendants, more than three years after the Settlements were entered.  Consequently, by recovering $35.7 million, the Toyota and CADA Settlements compare extremely well to "the relief the plaintiffs might recover after a successful trial and appeal, *discounted* for risk, delay and expense." *Compact Disc*, 216 F.R.D. at 207 (emphasis added).

Even assuming a successful outcome after trial and appeal, the Toyota and CADA Settlements represent an excellent result.  We begin with Toyota.  The settlement with Toyota resulted in payment of $35 million in cash, discovery cooperation from Toyota and its non-party Canadian affiliate, Toyota Canada Inc., and binding contractual agreement from Toyota that it would refrain from certain conduct that was the result of the alleged conspiracy.

The $35 million secured by the Toyota Settlement represents an exceptional value.  Plaintiff's expert, Professor Hall, completed a trial-ready damages analysis, which was presented to the Court and relied upon by plaintiffs in the course of the litigation.  The damages analysis found single damages attributable to the alleged conspiracy in the amount of $1.073 billion for those twenty states with live damage claims.  *See* Expert Report of Robert E. Hall, Ph.D., on Impact and Class Damages, May 10, 2007, ¶ 13 & Revised Ex. 24 ("Hall May 2007 Rpt.").[4] Toyota's share of total, single damages was determined to be just over $136 million (based on the total volume of Toyota and Lexus vehicles sold in the twenty states in the damages period of January 1, 2001 to April 30, 2003, at an average damage amount $94 per vehicle).  *See id.* at Revised Ex. 20; Professor Hall's Response to Defs.' Rebuttal Reports, Feb. 3, 2008, ¶ 3 ("Hall

---

[4] Professor Hall's May 2007 Report was submitted to the Court on June 6, 2008 as Plaintiffs' Exhibit 711 to their opposition to defendants' motions for summary judgment.  (Docket Item 894-18.)  Exhibits to Professor Hall's May 2007 Report were submitted as Plaintiffs' Exhibit 704.  (Docket Item 894-11.)

Feb. 2008 Rpt.").[5]   At $35 million, the Toyota Settlement Agreement secures 25.7% of the damages attributable to Toyota.

Making the monetary recovery from Toyota more valuable is the fact that the litigation risks were high, especially as to Toyota.  By February 2006 when plaintiffs settled with Toyota, plaintiffs still had the burden to prove the existence of an unlawful horizontal conspiracy, without the aid of any government enforcement action, and use common evidence to prove the conspiracy caused injury and a quantity of damages.  Class certification had been submitted to the District Court, but not yet decided.  Add to this the fact that, early in the litigation, defendant Toyota Canada Inc. had obtained dismissal on personal jurisdiction grounds.  The alleged conspiracy was carried out predominantly by the automakers' Canadian subsidiaries and affiliates.  This meant plaintiffs bore the added risk with Toyota by having to succeed with an extra step of proof as to defendant, by showing that it was vicariously liable for conspiratorial acts carried out by its affiliate, non-party Toyota Canada Inc.

Consequently, measured now or at the time of settlement in 2006, recovery of 25.7% of the damages allegedly caused by Toyota is an excellent value to the Settlement Class.

Turning to the CADA Settlement, it netted an additional $700,000, critical discovery cooperation, and the binding, contractual agreement from CADA[6] to refrain from the types of acts which facilitated the alleged conspiracy amongst the automakers.  Even if the litigation had

---

[5] Professor Hall's Feb. 2008 Report was submitted to the Court on June 6, 2008 as Plaintiffs' Exhibit 709.  (Docket Item 894-16.)

[6] Plaintiffs' settlement with CADA also contained CADA's stipulation to a court-ordered injunction.  The Court declined to certify an injunctive class.  *See In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 269 F.R.D. 80, 87 (D. Me. 2010).  Consequently, the stipulated injunction will not be entered.  As with Toyota, however, the contractual agreement by CADA to refrain from certain conduct remains as a benefit to the Class.

been more successful through a trial and appeals, plaintiffs would have been unlikely to extract more from CADA.

CADA is a relatively small trade association, representing Canadian auto dealers. It did not and does not manufacture and sell automobiles. It has few personnel, and relatively little capital. While plaintiffs viewed evidence of liability with respect to CADA to be strong, CADA's limited finances meant it would never be a source of significant monetary recovery for the Class. The value of CADA as a party to the litigation was the value of the documentary and testimonial evidence CADA would provide as a facilitator of the conspiracy amongst the automaker defendants. Consequently, even when viewed at the time of the CADA Settlement in September 2006, consideration of the value of the settlement measured against the "likely result of continued litigation" weighs strongly in favor of approving the CADA Settlement as fair and reasonable. The truism applies: "[Y]ou can't get blood from a stone." *New England Carpenters*, 602 F. Supp. 2d at 281 (approving as fair a settlement with a drug pricing publisher for $2.7 million in a case with damages estimated at over $1 billion where settling defendant had limited finances).[7]

### B. The Fact Plaintiffs Reached the Settlements After Extensive Litigation and Discovery Supports Approving Them as Fair

Three years (Toyota) and three-and-a-half years (CADA) of hard-fought litigation preceded the Settlements and provided the settling parties with ample information about the strengths and weaknesses of their positions on liability and damages. Before reaching the Settlements, the parties litigated two full rounds of motions to dismiss, and fully briefed class certification in the District Court. Seaver Decl. ¶¶ 9-16, 61-67. In the case of CADA, class

---

[7] CADA is not a party to any of the parallel State Actions, having been dismissed on personal jurisdiction grounds.

13

certification decisions in March and May 2006 indicated the Court's intention to conditionally certify injunctive and damages classes. *Id.* ¶ 67. Document production by defendants which ultimately produced over one million pages of documents began in October 2004 (*id.* ¶¶ 23-27) and plaintiffs had by then reviewed and analyzed the bulk of those documents. Defendants had answered Interrogatories by the time of the Settlements. *Id.* ¶ 25. Plaintiffs defended most of the forty-six named plaintiff depositions by the time the Settlements were reached, and begun taking depositions of percipient witnesses. *See id.* ¶¶ 29-30. The parties had retained expert economists and had already exchanged reports and taken expert discovery in connection with the first round of class certification briefing that was completed in 2005. *Id.* ¶¶ 50, 63-65.

As a result, the plaintiffs, Toyota and CADA possessed the requisite information with which to make informed judgments about the relative strength of their litigation positions before the settlement negotiations began or were completed. This fact fully supports approval of the Settlements.

### C.   Counsel Are Highly Qualified and Experienced

The Court has on more than one occasion appointed the lawyers and firms on the MDL Executive Committee as class counsel pursuant to Rule 23(g) based on its findings that class counsel is highly experienced and qualified. *See*, *e.g.*, *New Motor Vehicles*, 2010 U.S. Dist. LEXIS 106400, at *28-30 (citing prior orders). The State Action counsel are similarly experienced and qualified. *See* Tabacco Decl. Exs. 42 to 51 (declarations from State Action counsel).

Here, counsel diligently pursued discovery, made effective written and oral arguments, kept the Court informed of all pertinent issues and developments, and unfailingly demonstrated

14

candor in all pleadings and communications with the Court in the course of zealously advocating for plaintiffs.

### D.   The Fact Plaintiffs Reached the Settlements After Substantial and Arm's-Length Negotiations Makes the Settlements Presumptively Fair

Courts consistently judge settlements resulting from significant, arm's-length negotiations as being free from collusion, and therefore presumptively fair.  *See, e.g., City P'Ship Co.*, 100 F.3d at 1043 ("When sufficient discovery has been provided and the parties have bargained at arm's-length, there is a presumption in favor of the settlement."); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 71-72 (D. Mass. 2005).

Here, counsel for plaintiffs and counsel for Toyota held several face-to-face and telephonic negotiating sessions over a period of several months beginning in the autumn of 2005, and concluding with the agreement reached in February 2006.  Tabacco Decl. ¶ 2.

Focused negotiations with CADA that led to the CADA Settlement commenced in the summer of 2006 when counsel for CADA communicated with MDL lead plaintiffs' counsel about a possible settlement of the MDL case and all of the pending state court cases.  Extensive and intensive discussions ensued with MDL lead plaintiffs' counsel coordinating closely with their counterparts in the state court actions with regard to the question of settlement.  The final agreement was executed on September 6, 2006.  Tabacco Decl. ¶ 3.

### E.   The Complexity and Ultimate Duration of the Litigation Support Approval of the Settlements as Fair And Reasonable

The MDL Action commenced in February 2003, nearly eight years ago.  Cases were filed in federal district courts and state courts around the country.  As these actions were filed before the time the Class Action Fairness Act's new diversity jurisdiction provision, 28 U.S.C. § 1332(d)(2), took effect, the cases had complex management and coordination issues as

15

between federal and state court.  The parties' and the Court's management of the substantive and procedural issues have been a forerunner to the types of issues CAFA now reserves for federal district courts.  In this sense, the MDL Action blazed new trails and was highly complex.

Since the Settlements were reached, the risk, complexity and duration of the litigation has become a known quantity.  The litigation has been undeniably complex in all of its procedural and substantive attributes, a fact repeatedly recognized by this Court and the First Circuit Court of Appeals.

At the time the Settlements were reached, plaintiffs had the burden to prove conspiracy, causation and damage with common evidence, and would need to maintain evidence of the threat of imminent harm to succeed in obtaining injunctive relief.  To succeed at trial, plaintiffs would have to overcome significant factual disputes on many elements of their claims, necessitating the use of hundreds of evidentiary exhibits and the testimony of scores of witnesses.  There would have been a significant battle of expert witnesses concerning econometrics and statistics, and esoteric economic principles.  A trial would be lengthy, expensive and risky.

The factor of the complexity and duration of the litigation strongly supports approval of the Settlements as fair and reasonable.

**F.    Class Reaction Supports Approval of the Settlements as Fair**

Courts in this Circuit also consider the reaction of class members to proposed settlements in assessing whether to approve those compromises. *See Bussie v. Allmerica Financial Corp.*, 50 F. Supp. 2d 59, 77 (D. Mass. 1999) ("The number of requests for exclusion from the settlement, as well as the number and substance of objections filed, is relevant to this Court's analysis of the settlement."); *Relafen*, 231 F.R.D. 72 (class's reaction to the settlement supported

16

approval where the "overall reaction to the settlement has been positive" and the objections asserted by class members did not focus upon the total settlement consideration).

The accompanying Gilardi Declaration reports on the status of notice and claims.  In sum, while the rate and number of claims has been below expectations, the overall reaction of the Class has been positive. The claims period has another three weeks to run, with the deadline of February 1, 2011 for filing claims, opt-outs or objections.  To date, there are 4,335 claims filed, representing 4,330 claims filed by online consumers, 5 fleet purchaser claims for vehicles, and an additional 262 paper claims filed.  There have been 4 opt-outs and no objections filed.  Gilardi Decl. ¶¶ 21-22.

Gilardi reports that the claims website has received 47,300 unique visitors, and approximately 22,213 visitors reviewed at least some of the claim form pages.  *Id.* ¶ 11. Approximately 80% of the claims website traffic has been generated from the internet notice campaign efforts.  *Id.* ¶ 12.

Plaintiffs remain confident, if this case follows patterns in other class actions, that as the February 1, 2011 deadline approaches for filing claims, many more eligible claims will be filed. Nonetheless, plaintiffs intend to take additional steps to encourage maximum participation by Class Members.  *See* Tabacco Decl. ¶ 24 and Gilardi Decl. ¶¶ 17-18.

Plaintiffs will be prepared to present to the Court concerning the number and substance of objections, as well as opt-outs, following the conclusion of the claims period.  Plaintiffs' Reply briefing is due February 7, 2011.

## VI.   CONCLUSION

The proposed Settlements with Toyota and CADA are the result of intensive, extensive, arm's-length negotiations, after substantial factual investigation and legal analysis, and are, in

17

the opinion of plaintiffs' counsel, fair, reasonable and adequate.  Plaintiffs reached settlement of

the claims as to Toyota and CADA despite significant risks that the Class would obtain no

recovery at all.  Plaintiffs respectfully submit that the Settlements with Toyota and CADA are in

the best interests of Class Members and should be approved as fair and reasonable.

Dated:  January 7, 2011                          Respectfully submitted,

                                                 **BERMAN DeVALERIO**


                                                 By:  /s/ Todd A. Seaver_____
                                                         Todd A. Seaver

                                                 Joseph J. Tabacco, Jr.
                                                 Matthew D. Pearson
                                                 One California Street, Suite 900
                                                 San Francisco CA  94111
                                                 Telephone:  (415) 433-3200

                                                 *Plaintiffs' Chair of the Executive Committee*


                                                 **POMERANTZ HAUDEK BLOCK
                                                 GROSSMAN & GROSS**
                                                 Michael M. Buchman
                                                 100 Park Avenue
                                                 New York, NY 10017
                                                 Telephone:  (212) 661-1100

                                                 *Plaintiffs' Vice-Chair of the Executive Committee*

## PLAINTIFFS' EXECUTIVE COMMITTEE

Robert J. Larocca
William E. Hoese
KOHN SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA  19107
Telephone:  (215) 238-1700

Stephen Lowey
Richard W. Cohen
Peter D. St. Phillip, Jr.
LOWEY DANNENBERG COHEN &
    HART, P.C.
The Gateway
One North Lexington Avenue
White Plains, NY  10601
Telephone:  (914) 997-0500

Bernard Persky
Hollis L. Salzman
LABATON SUCHAROW LLP
140 Broadway
New York, NY  10005
Telephone:  (212) 907-0700

Patrick Cafferty
Jennifer Winter Sprengel
CAFFERTY FAUCHER LLP
30 North LaSalle Street
Suite 3200
Chicago, IL  60602
Telephone:  (312) 782-4880

Samuel D. Heins
David Woodward
HEINS MILLS & OLSON, PLC
3550 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Telephone:  (612) 338-4605