**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

|  |  |  |
|---|---|---|
| IN RE: NEW MOTOR VEHICLES | ) | MDL Docket No. 03-md-1532 |
| CANADIAN EXPORT ANTITRUST | ) | ALL CASES |
| LITIGATION | ) |  |

**PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES AND**
**REMIBURSEMENT OF EXPENSES ADVANCED BY CLASS COUNSEL**
<u>**WITH INCORPORATED MEMORANDUM OF LAW**</u>

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ...........................................................................................................1

ARGUMENT .................................................................................................................2

I.      THE PREMISE FOR THE OVERALL REQUEST FOR FEES AND EXPENSES ..........2

      A.     The Requested Reimbursement of 55% of Expenses ...............................2

      B.     Attorneys' Fees Are Requested as a Percentage of the Common Fund with a Lodestar Cross-Check ...............................................................................5

II.     THE REQUESTED 13.2% FEE IS FAIR AND REASONABLE GIVEN THE RECOVERY ACHIEVED IN LIGHT OF THE RISKS, COMPLEXITY AND DURATION OF THE LITIGATION ...................................................................6

      A.     Legal Standard ......................................................................................6

      B.     All the Relevant Factors Weigh Strongly in Favor of Awarding the Requested 13.2% Fee .......................................................................................6

            1.     The fee request is reasonable next to the recovery achieved for the Class in this high-risk litigation ..................................................6

            2.     Plaintiffs' counsel bore heavy risk of non-payment .....................8

            3.     The skill employed in litigating the complex issues supports the fee request ......................................................................................13

            4.     The significant time and labor plaintiffs' counsel expended to produce an excellent settlement support the 13.2% fee request ...............13

III.    THE FAIRNESS OF THE ATTORNEYS' FEES PLAINTIFFS REQUEST IS CONFIRMED BY A LODESTAR CROSS-CHECK .......................................................15

CONCLUSION ............................................................................................................15

i

# <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

**CASES**

*Green v. Transitron Elec. Corp.*, 326 F.2d 492 (1st Cir. 1964)................................. 6, 13

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197 (D. Me. 2003).. 5

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 270 F.R.D. 30 (D. Me. 2010) ............. 4

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, MDL Docket No. 1532, 2010 U.S. Dist. LEXIS 37955 (D. Me. Apr. 16, 2010) ............................................................. 13

*In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005) ................................. 6, 12

*In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995) ................................................................................. 5, 15

*White & White, Inc. v. Am. Hosp. Supply Corp.*, 786 F.2d 728 (6th Cir. 1986).......................... 13

**STATUTES**

Rule (b)(2).................................................................................................................. 4

Rule 23(b)(3)............................................................................................................. 4

Rule 23(f) ................................................................................................................. 10

**OTHER AUTHORITIES**

Laura E. Simmons & Ellen M. Ryan, *Post-Reform Act Securities Settlements: 2005 Review and Analysis*, Cornerstone Research, 2006 ................................................................ 7

## INTRODUCTION

Through diligent and skillful efforts, plaintiffs have recovered $35.7 million in cash from class action settlements with defendants Toyota Motor Sales, U.S.A., Inc. ("Toyota") and the Canadian Automobile Dealers' Association ("CADA").  By this motion, plaintiffs[1] seek an order awarding attorneys' fees equal to 13.2% of the settlement funds.  With accumulated interest, the Combined Settlement Fund totals approximately $37,300,000.[2]  *See* Declaration of Joseph J. Tabacco, Jr., ¶ 18, filed concurrently herewith ("Tabacco Declaration" or "Tabacco Decl.").

Over the course of eight years of fierce litigation against some of the largest corporations in the world, plaintiffs have incurred out-of-pocket expenses of over $11.4 million and have expended over $45.9 million in lodestar, representing the a total of over 121,500 hours of work based on historic hourly rates charged by the petitioning law firms.[3]

Plaintiffs also seek reimbursement of $6.27 million of their out-of-pocket expenses.  When combined with 13.2% of the Combined Settlement Fund for attorneys' fees (equal to approximately $4.92 million), plaintiffs are seeking a combined $11.19 million, or 30%, of the Combined Settlement Fund for fees and costs.  The request is in accordance with the Court-approved Notice, which informs the Settlement Class that plaintiffs would seek up to 30% of the

---

[1] The undersigned Chair of the MDL Executive Committee makes this motion on behalf of plaintiffs' class counsel in the above-captioned MDL Action and the various parallel State Actions, including the California Action (together, "Litigated Actions").  The "California Action" refers specifically to the State Action captioned *Automobile Antitrust Cases I & II*, JCCP Nos. 4298 & 4303, currently pending in the Superior Court of California, County of San Francisco, before the Honorable Richard A. Kramer.

[2] The Combined Settlement Fund includes the $35.7 million Toyota Settlement Fund and the $700,000 CADA Settlement Fund, with interest.  As of October 31, 2010, prior to deduction of Court-approved notice costs, the Combined Settlement Fund, with interest included, totaled approximately $37.3 million.  *See* Tabacco Decl. ¶ 18.

[3] Declarations from plaintiffs' counsel in the MDL Action and State Actions concerning fees and un-reimbursed costs are submitted herewith as Exhibits 7 to 51 to the Tabacco Declaration.

1

Combined Settlement Fund for combined out-of-pocket costs and attorneys' fees.   *See* Declaration of Dennis Gilardi Reporting on Notice and Claims Administration Exs. A, B, D, F, filed concurrently herewith ("Gilardi Declaration" or "Gilardi Decl.").

The attached Exhibit A is a table that describes the categories of expenses.

This motion is filed concurrently with Plaintiffs' Motion for Final Approval of Proposed Class Action Settlements with Defendants Toyota Motor Sales, U.S.A., Inc. and Canadian Automobile Dealers' Association, and Plaintiffs' Motion for Approval of Proposed Plan of Allocation.  The motions are supported by the Tabacco Declaration, the Declaration of Todd A. Seaver ("Seaver Declaration" or "Seaver Decl."), the Gilardi Declaration, and [Proposed] Orders for Final Judgment and Order of Dismissal with Prejudice, Granting Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, Awarding Incentive Payments to Certain Named Plaintiffs, Approving Plan of Allocation of Net Combined Settlement Fund and Approving *Cy Pres* Distribution as a Component of Plan of Allocation and Setting Schedule to Organize *Cy Pres* Distribution.

For the reasons set forth below, plaintiffs respectfully request that the Court grant the relief requested herein.

## ARGUMENT

### I.    THE PREMISE FOR THE OVERALL REQUEST FOR FEES AND EXPENSES

#### A.    The Requested Reimbursement of 55% of Expenses

The Toyota and CADA Settlements are global settlements on behalf of nationwide classes.  They propose to resolve all claims in the MDL Action and the parallel State Actions. During the past eight years, discovery proceedings and settlement in the federal MDL Action and the State Actions have been coordinated, in large part as a result of the Joint Coordination Order

2

in April 2004 requiring the MDL plaintiffs to coordinate all pre-trial discovery with counsel in the State Actions. The Court invited all the state courts overseeing parallel actions to enter a mirror order. Seaver Decl. ¶¶ 7, 21-22.

From early on, in accordance with the coordination orders of this Court and the courts in the California Action and other State Actions, plaintiffs' counsel in the MDL Action and the State Actions coordinated their pre-trial discovery efforts to the maximum extent possible in order to avoid duplication and to gain efficiencies. Tabacco Decl. ¶ 27; Seaver Decl. ¶¶ 7, 22. Plaintiffs endeavored to avoid overlap and divided up necessary tasks among the participating firms based on efficiency, skill and experience. Tabacco Decl. ¶ 27.

At an early stage in the litigation, plaintiffs' counsel in the MDL Action, the California Action and the other State Actions agreed to share expenses and also to apportion discovery work between the MDL and State Actions. The work and expense sharing took the form of a 55% / 45% split as between the MDL firms and the State Action firms. Tabacco Decl. ¶ 27. Consequently, out of the over $11.4 million in out-of-pocket expenses incurred to date, plaintiffs limit their reimbursement request to 55%, or $6.27 million, in connection with these Settlements. The remainder of costs will be recovered, if at all, through the continued litigation in the California Action and other State Actions.

By requesting reimbursement of 55% of expenses, plaintiffs do not mean to suggest that a higher amount of reimbursement would not be justified from these settlement common funds. If the goal was to reimburse those expenses that can be shown to have contributed to the Toyota and CADA Settlements and their ultimate approval, nearly *all* of the expenses occurred to date would be properly reimbursed from the Toyota and CADA Settlement Funds. Of course, these Settlements represent a global resolution of all of the cases brought in this coordinated litigation

3

against Toyota and CADA. These defendants paid more money to settle all these claims. Certainly the Toyota and CADA Settlements have benefited directly from practically all of the joint prosecution expenses, both pre- and post-settlement. This is probably best illustrated by the very precise plan of allocation proposed for this distribution of the settlement funds. The very extensive, hotly litigated efforts resulted in, among other things, a finely developed impact and damages model that is employed for this settlement distribution plan.[4] Consequently, it would be entirely justified if all of the expenses incurred to date to be reimbursed from these Settlements.

All expert discovery and expert testimony, summary judgment, *Daubert* motion practice, and all efforts related to attempts to certify litigation classes under Rule 23(b)(3) and (b)(2), including interlocutory appeal, were part and parcel of achieving the ultimate certification of the Toyota and CADA Settlement Classes. *See* Seaver Decl. ¶¶ 21-105 (detailing pre-trial work benefiting the Settlement Classes). Indeed, plaintiffs just recently won certification of the settlement classes, after expending practically all of the costs. *See In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 270 F.R.D. 30 (D. Me. 2010). Therefore, while the reimbursement request is designed along the lines of the coordinated counsels' agreed sharing of costs, if a request for a higher reimbursement amount were to be made, awarding it would be fair to the Settlement Classes.

---

[4] The prosecution efforts that have been necessary to push the Toyota and CADA Settlements to this point include all pre- and post-settlement discovery and all the work of expert witnesses. Indeed, the bulk of the expenses have fallen into the categories of (i) consulting and testifying expert witness fees, including the processing and empirical analysis of data in connection with proving causation and damages; (ii) expenses associated with data and document discovery; and (iii) expenses associated with deposition discovery, including deposition transcripts and linked digital video recordings of all testimony for trial purposes. *See* Tabacco Decl. ¶¶ 27-28 & Ex. 6; Seaver Decl. ¶¶ 21-105.

**B.     Attorneys' Fees Are Requested as a Percentage of the Common Fund with a Lodestar Cross-Check**

Plaintiffs request total attorneys' fees from the Settlements of $4.92 million, which is equal to 13.2% of the Combined Settlement Fund, which with interest totals approximately $37,300,000.  *See* Tabacco Decl. ¶ 18.  The requested fee of $4.92 million is balanced against a total lodestar for the MDL Action and State Actions of $45.98 million.  The requested fee, therefore, represents only 10.7% of total lodestar.

The First Circuit recognizes that a "percentage of the fund" method is preferred for evaluating attorneys' fees in common fund cases like this one.  *See In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir. 1995).  A lodestar cross-check is also permissible.  *Id.*; *see also In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 215-16 (D. Me. 2003).  Here, plaintiffs make their fee request using the percentage-of-the-fund approach with a lodestar cross-check.

The Toyota and CADA Settlement Agreements provide for a common fund.  There are no reversion or claims-made provisions.  The Settlement Agreements furthermore do not prescribe any particular level of attorneys' fees or costs for which plaintiffs may seek an award.  The Agreements do provide that plaintiffs, subject to Court approval, could use the settlement proceeds to fund past and future litigation expenses.  *See* Toyota Agreement ¶ 19; CADA Agreement ¶ 19.[5]

---

[5] The "Toyota Agreement" refers to the Settlement Agreement dated February 24, 2006 between plaintiffs and Toyota, attached as Exhibit 1 to the Tabacco Declaration.  The "CADA Agreement" refers to the Settlement Agreement dated September 6, 2006 between plaintiffs and CADA, attached as Exhibit 3 to the Tabacco Declaration.

## II.     THE REQUESTED 13.2% FEE IS FAIR AND REASONABLE GIVEN THE RECOVERY ACHIEVED IN LIGHT OF THE RISKS, COMPLEXITY AND DURATION OF THE LITIGATION

### A.     Legal Standard

There is no one set of factors to be used in assessing the merits of a class action attorneys' fee request, but the following factors are commonly used in the First Circuit:  (1) the reasonableness of the fee when examined as a percentage of recovery; (2) the risk of non-payment; (3) the complexity and duration of the litigation; (4) the amount of time devoted to the case by plaintiffs' counsel and the skill and efficiency of the attorneys; (5) the awards in similar cases; and (6) the presence of absence of substantial objections by members of the class to the fee request.  *See Green v. Transitron Elec. Corp.*, 326 F.2d 492, 496 (1st Cir. 1964); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 79 (D. Mass. 2005).

### B.     All the Relevant Factors Weigh Strongly in Favor of Awarding the Requested 13.2% Fee

#### 1.     The fee request is reasonable next to the recovery achieved for the Class in this high-risk litigation

The Settlements represent an excellent recovery for automobile purchasers injured by defendants' alleged conspiracy.   The Settlements provided (i) cash, (ii) discovery and cooperation which was essential to the ongoing prosecution of the case against other defendants, and (iii) valuable affirmative relief in the form of changes in conduct by Toyota and CADA (even as CADA's stipulated court-ordered injunction fell victim to Article III standing requirements as applied by the court of appeals).  Plaintiffs seek to distribute the net settlement proceeds to qualified Class Members and seek to make a *cy pres* distribution for the entire Class' benefit.

6

The Toyota Settlement's cash component is an excellent achievement, representing 25.7% of Toyota's share of the single damages. This is based on plaintiffs' expert Professor Robert E. Hall's completed, trial-ready damages analysis, which was presented to the Court and relied upon by plaintiffs in the course of the litigation.  It found single damages attributable to the alleged conspiracy in the amount of $1.073 billion for those twenty states with live damage claims.  *See* Expert Report of Robert E. Hall, Ph.D., on Impact and Class Damages, May 10, 2007, ¶ 13 & Revised Ex. 24 ("Hall May 2007 Rpt.").[6]  Toyota's share of total, single damages was determined to be just over $136 million (based on the total volume of Toyota and Lexus vehicles sold in the twenty states in the damages period of January 1, 2001 to April 30, 2003, at an average damage amount $94 per vehicle).  *See id.* at Revised Ex. 20; Professor Hall's Response to Defs.' Rebuttal Reports, Feb. 3, 2008, ¶ 3 ("Hall Feb. 2008 Rpt.").[7]  At $35 million, the Toyota Settlement Agreement secures 25.7% of the damages attributable to Toyota.

Median recoveries in other complex class actions, such as securities class actions, amount to approximately 3% of estimated damages.  Laura E. Simmons & Ellen M. Ryan, *Post-Reform Act Securities Settlements: 2005 Review and Analysis*, Cornerstone Research, 2006, at 5 & Fig. 5.[8]  Securities class actions typically involve one primary defendant (the publicly-owned company), and so are a meaningful comparison to the recovery from one defendant in a multi-

---

[6] Professor Hall's May 2007 Report was submitted to the Court on June 6, 2008 as Plaintiffs' Exhibit 711 to their opposition to defendants' motions for summary judgment.  (Docket Item 894-18.)  Exhibits to Professor Hall's May 2007 Report were submitted as Plaintiffs' Exhibit 704.  (Docket Item 894-11.)

[7] Professor Hall's Feb. 2008 Report was submitted to the Court on June 6, 2008 as Plaintiffs' Exhibit 709.  (Docket Item 894-16.)

[8] *Available at* http://www.cornerstone.com/files/Publication/1ee4b7ed-9cf7-4345-a454-a494d8d67347/Presentation/PublicationAttachment/120834ca-9c06-45a2-ae9f-2622f2d881f2/Settlements_2005.pdf.

defendant antitrust class action. Compared with the approximately 3% mean recovery in securities actions, the 25.7% recovery of the Toyota single damages generated by plaintiffs here is a superior result.

The CADA Settlement recovery of $700,000, meanwhile, is plainly a small recovery in light of the overall damages. However, CADA's limited finances meant it was never going to be a source of significant monetary recovery for the Class. The value of CADA as a party to the litigation was the value of the documentary and testimonial evidence CADA provided as a facilitator of the conspiracy amongst the automaker defendants. The Settlement capitalized on what value CADA could provide the Class by its discovery and cooperation provisions, and its affirmative relief benefiting the Class.

### 2.    Plaintiffs' counsel bore heavy risk of non-payment

Taking on the automobile industry in North America was never going to be for the faint of heart. These cases were filed after an extensive investigation entirely funded by class counsel. This pre-filing investigation included interviewing prospective witnesses and gathering available public and non-public information and documents. Such efforts were undertaken by plaintiffs' counsel and their private investigators. As the Court is aware, this case was prosecuted start to finish without any benefit to plaintiffs from any governmental investigation. The investigatory and prosecution efforts of this matter were further complicated by the cross-border nature of the alleged conspiracy.

Class counsel undertook to represent United States car consumers eight years ago to stop the major automakers' joint effort to prevent cheaper Canadian vehicles from being lawfully exported to the U.S., an unlawful conspiracy that affected retail prices paid by consumers across the country. In addition to stopping a conspiracy which plaintiffs' counsel alone unearthed,

8

plaintiffs sought to compensate the injured consumers, and deter the unlawful horizontal agreement in the future.  At no time have class counsel had any assurance that any fees would be paid, or any out-of-pocket cost recompensed.

Plaintiffs' counsel have taken enormous financial risks.  They fought for U.S. consumers, aware that the fight would mean a substantial commitment of skilled attorneys' time and money before there could even be a possibility of recovering a fee.  Some of the risks were:

**(a) Risk of proving the existence of a secret horizontal conspiracy.**  Some antitrust actions alleging a horizontal agreement involve an agreement that is publicly disclosed (e.g., agreements not to compete between brand-name drugmakers and generic competitors).  Many more involve a criminal or civil case brought by the U.S. government's antitrust enforcers, where one cartel member informs on the others, and indictments and guilty pleas follow. In those antitrust class actions, liability on the element of conspiracy is not a significant risk.

Here, the conspiracy was secret.  No government enforcement action was ever begun. Proving that a meeting of the minds happened between sophisticated multi-national corporations with only civil discovery tools at your disposal is a large undertaking, and an even larger risk.  In this case, the risk that plaintiffs might never unearth a preponderance of evidence of an unlawful conspiracy was heightened by the fact that the alleged conspirators are some of the largest industrial corporations on earth.  They have decades-long experience as firms in an oligopoly market, and all the antitrust counseling that comes with it.  The risk of never being able to prove a conspiracy cannot be understated.  Yet, the Court recognized at summary judgment that class counsel succeeded in presenting triable proof of conspiracy.

In addition, plaintiffs faced the additional risk of having to prove vicarious liability as to defendant Toyota owing to the fact that Toyota Canada Inc. was dismissed early in the litigation

9

for the Court's lack of personal jurisdiction over the Canadian Toyota entity. This served to add an extra step of proof as to Toyota, a key defendant.

(b) **Class certification risk.** Plaintiffs faced serious risks with respect to the chances of certifying litigation classes after the Court deemed them "indirect purchasers" in an early *Illinois Brick* ruling. It is often difficult to certify damage classes under Rule 23 when plaintiffs are indirect purchasers and where, as here, the market involves negotiated transactions. With Rule 23(f) interlocutory appeal at their disposal, defendants always had an appellate avenue to resist class certification or seek de-certification later in the case, even after trial. The possibility defendants could defeat certification at the district court or appellate court level, and thereby prevent recovery by plaintiffs, was an ever-present hazard.

(c) **Proof of causation risk.** Ultimately the undoing of plaintiffs' claims at summary judgment with respect to non-settling defendants, the risks involved in proving causation was linked closely to class certification risk and appellate court review on interlocutory appeal. As it happened, the First Circuit changed the law five years into the case so as to apparently require that class action plaintiffs in an antitrust case prove, at the class certification stage, that class members were in fact injured by the anticompetitive conduct. The changing legal standard under Rule 23 is a significant part of the ultimate risk calculation.

Another formidable risk faced by plaintiffs in this litigation with respect to proof of causation was data risk. Pricing data, including that of factory incentives and other rebate programs, had to be obtained by class counsel so it could be collated and digested by plaintiffs' economic, statistical and mathematics experts to show the fact and amount of injury empirically. The data were exclusively in the hands of the defendant automakers, and they were not in ready-to-use form. Other critical data were data on actual consumer new vehicle purchasers. Class

10

counsel faced the risk of being unable to obtain it through third-party discovery from the secretive company that maintained it.  There was also a substantial risk that the data would turn out to be unobtainable, or obtainable but not useable.

Fortunately, through perseverance and capable guidance from the Court through Magistrate Judge Kravchuck, plaintiffs' counsel were eventually able to obtain the data necessary to permit their experts and consultants to complete the formidable work required to assess class-wide impact and damages.

**(d) Evidentiary risk.**  Plaintiffs bear the burden of proof on every element of their claims.  In a multi-district litigation, with party and non-party witnesses scattered across the continent, plaintiffs bear the enormous risk of assembling trial-ready evidence that is in admissible form.  This is because plaintiffs cannot count on witnesses being available at trial, subject to the MDL transferee court's subpoena power (or that of a transferor court, should the original actions return to their transferor district for trial).  Consequently, deposition testimony in an MDL action like this one must go beyond pure discovery goals and produce questions and answers that can be presented to a jury, free of evidentiary defects.

The same risks were present for documentary evidence.  Many a class action has been derailed at summary judgment, for example, because of failures to offer critical evidence in a form admissible under the Federal Rules of Evidence.  *See, e.g., In re Oracle Corp. Sec. Litig.*, No. C01-00988, 2009 U.S. Dist. LEXIS 50995, at *27-48 (N.D. Cal. June 16, 2009) (granting summary judgment for defendants where plaintiffs failed to respond to defendants' objections to proffered evidence).  Here, class counsel painstakingly conducted discovery to provide record evidentiary support in admissible form for hundreds of key documents and scores of pieces of

11

deposition testimony.  This was critical at the summary judgment stage, and would be critical for any trial of the action as well.

**(e) The considerable expenses plaintiffs' counsel advanced.**   In assessing the risks plaintiffs' counsel assumed, it must be considered that this was an unusually expensive litigation. The costs stemmed primarily from (i) millions of dollars expended on consulting experts and testifying experts, whose empirical econometric work was critical to plaintiffs ability to meet their burden of proof, and who were critical in combating the testimony of the eleven experts proffered by the defendants; (ii) the enormous expense of videotaped deposition testimony and their transcripts where there were over 130 depositions; and (iii) the cost of utilizing state-of-the-art technology in the form of a web-based document and evidence repository, accessible from the computers of plaintiffs' law firms across the country, 24 hours a day.

*      *      *      *

In sum, plaintiffs' counsel faced risk of non-payment that far exceeded the risk typically encountered in class actions.  Many of defendants' available defenses and arguments—some of which the Court and the First Circuit found credible—operated to preclude any recovery by the Class in federal court.  In light of those risks, if any settlement can justify a 13.2% fee, which will only pay counsel an average of 10.7% of their normal hourly rates, this case does.  *See, e.g., Relafen*, 231 F.R.D. at 80 (complexity of litigation supported fee equal to 33.33% of $67 million settlement by direct purchasers where case lasted four years, presented "complex legal issues," and involved "'some highly technical and complex issues with regard to pharmaceutical pricing and distribution, health insurance and federal regulation and preemption issues'") (citation omitted).

12

### 3. The skill employed in litigating the complex issues supports the fee request

Further criteria outlined by the First Circuit for assessing attorneys' fees in common fund litigation are "the skill required and employed on the case with reference to the intricacy, novelty and complexity of issues" and "the skill and resourcefulness of opposing counsel." *Green*, 326 F.2d at 496. Here, plaintiffs' counsel represented the Class with distinction in this highly complex matter. The accompanying Seaver and Tabacco Declarations detail the complexity and difficulty of litigating the case against some of the most well-regarded antitrust defense counsel in the world.

The Court has expressed the view that this case presented a close question, where the litigation demanded for the parties and the Court a "refinement of perception" in order to "recognize, sift through and organize relevant evidence" and combat "the difficult[y] of discerning the law of the case." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, MDL Docket No. 1532, 2010 U.S. Dist. LEXIS 37955, at *16-17 (D. Me. Apr. 16, 2010) (quoting *White & White, Inc. v. Am. Hosp. Supply Corp.*, 786 F.2d 728, 732-33 (6th Cir. 1986)) (quotation marks omitted). The Court recognized that "[t]he class action questions were exceedingly difficult, as recognized by me and the Court of Appeals." *Id.*, at *17.

The factor of the skill of plaintiffs' counsel and opposing counsel weighs strongly in favor of approval of the requested fee as fair and reasonable.

### 4. The significant time and labor plaintiffs' counsel expended to produce an excellent settlement support the 13.2% fee request

In assessing appropriate attorneys' fees in common fund litigation, courts also consider "the time fairly required to be spent on the case." *Green*, 326 F.2d at 496. In the MDL Action, plaintiffs' counsel have spent over 75,000 hours litigating this matter during the past eight years.

13

Counsel for the State Actions have spent over 46,500 hours, for a combined total of over 121,500 hours. At certain times, the case has required the full-time efforts of dozens of lawyers. Furthermore, as the Seaver Declaration outlines in detail, plaintiffs' counsel's efforts consisted of a substantial amount of sophisticated work regarding novel issues of law and highly complex facts. *See, e.g.,* Seaver Decl. ¶¶ 47-97.

For example, this was an expert-intensive litigation. Plaintiffs' expert economist, Professor Hall, prepared six reports and rebuttal reports. Seaver Decl. ¶ 49. Not to be outdone, defendants served fourteen reports from eleven different expert witnesses (seven economists), not including rebuttal or reply reports, of which there were at least a dozen more. *Id.* ¶¶ 57-58. There came a time in October 2007 when defendants served thirteen of those reports at one time in response to a single report Professor Hall submitted in May 2007. *Id.* ¶ 57. These thirteen defense expert reports totaled over 600 pages of some highly technical opinion testimony on economics, statistics, econometrics, and mathematics, alongside over 600 exhibits. *Id.* ¶¶ 57-59. Plaintiffs' counsel worked closely with their retained consulting experts at Cornerstone Research, and deposed the defendants' expert witnesses over a period of twelve days in December 2007 and January 2008, just weeks after first receiving the reports. *Id.* ¶ 60. Plaintiffs' counsel worked tirelessly to become versed in advanced econometric concepts and modeling before deploying across the country to the cities of Detroit, New York, Chicago, Washington, D.C. and San Francisco to examine the defense expert witnesses. *Id.*

The success of fast-paced maneuvers such as this contributed greatly to the excellent result plaintiffs produced for the Class. The time spent on the case to produce the superior result plaintiffs achieved, therefore, supports the 13.2% fee request.

14

## III.   THE FAIRNESS OF THE ATTORNEYS' FEES PLAINTIFFS REQUEST IS CONFIRMED BY A LODESTAR CROSS-CHECK

Courts frequently "cross-check" the fee requested as a percentage-of-the-fund by analyzing counsel's lodestar, i.e., by multiplying the reasonable hours worked by counsel by their reasonable rates and applying a risk multiplier, if appropriate.  *See Thirteen Appeals*, 56 F.3d at 308.

Here, that cross-check emphatically confirms the fairness of the requested 13.2% of the common fund for attorneys' fees.  Plaintiffs' total lodestar in the MDL Action and the State Actions stands at over $45.9 million.  Compared with that lodestar, the $4.92 million requested fee is exceedingly fair, representing only 10.7% of the total lodestar.  The lodestar cross-check demonstrates the fairness of the fee request.

## <u>CONCLUSION</u>

For all the reasons set forth above, plaintiffs' counsel should be awarded attorneys' fees in the amount of 13.2%, or approximately $4,920,000, and reimbursement of expenses in the amount of $6.27 million.

Dated:  January 7, 2011                  Respectfully submitted,

**BERMAN DeVALERIO**

By:  /s/ Todd A. Seaver
        Todd A. Seaver

Joseph J. Tabacco, Jr.
Matthew D. Pearson
One California Street, Suite 900
San Francisco CA  94111
Telephone:  (415) 433-3200

*Plaintiffs' Chair of the Executive Committee*

15

**POMERANTZ HAUDEK BLOCK GROSSMAN & GROSS**
Michael M. Buchman
100 Park Avenue
New York, NY 10017
Telephone:  (212) 661-1100

***Plaintiffs' Vice-Chair of the Executive Committee***

16

## PLAINTIFFS' EXECUTIVE COMMITTEE

Robert J. Larocca
William E. Hoese
KOHN SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA  19107
Telephone:  (215) 238-1700

Stephen Lowey
Richard W. Cohen
Peter D. St. Phillip, Jr.
LOWEY DANNENBERG COHEN &
   HART, P.C.
The Gateway
One North Lexington Avenue
White Plains, NY  10601
Telephone:  (914) 997-0500

Bernard Persky
Hollis L. Salzman
LABATON SUCHAROW LLP
140 Broadway
New York, NY  10005
Telephone:  (212) 907-0700

Patrick Cafferty
Jennifer Winter Sprengel
CAFFERTY FAUCHER LLP
30 North LaSalle Street
Suite 3200
Chicago, IL  60602
Telephone:  (312) 782-4880

Samuel D. Heins
David Woodward
HEINS MILLS & OLSON, PLC
3550 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Telephone:  (612) 338-4605

17

# Exhibit  A

**In re New Motor Vehicles Canadian Export Antitrust Litigation**
**EXPENSES SUMMARY**

**LITIGATION FUND**

| Expense Category | Amounts | Description |
|---|---|---|
| Expert/Consulting Fees | $ 8,640,731.47 | E.g., Professor Hall, Cornerstone Research |
| Computer Research | $ 403,246.96 | E.g., LextraNet, LEXIS |
| Outside Counsel Fees | $ 301,526.03 | E.g., Canadian Counsel re: Letters Rogatory |
| Court Fees | $ - | |
| Court Reporters/Transcripts/Videographer | $ 250,101.82 | E.g., Merits Depositions |
| Miscellaneous | $ 139.00 | Subscripton to *Automotive News* |
| Postage/Express Delivery/Messenger | $ - | |
| Photocopying | $ 18,523.33 | E.g., Outside Photocopying or Printing |
| Service of Process Fees | $ 1,060.00 | |
| Telephone/Facsimile | $ 13,479.38 | |
| Travel/Meals/Lodging | $ - | |
| California Action Notice Costs | $ 82,744.00 | Published Notice of Pendency in California Action |
| Witness Fees | $ - | |
| **TOTAL** | **$ 9,711,551.99** | |

**EXPENSES PAID DIRECTLY BY FIRMS (not including contributions to Litigation Fund)**

| Expense Category | Amounts |
|---|---:|
| Computer Research | $308,916.64 |
| Court Fees | $18,709.51 |
| Court Reporters/Transcripts/Videographer | $17,643.76 |
| Miscellaneous | $24,606.09 |
| Postage/Express Delivery/Messenger | $53,385.89 |
| Photocopying | $410,285.71 |
| Service of Process Fees | $30,707.05 |
| Telephone/Facsimile | $79,439.60 |
| Travel/Meals/Lodging | $738,994.24 |
| Witness Fees | $270.40 |
| Industry Consultant Fees | $10,000.00 |
| Outside Counsel Fees | $2,319.19 |
| **TOTAL** | **$1,695,278.08** |

| TOTAL CUMULATIVE EXPENSES | $ 11,406,830.07 |
|---|---|