The Honorable D. Brock Hornby

# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| *In re:* | MDL Docket No. 03-1532 |
| *New Motor Vehicles Canadian Export Antitrust Litigation* | **<u>CLASS ACTION</u>**<br><br>**SUPPLEMENTAL REPLY BRIEF IN SUPPORT OF OBJECTION TO PROPOSED SETTLEMENT AND PROPOSED ATTORNEYS' FEE AWARD** |

Daniel Greenberg
(AR BAR 2007193)
**GREENBERG LEGAL SERVICES**
55 Fontenay Circle
Little Rock, AR  72223
DnGrnbrg@gmail.com
(501) 588-4245
Attorney for Objector Theodore H. Frank

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………..3

ARGUMENT
…………………………………………………………………...…………..5

    **I.**    The proposed settlement's clear sailing agreement "increases the likelihood that class counsel will have bargained away something of value to the class" …………………………………………………..5

    **II.**    Class counsel's fee request is unreasonably high, given that the "market-mimicking" approach suggests that the fee should be significantly lower …………………………………………..…7

    **III.**    The *Cy Pres* Provision Materially Diminishes Compensation to Deserving Class Members ………………………………...… 12

CONCLUSION…………………………..……………………………………17

# TABLE OF AUTHORITIES

## CASES

*Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n,* 84 F.3d 451 (D.C. Cir. 1996)……………………………………………………………...……15

*Government Employees Hosp. Ass'n v. Serono Intern., S.A.,* 246 F.R.D. 93, 95 (D. Mass. 2007) …………………………………….....................…………………………... 14

*In re Relafen Antitrust Litigation*, 231 F.R.D. 52, 82 (D. Mass. 2000)............ 13-14

*In re Tyco Intern., Ltd. Multidistrict Litigation,* 535 F. Supp.2d 249, 259, 262 (D.N.H. 2007) …………………………………………………………………… 14

*Masters v. Wilhemina Model Agency, Inc.*, 473 F.3d 423 (2d Cir. 2007)…………………………………………………………..…………… 15

*Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 784, 785 (7th Cir. 2004)……………………………………………………………………….......13

*Molski v. Gleich*, 318 F.3d 937, 954-55 (9th Cir. 2003) ……………………………………………………………………………...…..15

*Nilsen v. York County,* 400 F. Supp.2d 266, 278-79 (D. Maine 2005)…………9, 10

*In re Synthroid Mktg. Litigation,* 264 F.3d 712 (7th Cir. 2001)………………10, 11

*Weinberger v. Great Northern Nekoosa Corp.,* 925 F. 2d 518 (1st Cir. 1991) ... 5, 7

## OTHER AUTHORITIES

American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.07 (2010) ………………….…………………………………..……………...…… 13, 14

Michael Perino, *Markets and Monitors: The Impact of Competition and Experience on Attorneys' Fees in Securities Class Actions,* St. John's University School of Law Legal Studies Research Paper Series, Paper #06-0034, January 2006 …..….11

This brief responds to the Court's request for supplemental briefing based on the oral argument at the February 18, 2011 fairness hearing.

## I.   The proposed settlement's clear sailing agreement "increases the likelihood that class counsel will have bargained away something of value to the class."

Frank's objection defined a 'clear sailing' clause generally as one that "stipulates that attorney awards will not be objected to or contested by opposing parties." Frank Objection, 14. It is hardly a phenomenon unfamiliar to the class action bar or an esoteric definition of the phrase. The First Circuit has offered a similar definition:  "In general, a clear sailing agreement is one where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling." *Weinberger v. Great Northern Nekoosa Corp.,* 925 F. 2d 518, 520 n. 1 (1st Cir. 1991).   These definitions, without being technical, describe the nature of a clear sailing clause.

The clause in question is at Section 19 of the Toyota Settlement Agreement. This section of the Agreement (titled "Litigation Expenses From The Escrow Funds") requires: "After (a) the Settlement becomes Final and (b) the Toyota Defendants are dismissed from all State Actions, Plaintiffs may, *without objection from* [defendant] *TMS,* but subject to the MDL court's approval, withdraw monies

from the Escrow funds to defray the litigation expenses, including necessary expenses and expert fees, of prosecuting claims asserted against the other defendants" (emphasis added). Except for the necessary change of defendant, the language of the companion CADA Settlement Agreement's Section 19 is identical. Both these sections contain, in plain English, all the elements of a clear sailing clause as defined above.

Class counsel argued in court that the Section 19 language is not a clear sailing clause, because its language was "contemplated in 2006 to refer to a circumstance" that "never happened" and now cannot happen. Fairness Hearing Transcript, 66. But whether Section 19 contains a clear sailing agreement cannot be answered by what its drafters might have "contemplated"; rather, the relevant question is the language's practical import and legal effect. An examination of the public language of the settlement agreement, as opposed to class counsel's private thoughts, demonstrates that the Section 19 language is a clear sailing agreement. Notably, that language suggests that if defendants had objected to the fee amount, class counsel could have argued that defendants had breached the agreement. No such fee objection ever occurred, which is of course the central goal of a clear sailing agreement.

A clear sailing agreement is inherently suspect – perhaps even more so in this particular case, when it is part of the express language of the settlement but

plaintiffs deny its existence. As the First Circuit has held, "Such a clause by its very nature deprives the court of the advantages of the adversary process." *Weinberger,* 925 F. 2d at 525. The implication of "absence of adversariness makes heightened judicial oversight of this type of agreement highly desirable. Furthermore, the very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class." *Id.* It is "self-evident" that a clear sailing clause should "put a court on its guard." *Id.* In short, the clear sailing clause in this settlement – like all clear sailing clauses – invites the inference that the settlement's provisions are detrimental to the interests of the class.


II.    **Class counsel's fee request is unreasonably high, given that the "market-mimicking" approach suggests that the fee should be significantly lower.**


It is not clear that plaintiffs correctly apprehend the nature of Frank's objection to the proposed award to plaintiffs of 30% of the $37 million proposed settlement. As repeatedly noted in the original objection, class counsel's award combines counsel's requested fees and requested expenses.

Plaintiffs label Frank's concern "groundless," but do not explain why. They paraphrase this allegedly "groundless" concern by describing it as the claim that

"class counsel will really keep 30% of the Combined Settlement fund for itself." Plaintiffs' Consolidated Reply, 10. The ground for this concern lies in section 16 of the Settlement Notice (titled "How will the lawyers be paid?"), which states that class counsel "are limiting their request for an award of attorneys' fees and costs, combined, to 30% of the Combined Settlement Fund."

Decisions of class counsel – to file suit, to invest their firms' resources, and ultimately to settle – are like any other risky investment with an uncertain return; whatever word or words class counsel decides to adopt in order to describe the 30% of the settlement they request, Frank hopes that this Court will not assume that class counsel is entitled to the complete refunding of its principal as well as a guaranteed return that it sets itself. Class counsel's firm is not in the position of (for instance) a relatively unsophisticated bank customer, who buys a certificate of deposit and can legitimately rely on the full return of principal as well as a low, fixed rate of return. Class counsel's firm is, in contrast and in fact, a risk-taking and entrepreneurial business – an enterprise run by sophisticated businesspeople who make considered choices for business reasons. But even successful and powerful businesses must at times answer to regulators, and in this case, the regulator is this Court. Like any other regulator, this Court may appropriately lay down rules and standards that serve the interests not only of class action lawyers but of everyone else. This Court is quite right to observe that part of its job, in

laying down those rules and standards, is to encourage the socially beneficial practice of law. Fairness Hearing Transcript, 29. The other side of the coin, of course, is that encouraging overly generous attorneys' fees in class actions will create costs for everyone – not just the class clients.

There is no legal authority for any argument to the effect that "costs" have priority over "fees" in class action settlements. If class counsel had desired to prove their claims in what they call "the crucible of adversarial litigation," they might conceivably have won at trial and therefore been entitled to request fees and costs. But they didn't win; they settled. Arguments that class counsel is really only asking for 13.2% of the settlement, not 30% – as well as the arguments that designating some of class counsel's award for "costs" and only the remainder for "fees" somehow insulates class members from the impact of the diminution of the settlement – are little more than games played with words and numbers.

This Court has wisely adopted a "market-mimicking" approach when determining attorneys' fees. *Nilsen v. York County,* 400 F. Supp.2d 266, 278-79 (D. Maine 2005). Among the many virtues of this approach is that a Court which will "look to the market" will discover facts that will likely make judicial fee-setting in some particular case comport with economically justified practices in the rest of the world. *Id.,* at 278. (In contrast, the "highly subjective" approach of a multifactor test could lead to "uncabined discretion," thus raising serious questions

about principled adjudication. *Id.,* at 277.) *Nilsen, id.* at 275, cites a leading Seventh Circuit case on market-mimicking, *In re Synthroid Mktg. Litigation,* 264 F.3d 712 (7th Cir. 2001), that explains market-mimicking methodology in some detail. *Synthroid,* at 718-722. One benchmark useful in market-mimicking that *Synthroid* recommends is data from securities suits, in which large investors hire counsel up front; another benchmark is data from judicial auctions, in which the judge awards the winner the right to be lead counsel. *Id.* at 720.

There is a strong argument that the "highly subjective" multi-factor approach that some courts use to set attorneys' fees (and that *Nilsen* rightly criticizes) tends towards the irrational or conclusory. *See Nilsen* at 277. In contrast, the reliance on empirical evidence at the core of the market-mimicking approach provides an objective foundation for principled judicial decisions involving fee-setting. *Id.* In this case, the available evidence that market-mimicking methodology relies upon demonstrates that the fee percentage that class counsel has chosen for itself is too high.

That evidence is contained in the empirical data on judicial auctions. An auction for the lead-counsel position in a class action places competitive market constraints on fees – constraints that are absent in other class actions. A judicial auction "approximates a market," and the buyer (the judge) looks not so much for the lowest bid as for the best bid – "just as any private individual would do in

selecting a law firm, an advertising firm, or a construction company." *Synthroid,* at 720. All that a court needs to do if it wants to mimic the fee-setting market is to determine what fees would have been obtained by a judicial auction for a case of this size.

That data was compiled in a comprehensive survey in 2006. In a random sample comprising nearly 250 securities fraud class action settlements that ranged from the mid-1990s to the mid-2000s, Professor Michael Perino determined a variety of market-based rates for securities fraud class action settlements. See *Markets and Monitors: The Impact of Competition and Experience on Attorneys' Fees in Securities Class Actions,* St. John's University School of Law Legal Studies Research Paper Series, Paper #06-0034, January 2006. According to Perino, the appropriate market-based fee for a significantly smaller case than the one at issue is just under 11%. *Id.* at 25 (predicted fee for a $25 million settlement is roughly $2.74 million, which is nearly 11%). Perino ends his paper by endorsing the continued use of market-mimicking data (although he does not use the term) by courts so as to rely on the experience of others and to expand competitive bargaining in fee-setting. *Id.* at 35.

Of course, it is always arguable that more data is needed to draw any conclusion. And it is arguable that attorneys' fees in securities fraud cases are fundamentally different from attorneys' fees in antitrust cases. But the second

proposition is a hard case to make. Securities cases, like antitrust cases, require experience with complex litigation, discovery of corporate defendants, and economic experts performing market analysis (either financial markets or consumer markets). If anything, the minor dissimilarities between antitrust class actions and securities class actions suggest that antitrust cases will generate relatively smaller attorneys' fees: plaintiffs in antitrust cases face nothing like the hurdles imposed by the Private Securities Litigation Reform Act. In short, the auction evidence from securities fraud cases serves as a reasonable proxy and suggests that the percentage of the common pool that class counsel has set aside for itself in this case is too high.

To sum up, although class counsel is entitled to a reasonable return on investment for its work, the fees it has requested are too high. As a matter of judicial policy, the court should balance its reluctance to short-change class counsel with its knowledge that high attorneys' fees harm not only class members but also third parties.

### III.   The *Cy Pres* Provision Materially Diminishes Compensation to Deserving Class Members

As noted in Frank's original objection, class counsel's desire to assign a discrete third party hundreds of thousands of dollars by reducing the compensation

of thousands of putatively represented clients by a dollar or two each cannot be justified under the law. The entire point of *cy pres* in the class-action context "is to prevent the defendant from walking away from the litigation scot-free because of the infeasibility of distributing the proceeds … to the class members. There is no indirect benefit to the class from the defendant's giving the money to someone else." *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 784 (7th Cir. 2004). Something has gone wrong somewhere when a *cy pres* remedy is used to assign resources to third parties that could go to class members. American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.07 (2010).

Class counsel cites *In re Relafen Antitrust Litigation,* a district court decision, to justify its argument that *cy pres* will appropriately " 'provide alternative compensation for' class members with the weakest claims." Plaintiffs' Consolidated Reply, 12. Class counsel's recap of *Relafen* omits a crucial fact. In *Relafen,* the settlement approved by the court contemplated the possibility of compensation of class members at rates up to 150 percent of the damage they claimed. *Id.* at, e.g., 63, 66, 67. This is in sharp contrast to the settling parties' proposal in this case, which contemplates a *cy pres* distribution with the full knowledge that class members will thereby be undercompensated.

A *cy pres* distribution that would occur only after all class members were fully compensated is, as such, unobjectionable. That is why Frank's original

objection cited multiple authorities, in addition to *Relafen*, that contemplate *cy pres* only after reasonable efforts are made to fully compensate class members. *See In re Tyco Intern. Ltd. Multidistrict Litigation*, 535 F. Supp.2d 249, 262 (D. N.H. 2007) ("The plan calls for the continued re-distribution of unclaimed funds to class members according to their pro rata shares, until the costs of such redistributions make it economically unfeasible to continue doing so. If and when that point is reached, then the balance of the fund will be subject to a *cy pres* remedy."); *Government Employees Hosp. Ass'n v. Serono Intern., S.A.,* 246 F.R.D. 93, 95 (D. Mass. 2007) (Settlement amount "specifically allocated" to class members; "This amount was expected to be sufficient to fully pay all of the claims"; "Any excess was to be distributed as a *cy pres* fund"); American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.07 (2010). The path of the law is that settlement resources preferably go first to identifiable, deserving class members who have filed a claim; especially when class members remain uncompensated, assigning resources to the general public is less desirable. Class counsel might just as well, with about as much justification, send a check to everyone in the relevant list of states, motivated by the hope that many recipients are deserving class members.

Furthermore, the particular *cy pres* programs that class counsel proposes (Fairness Hearing Transcript, 55-57) underscore why those plans are deficient. Class counsel argues that the *cy pres* programs that it advocates are not directed to

the general public, because they will instead (for instance) educate deputy attorney generals to better work on behalf of the public. *Id.* Class counsel's argument – that a *cy pres* program is not directed at the public, so long as it trains a public official how best to exercise his or her public authority to benefit the public – is ingenious but unimpressive. Of course, there is no material difference between a *cy pres* program which directs resources to a public official whose job it is to represent the public and a *cy pres* program which directs resources to a private charity with a charter that benefits the public. Furthermore, a significant concern for any *cy pres* remedy aimed at helping a public body supply a public benefit is that the remedy may simply motivate concomitant reductions in funding to those offices that already supply the benefit in question; see *Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n,* 84 F.3d 451, 458 (D.C. Cir. 1996). But the fundamental defect of the *cy pres* remedy in this case is not repairable by promises that the remedy will serve the particular interests of the public at issue in this case: the fundamental defect is that resources from the common pool have been diverted from deserving and uncompensated class members in favor of an inferior alternative. See *Molski v. Gleich*, 318 F.3d 937, 954 (9th Cir. 2003) (*cy pres* remedy impermissible, because it was in lieu of "claims for actual and treble damages of potentially thousands of individuals"); *Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423, 435-36 (2d Cir. 2007)(appellate court, remanding,

notes that the lower court "was not aware of the extent of its discretion" with respect to *cy pres*, because *cy pres* is an inferior alternative when identifiable class members can feasibly be compensated).

Class counsel's third argument in defense of its *cy pres* proposal – that it has "minimal effect," is "modest in its total amount," has "little effect" on any individual recovery, and that awarding it to actual class members would "only" get each one of its clients "about $1.14" (Plaintiff's Consolidated Reply Brief, 13) – is remarkable in its implications. Class counsel has a fiduciary duty to those it putatively represents. Class counsel's recommendation to divert settlement resources away from its clients and towards the general public suggests a less than diligent attachment to this fiduciary duty. An agent who breaches a fiduciary duty cannot argue in defense that the amount was modest or that the effect was minimal, whether the monies in question are described as half a million dollars or a measly $1.14 per claimant.

As noted above, the *cy pres* award fails to benefit class members directly; as noted in Frank's original objection, its value should arguably not be a factor in the calculation of class counsel's share of the settlement. In its reply brief, class counsel argues that Frank "misapprehends the nature" of the *cy pres* award and the fee request, supporting this accusation by noting that the *cy pres* award does not change the value of the common fund. Plaintiffs' Consolidated Reply Brief, 14.

Certainly, the award comes from the common fund, but the relevance of this fact is less than clear. The proposition that the *cy pres* benefit will be drawn from the common fund but will accrue only incidentally to class members is also true, and arguably more relevant: the fraction of the *cy pres* award (class counsel, using yet another eyebrow-raising phrase, say it's "a mere 1.35%" of the common fund, *id.*) is money conferring a benefit that class members as such do not see. The nature of the common fund is that its highest and best use is to compensate class members, and the nature of the *cy pres* award is that by definition it cannot do so.

## CONCLUSION

In conclusion, this Court should take two actions if and when it approves this settlement. First, this Court should significantly reduce the percentage of the settlement's common pool that goes to class counsel, ideally down to 25%. Second, it should eliminate the *cy pres* portion of the settlement, which as noted above is of dubious legitimacy for multiple reasons. However, with respect to this second suggestion, there is an alternative that the Court might consider.

Class counsel's proposed *cy pres* remedy is an attempt to distribute a relatively small portion of the settlement to "Class Members with the weakest claims." Plaintiffs' Consolidated Reply Brief, 12. There is some tension between,

first, the duty of class counsel to represent the entire class and, second, the decision of class counsel to apportion individualized benefits to one subclass and a generalized *cy pres* benefit that will with some luck reach the rest of the class members with the weakest claims. It would arguably be an overreaction to scuttle the settlement at this point on the grounds that class counsel has a conflict as between its representation of two subclasses. However, in view of this possible problem, the Court might consider funding a *cy pres* settlement by reducing by $500,000 or so (a sum, according to class counsel, "modest in its total amount") the portion of the common pool designated for class counsel. An equal sum of money would thereby be available for its highest and best use: an increase in the common pool that goes to individual class members. If the Court addressed the *cy pres* problem by exercising its judicial discretion to fund the award from class counsel's portion of the settlement, that solution (while hardly routine) would arguably be well within the Court's equitable powers.

To summarize, this Court should reduce class counsel's fees and either fund the *cy pres* award from the portion of the pool that class counsel had originally designated for itself or eliminate the *cy pres* award entirely.


Dated: March 2, 2010

Respectfully submitted,

*/s/ Daniel Greenberg*
Daniel Greenberg
(AR BAR 2007193)
**GREENBERG LEGAL SERVICES**
55 Fontenay Circle
Little Rock, AR  72223
DnGrnbrg@gmail.com
(501) 588-4245
Attorney  for  Objector  Theodore  H.
Frank