The Honorable D. Brock Hornby

# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| *In re:* | MDL Docket No. 03-1532 |
|---|---|
| *New Motor Vehicles Canadian Export Antitrust Litigation* | **CLASS ACTION** <br><br> **OBJECTOR'S RESPONSE TO PLAINTIFFS' SUPPLEMENTAL BRIEF** |

Daniel Greenberg
(AR BAR 2007193)
**GREENBERG LEGAL SERVICES**
55 Fontenay Circle
Little Rock, AR  72223
DnGrnbrg@gmail.com
(501) 588-4245
Attorney for Objector Theodore H. Frank

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………….3

ARGUMENT …………………………………………………...………………….4

    **I.**    Data Trumps Anecdotes……………………………………………....5
    **II.**   Some Data Is Better Than Others ……………………………………..8
    **III.**  Class Counsel's Arguments Suggest That Its Fees Should Be Lower ………………………………………………………………………. 9

CONCLUSION…………………………………..……………………………………17

# TABLE OF AUTHORITIES

## CASES

*In re Cabletron Systems Inc. Securities Litigation,* 239 F.R.D. 30, 38 (D. N.H. 2006) ………………………………………………………………………………….7

*In re Cont'l Sec. Litig.,* 962 F. 2d 566, 570 (7th Cir. 1992) ……………………….6

*In re Merry-Go-Round Enterprises, Inc.,* 244 B.R. 327 (D. Md. 2000) ………...5, 7

*In re Synthroid Mktg. Litigation,* 264 F.3d 712 (7th Cir. 2001)……………..…9, 12

*In re Tyson Foods, Inc.,* 2004 WL 1396269 (D. Del. Jun. 17, 2004) at * 12 …..6

*Jones v. Harris Associates L.P,* 527 F.3d 627 (7th Cir. 2008), *vacated*, 130 S. Ct. 1418 (2010) ……………………………………………………………………….11

*Nilsen v. York County*, 400 F.Supp.2d 266 (D. Me.2005) ……………….5-7, 9-11

## OTHER AUTHORITIES

Lande & Davis, *Benefits From Private Antitrust Enforcement: An Analysis of Forty Cases,* 42 U.S.F. L. Rev. 879 (July 2008) ………………………………….8

Perino, *Markets and Monitors: The Impact of Competition and Experience on Attorneys' Fees in Securities Class Actions,* St. John's University School of Law Legal Studies Research Paper Series, Paper #06-0034, January 2006 ……………9

Schwartz & Wilde, *Imperfect Information in Markets for Contract Terms,* 69 Va. L.Rev. 1387 (1983) …………………………………………………………….11

## INTRODUCTION

Objector Theodore H. Frank thanks this Court for the opportunity to respond to Plaintiffs' Supplemental Brief In Further Support of Motion for an Award of Attorneys' Fees and Reimbursement of Expenses Advanced By Class Counsel of March 2, 2011.

Plaintiffs' supplemental brief makes several arguments to justify its request for 30% of the $37 million proposed settlement which are difficult to square either with precedent or economic analysis. That brief misconstrues both the method and the application of this Court's "market-mimicking" precedents: it confuses competitive markets with monopolies, argues that an anecdote is more relevant than a scientific survey, and even suggests that courts are unequipped to make intelligent decisions. These are not minor errors comparable to mistakes in spelling or grammar: instead, like a worm in an apple, these flaws contaminate the market-mimicking analysis that was requested by this Court. To top it off, Plaintiffs' criticism of data supplied to this Court actually supports the conclusion that Plaintiffs' fee request should be lower, not higher. Those who desire consensus among the parties will be relieved to hear that – on this point – Plaintiffs and Objector Frank agree.

## I. Data Trumps Anecdotes

Roughly half of Plaintiffs' brief comprises an extensive recitation of the facts of *In re Merry-Go-Round Enterprises, Inc.,* 244 B.R. 327 (D. Md. 2000), followed by an attempt to draw analogies to the action at hand. Although the citation of non-precedential district court cases in other circuits is sometimes useful to illustrate relevant law or facts, Plaintiffs' attempt to rely on the precedential force of *Merry-Go-Round* for purposes of market-mimicking suggests a misunderstanding or misapplication of basic economic analysis.

As this court noted in *Nilsen v. York County*, 400 F.Supp.2d 266, 278 (D. Me.2005), when it explained the superiority of a market-oriented approach to the question of fees: " If a consumer wanted to determine a reasonable plumber's, mechanic's or dentist's fee, the consumer would have to look to the market. Why should lawyers be different?" The clarity and compactness of this Court's explanation may have caused Plaintiffs to overlook some subtle aspects of the market-mimicking method. Notably, those who want to determine a reasonable plumber's fee (for example) should not simply "look to another plumber." Rather, they "look to the market" – a price system generated by an arguably infinite number of objective facts, subjective perceptions, and human choices.

Prices in markets are fundamentally different from holdings of cases: although a holding in one decision can serve as a powerful or even precedential argument in another, the Nation's entire judicial system relies on the premise that its findings and holdings can be correctly collected, analyzed, and articulated by courts. Markets aren't like that: the price system they produce is the result of a near-infinite compilation of information produced by decisions of innumerable actors, information which in raw form may be impossible to comprehend or express in words. This idea is, of course, commonplace in any analysis of complex financial markets; see, e.g., *In re Tyson Foods, Inc.,* 2004 WL 1396269 (D. Del. Jun. 17, 2004) at * 12 ("as the price for securities on open markets is the function of numerous factors and participants, it is rarely possible to isolate a single event as the sole cause of a particular downturn or upturn in the security's price"). Markets efficiently set prices, but people can't: the information that the price system collects is both too extensive and too subtle. Or, to put it more economically, "Markets know market values better than judges do." *Nilsen* at n. 30, quoting *In re Cont'l Sec. Litig.,* 962 F. 2d 566, 570 (7th Cir. 1992). Men and women can be trained to draw distinctions between diverse cases, but they will always be hopelessly inept at setting prices. Finding a favorable case and drawing parallels with another one for seven pages may be strong legal analysis; as regards economic analysis, it is weak tea.

Class counsel's mistake – choosing an anecdote or two over a larger and more meaningful array of data in advocating for their own fees – is hardly unique to this class action. A recent decision in this circuit, *In re Cabletron Systems Inc. Securities Litigation,* 239 F.R.D. 30, 38 (D. N.H. 2006) introduces its fee-setting analysis by criticizing other class action attorneys for making precisely the same mistake that Plaintiffs make here:

> "Plaintiffs' counsel contend that its 30 percent/$3.15 million fee request is reasonable and common in securities class actions, and reflects what would have been contracted for in the private marketplace. For support, Plaintiffs' counsel rely primarily upon numerous examples in which district courts have awarded fees in this percentage range. Contrary to this claim, however, these examples do not accurately reflect actual experience (or the marketplace) in any statistically significant way; rather, they are merely anecdotal examples of cases in which courts have awarded a fee of 30 percent. For the reasons discussed below, this Court rejects the common practice of reflexively awarding 30 percent (and calling this market-based). This practice mislabels the award as "market-based" and arguably abdicates a district court's obligation to carefully examine the fee request for reasonableness."

The majority of Plaintiffs' supplemental brief rests on *Merry-Go-Round* and a few other cherry-picked decisions from other circuits (which are equally inapposite, for the reasons expressed above). Plaintiff's Supplemental Brief, at 2-8, 11-12. *Nilsen's* suggestion that we "look to the market" means more than looking to a few isolated instances. Instead, looking to the market requires scrutiny of datasets that say something meaningful about large numbers of cases.

## II. Some Data Is Better Than Others

At root, the market-mimicking approach relies on statistically significant data. Plaintiffs implicitly recognize this by their continued references to Lande's and Davis's study, *Benefits From Private Antitrust Enforcement: An Analysis of Forty Cases,* 42 U.S.F. L. Rev. 879 (July 2008), a study sponsored by the trial-lawyer-friendly American Antitrust Institute. *E.g.,* Plaintiffs' Supplemental Brief, at 13. But this data doesn't demonstrate what Plaintiffs need it to.

This study fails to reveal market rates; it is therefore essentially unusable for market-mimicking analysis. Rather, this article is a study of the fees that courts have ordered. Furthermore, it would probably be a mistake to interpret the article as some sort of unambiguous endorsement of judicial fee-setting, given that Lande and Davis cite several law review articles criticizing excessive fees. Lande and Davis, at 886 n. 32.

Exactly one of the forty cases that Lande and Davis analyzed involved a market rate achieved by auction; namely, the *Auction Houses* case mentioned at Table 7c. In this case, Boies Schiller won the lead-counsel role by means of its fee bid of 5.2 percent. There is, of course, substantial room for doubt about this figure's statistical significance – just as there is substantial room for doubt about the relevance to market-mimicking of the study's other 39 cases.

Fees set by courts are not products of markets. Markets, as noted above, generate prices based on the actions and choices of innumerable actors. Courts typically set fees based on elaborate processes and negotiations between two litigants in a process governed by Federal Rule of Civil Procedure 23(h). There are fundamental differences between litigants and consumers; litigants in the class-action context are often bilateral monopolies attempting to get a better deal solely from each other, not free-market actors who face competition from third parties.

In short, with respect to market-mimicking, the data for nearly 250 cases provided in an earlier brief – from Michael Perino's *Markets and Monitors: The Impact of Competition and Experience on Attorneys' Fees in Securities Class Actions,* St. John's University School of Law Legal Studies Research Paper Series, Paper #06-0034, January 2006 – is likely more reliable. As noted previously, the appropriate market-based fee for a significantly smaller case than the one at issue is just under 11%. *Id.* at 25 (predicted fee for a $25 million settlement is roughly $2.74 million, which is nearly 11%).

### III. Class Counsel's Arguments Suggest That Its Fees Should Be Lower

One notable feature of Plaintiffs' brief is its unusual interpretation of portions both of *Nilsen* and of a leading Seventh Circuit analysis of market-mimicking, *In re Synthroid Mktg. Litigation,* 264 F.3d 712 (7th Cir. 2001). Citing Synthroid and Nilsen, Plaintiffs argue that "lead counsel auctions are a poor

mechanism for replicating the market price for legal services," largely because such auctions are based on a "feeling" that the court gets about the relative quality of bidders – and that these decisions merit criticism because they are "instinctive" (and, therefore, presumably irrational). Plaintiffs' Supplemental Brief, at 9. More particularly, Plaintiffs' concern is apparently (at least in part) that lead counsel auctions "force a judge to select the law firm that presents the "best" bid and not necessarily the "lowest" bid, based on the evaluation of whether the firm "seems likely" to generate the highest recovery net of fees." *Id.*, quoting *Synthroid.*

One remarkable aspect of Plaintiffs' interpretation is that it is flatly inconsistent with extensive passages in *Nilsen. Nilsen* warns that the "highly subjective" approach of a multifactor test could lead to "uncabined discretion," thus creating an appearance of unprincipled adjudication. *Id.,* at 277. In *Nilsen,* this Court *contrasted* its market-mimicking approach to a multifactor approach, concluding that market-mimicking's "objective external constraint on a judge's otherwise uncabined power …has its own shortcomings but it is better than the fuzzier alternatives." *Id*. at 278-79. In part, that is because a multifactor approach does "not produce a result or even a substantive standard of reasonableness. At the very least, the market-mimicking approach is situated outside the judge's *Gestalt,* in a somewhat more objective realm." *Id*., at n. 30.

In short, this aspect of *Nilsen* is best understood as a criticism of certain kinds of "fuzzier" decision-making. That interpretation presumably motivates Plaintiffs' emphasis on disfavored "feelings" and "instincts" when arguing for the relative inferiority of lead counsel auctions. Plaintiffs' Supplemental Brief, at 9. But there are plenty of consumers in the market who are chock-full of feelings and instincts on a regular basis: somehow, the market continues to be worthwhile to look to, even absent perfect information and uniformly rational decision-making. In the face of a similar claim about irrational consumers, perhaps the Seventh Circuit was right to opine that that "It won't do to reply that most investors are unsophisticated and don't compare prices. The sophisticated investors who do shop create a competitive pressure that protects the rest." *Jones v. Harris Associates L.P,* 527 F.3d 627 (7th Cir. 2008), *vacated*, 130 S. Ct. 1418 (2010), citing Alan Schwartz & Louis Wilde, *Imperfect Information in Markets for Contract Terms,* 69 Va. L.Rev. 1387 (1983). In fact, judges' knowledge of the work ethic and work product of the attorneys who practice before their Court likely compares well to the average purchaser of consumer goods; any auction market in which lawyers repeatedly compete before a judge knowledgeable about their work is probably as efficient as the markets that determine a "plumber's, mechanic's, or dentist's fee."

Another remarkable aspect of Plaintiffs' criticism of lead counsel auctions is that it leads logically to the conclusion that Plaintiffs' fees should be lower.

Plaintiffs criticize lead counsel auctions because (to repeat) they "force a judge to select the law firm that presents the "best" bid and not necessarily the "lowest" bid, based on the evaluation of whether the firm "seems likely" to generate the highest recovery net of fees." Plaintiffs' Supplemental Brief, at 9, quoting *Synthroid*. Plaintiffs' criticism of lead counsel auctions seems to be based on the view that judges conducting them make sub-par hiring decisions, in part because those judges have instincts and feelings which govern their choices and so might irrationally fail to give the low bidder a shot at the contract. Plaintiffs' proposed theory – that lead counsel auctions are systemically biased towards irrationally high fees – is certainly courageous: this argument deserves credit, if for no other reason than one would hardly expect that it would originate from Plaintiffs. But its unexpectedness may cut both ways: it had certainly never occurred to this writer that Plaintiffs would so desire to blacken the informational value of auctions that it would resort to arguing that those auctions produce irrationally high prices. However, the implications of this argument – namely, that the evidence we get when we "look to the market" of lead counsel auctions really ought to be adjusted downwards – presumably had not occurred to Plaintiffs.

## CONCLUSION

As requested previously, this Court should take two actions if and when it approves this settlement. First, this Court should significantly reduce the

percentage of the settlement's common pool that goes to class counsel, ideally down to 25%. As noted above, there are multiple serious and credible arguments that the percentage of the pool that Plaintiffs ask for themselves is simply too high. Second, it should eliminate the *cy pres* portion of the settlement, which is of dubious legitimacy for multiple reasons, or fund it from the portion of the pool that class counsel had originally designated for itself.

Dated: March 9, 2010

                                      Respectfully submitted,

                                      */s/ Daniel Greenberg*
                                      Daniel Greenberg
                                      (AR BAR 2007193)
                                      **GREENBERG LEGAL SERVICES**
                                      55 Fontenay Circle
                                      Little Rock, AR  72223
                                      DnGrnbrg@gmail.com
                                      (501) 588-4245
                                      Attorney for Objector Theodore H. Frank

# CERTIFICATE OF SERVICE

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court using the ECF system, with the advice and assistance of the staff of the Clerk's office.

I hereby further certify that on this day I caused a true and correct copy of the foregoing to be served via First Class Mail upon addressees designated below.

Clerk of the Court
United States District Court
District of Maine
156 Federal Street
Portland, ME 04101

Canadian Export Antitrust Litigation
c/o Gilardi & Co. LLC
Box 808061
Petaluma, CA 94975-8061


DATED this 9th day of March, 2011.


*(s) Daniel Greenberg*

Daniel Greenberg