# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| IN RE NEW MOTOR VEHICLES | ] | |
| CANADIAN EXPORT ANTITRUST | ] | MDL DOCKET NO. 1532 |
| LITIGATION | ] | |

## DECISION AND ORDER ON PROPOSED SETTLEMENTS AND PLAN OF ALLOCATION

We are approaching the end of a very complex multidistrict antitrust class action lawsuit.[1]  The case has been proceeding here now for almost eight years.  Magistrate Judge Kravchuk and I have been intensively involved in its management and in substantive decisions.  Although the end is tantalizingly near, complex matters do not often close easily or cleanly, and this case is no exception.  Despite the quality of the plaintiffs' lawyers' advocacy (during the course of the lawsuit they were up against formidable opponents), and obvious frustration in not being able to obtain cloture (I know they would like to stanch the hemorrhaging of attorney time and expense), after the fairness hearing on the class action settlement as to two defendants, a few issues still remain.

### BACKGROUND

The plaintiffs attacked, in a number of jurisdictions, alleged restrictions on the export of new automobiles from Canada to the United States, claiming that the restrictions affected U.S. prices for cars.  They requested class action

---

[1] Parts of the lawsuit are already treated in antitrust or complex litigation casebooks/treatises.  See, e.g., R. MARCUS, COMPLEX LITIGATION: CASES AND MATERIALS ON ADVANCED CIVIL PROCEDURE 487 (5th ed. 2010); ERIC J. MCCARTHY, INDIRECT PURCHASER LAWSUITS: A STATE-BY-STATE SURVEY 127, 168, 174, 271 (ABA Section on Litigation 2010).

status for their claims.  The Multidistrict Litigation Panel ("MDL") sent all the federal cases (over two dozen) to this court. A number of parallel state court lawsuits also are pending; one in California is proceeding actively.[2]

Here in the MDL case, the plaintiffs and their lawyers have confronted a succession of challenges: among others, personal jurisdiction over some defendants; the viability of any federal antitrust claim at all; the viability of state law damages claims; the certifiability of a class or classes; and their ability to prove antitrust causation.  They lost their federal damages claim on a motion to dismiss at the trial level,[3] and lost their federal injunctive claim in the court of appeals for lack of a continuing case or controversy due to changed U.S./Canada exchange rates.[4]  They lost some of their state law damages claims on another motion to dismiss.[5]  They obtained class certification at the trial level on a federal injunctive claim and twenty state law damages claims,[6] but had it taken away (only provisionally as to the state law certifications) in the court of appeals.[7]  Ultimately they lost summary judgment at the trial level on all their remaining state law claims against all the remaining defendants

---

[2] For example, in May 2009 the California Superior Court certified a class comprised of those who purchased a new vehicle in California during the period January 1, 2001 to April 30, 2003. Automobile Antitrust Cases I & II, JCCP No. 4298 and 4303 (Cal. Super Ct., San Francisco Cty.) (Kramer, J.). See Letter to Court dated May 22, 2009 (Docket Item 1015). That court is now considering various motions for summary judgment.  See Tr. of Proceedings February 18, 2011 at 8-11 (Docket Item 1155).

[3] In re New Motor Vehicles Canadian Export Antitrust Litig., 307 F. Supp. 2d 136 (D. Me. 2004).

[4] In re New Motor Vehicles Canadian Export Antitrust Litig., 522 F.3d 6 (1st Cir. 2008).

[5] In re New Motor Vehicles Canadian Export Antitrust Litig., 241 F.R.D. 77 (D. Me. 2007).

[6] In re New Motor Vehicles Canadian Export Antitrust Litig., 243 F.R.D. 20 (D. Me. 2007)

[7] In re New Motor Vehicles Canadian Export Antitrust Litig., 522 F.3d 6.

because of an inability to produce evidence of antitrust impact upon the uniform basis they had chosen in order to maintain class action treatment.[8]

Relatively early in the proceedings (2006), however, the plaintiffs did persuade two defendants to settle—Toyota for $35 million, and CADA for $700,000.  Both Settlements include cash and non-cash components, and have co-extensive Settlement Classes.  As of October 31, 2010, with interest, they amounted to a total of $37.3 million.[9]

On October 4, 2010, I approved the plaintiffs' proposed settlement class and ordered notice of a fairness hearing and a claims procedure.[10]   On February 18, 2011, I held a fairness hearing on the two settlements, the plaintiffs' proposed allocation of settlement funds, and their requests for attorney fees and expenses.  Through their lawyers, the plaintiffs assured me that there are no side agreements.[11]  Two objectors appeared through counsel, in addition to their written filings.  Three other objections were filed solely in writing.[12]

The open issues are:   whether to approve the parties' settlements; whether to approve the plaintiffs' proposed allocation of settlement funds; what

---

[8] In re New Motor Vehicles Canadian Export Antitrust Litig., 632 F. Supp. 2d 42 (D. Me. 2009).
[9] Decl. of Joseph Tabacco ¶ 18 (Docket Item 1132).
[10] Order Certifying Settlement Classes for the Purpose of Disseminating Notice (Docket Item 1123).  The plaintiffs sought preliminary approval of the settlements years earlier, but I resisted.  See Procedural Order of June 16, 2006 (Docket Item 376), and Tr. of Proceedings of June 1, 2006 (Docket Item 370).
[11] Fed. R. Civ. P. 23(e)(3).
[12] Fed. R. Civ. P. 23(e)(5).

attorney fees and expenses to award; and whether to approve finally the notice that has issued and allow the certification of the class to stand.[13]

### SETTLEMENT AND ALLOCATION

For a settlement proposal in a class action, Rule 23(e) of the Federal Rules of Civil Procedure requires:

> (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
>
> (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
>
> (3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.
>
> (4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.
>
> (5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

Here, (1) notice has been given; (2) the hearing has occurred; (3) I have inquired about any agreements (there are none); (4) there was no previous class certification within the meaning of (4); and (5) objectors have appeared and not withdrawn. What remains is for me to determine whether the proposal is "fair, reasonable and adequate."

As is often the case, the settlement agreements themselves do not address allocation of the settlement funds. I therefore consider separately the settlement agreements as such and the plaintiffs' proposed allocation plan.[14]

---

[13] Rule 23(c)(1)(C) provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment."

## FAIRNESS, REASONABLENESS AND ADEQUACY
## OF THE TWO SETTLEMENT AGREEMENTS

Previous caselaw has identified a number of factors for deciding whether settlements are fair, reasonable and adequate.[15]  But in candor, the only thing that really matters here in approving the overall settlement amounts is that there *are* settlement funds—and they are substantial.  I say that because now, at the end of the lawsuit, we know that the plaintiffs' had what was ultimately a losing case.  If I were to reject the settlement agreements, there would be no improvement for class members; instead, the plaintiff class would get nothing, and Toyota and CADA would walk away with the $37.3 million.

In evaluating the settlements, I consider nevertheless the customary list of factors to satisfy appellate review:   (1) a comparison of the proposed settlement with the likely outcome of litigation; (2) the stage at which the matter settled and the amount of discovery completed; (3) the reaction of the class to the settlements, including the number of objectors and the nature of the objections; (4) the quality of the plaintiffs' lawyers' representation; (5) the

---

[14] Rule 23(e) applies to voluntary dismissal as well as settlement and compromise, and the court must deal with "the proposal."   The commentators generally speak of it all as "settlement."  See, e.g., PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION CH. 3 (2009).

[15] See, e.g., City P'ship Co. v. Atlantic Acquisition Ltd. P'ship, 100 F.3d 1041, 1043 (1st Cir. 1996) (sufficient discovery and bargaining at arm's length creates a presumption in favor of settlement approval); Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 116-17 (2d Cir. 2005) (factors courts consider when examining the fairness, adequacy, and reasonableness of a class settlement:   (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation).

conduct of the negotiations; and (6) the prospects of the case, including risk,

complexity, expense, and duration.[16]

---

[16] See In re Compact Disc Minimum Advertised Price Antitrust Litig., 216 F.R.D. 197, 206 (D. Me. 2003) (noting that the First Circuit has not adopted a specific test to evaluate class action settlements but that other circuits consider these factors); see also Wal-Mart Stores, 396 F.3d at 117 (considering similar factors); 4 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 11:43, AT 120-21 (4th ed. 2002). THE PRINCIPLES OF AGGREGATE LITIGATION have tried to condense and rationalize the caselaw's multitude of factors to the following:

> (a)     Before approving or rejecting any class-wide settlement, a court must conduct a fairness hearing.  A court reviewing the fairness of a proposed class-action settlement must address, in on-the-record findings and conclusions, whether:
> (1)     the class representatives and class counsel have been and currently are adequately representing the class;
> (2)     the relief afforded to the class (taking into account any ancillary agreement that may be part of the settlement) is fair and reasonable given the costs, risks, probability of success, and delays of trial and appeal;
> (3)     class members are treated equitably (relative to each other) based on their facts and circumstances and are not disadvantaged by the settlement considered as a whole; and
> (4)     the settlement was negotiated at arm's length and was not the product of collusion.
> (b)     The court may approve a settlement only if it finds, based on the criteria in subsection (a), that the settlement would be fair to the class and to every substantial segment of the class.  A negative finding on any of the criteria specified in subsections (a)(1)–(a)(4) renders the settlement unfair.  A settlement may also be found to be unfair for any other significant reason that may arise from the facts and circumstances of the particular case.
> (c)     The burden is on the proponents of a settlement to establish that the settlement is fair and reasonable to the absent class members who are to be bound by that settlement.  In reviewing a proposed settlement, a court should not apply any presumption that the settlement is fair and reasonable.
> (d)     A court may approve or disapprove a class settlement but may not of its own accord amend the settlement to add, delete, or modify any term.  The court may, however, inform the parties that it will not approve a settlement unless the parties amend the agreement in a manner specified by the court.  This subsection does not limit the court's authority to set fair and reasonable attorneys' fees.

PRINCIPLES OF AGGREGATE LITIGATION § 3.05 (Judicial Review of The Fairness of A Class Settlement).  The First Circuit has said that "[i]f the parties negotiated at arm's length and conducted sufficient discovery, the district court must presume the settlement is reasonable." In re Pharm. Indus. Average Wholesale Price Litig., 588 F.3d 24, 32-33 (1st Cir. 2009) (citing City P'ship Co., 100 F.3d at 1043).  But here I need not rely on that presumption, which commentators have attacked.  See PRINCIPLES OF AGGREGATE LITIGATION § 3.05(c) and cmt. c (critique of presumption of fairness).

**(1)    *Comparing the Settlement to the Likely Outcome***

As I have said, in this case the settlement amount is the most important factor.  It is easy to conclude that the settlement agreements with Toyota and CADA were fair and reasonable in amount.[17]  We know now that the plaintiffs had a losing case, and thus the recoveries that they achieved from these two defendants actually are remarkable.[18]  This factor favors approval.

**(2)    *Stage at Which the Lawsuit Settled and the Amount of Discovery***

Approximately three years of litigation passed between the lawsuit's filing and the settlements.  Discovery had been active and ongoing and now, after five more years of hard-fought litigation, discovery is complete, and we know all there is to know.  Litigation success is and was impossible.  This factor favors approval.

**(3)    *Class Reaction and Objectors***

Class reaction to proposed settlements of modest claims is often muted, and I do not give it great weight.  The reaction to the settlement here by the approximately 11.3 million eligible claimants who could qualify for a cash recovery and the overall 70.7 million class members has been favorable.  Claims for 438,169 vehicle transactions have been filed.[19]  There are only four

---

[17] Apart from the cash settlements, the plaintiffs obtained important value (at the time) in these defendants' promised cooperation in discovery during the ongoing litigation.  There is modest marginal value in the settlement's additional requirement that Toyota and CADA not engage in any conduct that violates section 1 of the Sherman Act through December 31, 2011.

[18] I realize that this evaluation uses hindsight, whereas the parties negotiated their settlement with what they knew then.  But from the outset, this was an uphill case, in light of Illinois Brick and the difficulties of proving antitrust impact in a class action on behalf of vehicle purchasers (given the dynamics of the car purchasing market).

[19] Supp. Decl. of Dennis Gilardi Reporting on Notice and Claims Administration ¶ 17 (Docket Item 1144-1).  Fleet purchasers filed 32 fleet claims, representing 430,236 vehicle purchases, *(continued next page)*

requests for exclusion[20] and only five objections, covering nine settlement class

members.[21]   None of the objectors claims that the overall results achieved by

the settlement are inadequate.   Instead, they object to the proposed plan of

allocation among class members, the proposed $500,000 cy pres component,

the requested attorney fees award, and aspects of the notice and the claims

process.[22]

---

and 7,933 claims were filed by individual purchasers.  Supp. Decl. of Dennis Gilardi Reporting on Notice and Claims Administration ¶ 17 (Docket Item 1144-1).

[20] Id. ¶ 19.

[21] Objections (Docket Items 1135, 1136, 1138, 1139, 1140).

[22] Some objections are unworthy of lengthy discussion.  First, Joseph Jones asserts that although he was not a class representative or named class member, he is entitled to a $750 incentive payment because he is "giving up my right to sue the defendant with no absolute guarantee I will receive any payment from the settlement fund."  Letter of Objection (Docket Item 1135).  Mr. Jones was not deposed and, thus, he is not entitled to an incentive payment. Like all other class members, Mr. Jones must give up his right to sue the defendant without any guarantee of payment.  (Mr. Jones had the opportunity to opt out of the settlement and, if he desired, bring his own action against Toyota and CADA.)  Second, Kenneth Harris objects generally to the limited time period for which monetary recovery is available and the requirement that he must "'declare under penalty of perjury' that the consumer claim form is 'true and correct.'"  Letter of Objection (Docket Item 1139).  The time period has been limited by earlier substantive decisions that I and the Court of Appeals made based on currency exchange rates—this is the law of the case.  Swearing to the accuracy of the information provided on the claim form is a reasonable requirement to assure the truth and reliability of the claims submitted for payment from the common fund.

Theodore Frank objects to the settlement in part because of the presence of a clear sailing provision.  Notice of Appearance and Objection to Proposed Settlement and Proposed Attorneys' Fee Award at 14-15 (Docket Item 1138) (a "clear sailing" provision, which requires "aggressive judicial scrutiny").  In Weinberger v. Great N. Nekoosa Corp., 925 F.2d 518, 520 n.1 (1st Cir. 1991), the court defined a "clear sailing" agreement as "one where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling."  In general, such clauses are objectionable because they create the likelihood that plaintiffs' counsel, in obtaining defendants' agreement not to challenge a fee request under a stated ceiling, will bargain away something of value to the plaintiff class.  Mr. Frank's claim that these Settlement Agreements contain a "clear sailing" provision is factually incorrect.  The language in the Settlement Agreements upon which he relies provides:

> Litigation Expenses From The Escrow Funds.  After (a) the Settlement becomes Final and (b) the Toyota Defendants are dismissed from all State Actions, Plaintiffs may, *without objection from TMS, but subject to the MDL Court's approval*, withdraw monies from the Escrow Funds to defray the litigation expenses, including necessary expenses and expert fees, of prosecuting claims asserted against the Other Defendants.  Except for TMS's payment of the Settlement Fund, no Releasee will be liable for any

*(continued next page)*

This factor favors approval of the settlement between the parties.

**(4)     *Quality of Counsel and Representation***

The plaintiffs' lawyers have extensive experience in class action and antitrust litigation. From my extensive and intensive involvement in the case over the past eight years, I know that they have pressed their claims with vigor and skill and, in addition, have committed extensive resources, both internal and external, to the lawsuit. The lawyers have been effective and thorough in their written and oral arguments and other communications with the Court. I am confident that they advocated zealously and capably for the class in achieving these settlements. This factor favors approval.

---

attorneys' fees, costs or expenses of the litigation of the Litigated Actions or of this Settlement, including but not limited to those (a) of any of Plaintiffs' experts, counsel, consultants, agents and representatives; (b) incurred in giving notice; or (c) incurred in administering the Settlement or distributing the Settlement Fund.

Toyota Settlement Agreement ¶ 19 (Docket Item 1043-1) (emphasis added); see also CADA Settlement Agreement ¶ 19 (Docket Item 1043-3). This provision does not prevent Toyota (or CADA in the comparable provision of that Settlement Agreement) from objecting to the Plaintiffs' fee request; rather it states that after the settlement is finally approved Toyota will not object to the Plaintiffs' withdrawal of funds from the settlement escrow account for ongoing litigation expenses. This does not constitute a "clear sailing" provision and is not improper. In fact, I permitted the plaintiffs to withdraw up to $1.325 million from the Toyota and CADA Settlement Funds to pay for the costs associated with the implementation of the notice plan.] Order Permitting Advance of Notice Costs from Settlement Funds (Docket Item 1128). (Objector Frank also objects to cy pres and attorney fees, topics I address later.)

Joey Hutto, Jeanne Finn, Channing Carder, Deborah Colburn, Nancy Carder and Wayne Phillips d/b/a/ American Electric Motor Service, object in part because I am asked to award attorney fees before determining the value of benefits actually received by the class members, and because claim forms must be submitted before the settlement is finally approved. Objection to Proposed Settlement ¶¶ 11-12 (Docket Item 1140). This is a specious argument. It is because the claims have already been submitted that I can determine the actual value of benefits the class will receive, and obviously any subtraction for attorney fees must be made before checks can be distributed to class members. The benefits will be received by all who have filed claims (except those who fail to cash the claim check). Moreover, the class members had both notice and a reasonable amount of time to file claims.

**(5)      Conduct of Negotiations**

The Toyota and CADA Settlements resulted from extensive and arm's-length negotiations between the plaintiffs' MDL and state court lead counsel, on the one hand, and counsel for Toyota and CADA respectively, on the other hand.[23]   The parties entered the Toyota settlement agreement ("Toyota Agreement") on February 24, 2006, and the CADA settlement agreement ("CADA Agreement") on September 6, 2006, at a time when the lawsuit was actively and hotly contested.  Later, in August 2009, the parties amended their respective agreements to provide a class period end date and modified the duration of the injunctive provisions.[24]   There is no sign of collusion in either settlement.   Moreover, after I ruled on August 17, 2010, that I would not approve a 23(b)(2) injunctive settlement class,[25] the plaintiffs' lawyers negotiated revisions so that they could proceed forward.  Finally, the parties informed me at the final fairness hearing that there are no side agreements made in connection with the proposed settlement.[26]

This factor favors approval.

**(6)      Prospects of the case, including Risk, Complexity, Expense and Duration of Continued Litigation**

The prospects of the case have proven to be dismal.   On summary judgment, the plaintiffs lost their claims against any remaining defendants.  It took several years of extensive discovery and litigation to get there.  Thus, at

---

[23] Tabacco Decl. ¶¶ 2-3 (Docket Item 1132).
[24] Id. ¶¶ 4, 7, 11, 14; Toyota Settlement Agreement Amendment (Docket Item 1043-3); CADA Settlement Agreement Amendment (Docket Item 1043-4).
[25] In re New Motor Vehicles Canadian Export Antitrust Litig., 269 F.R.D. 80 (D. Me. 2010).
[26] See Fed. R. Civ. P. 23(e)(2) (requiring the parties to identify any such agreements).

the time of these settlements the risk, complexity, expense and duration of continued litigation were significant factors supporting these settlements.  This factor favors approval.

*  *  *  *  *

In sum, all these factors favor my approving the settlement agreements between the plaintiff class and Toyota and CADA.

But before I approve the settlement agreements finally, I must address allocation, because one objector's attack on allocation leads me to a conclusion that may create one problem for the settlement agreements.  I treat it in the third subsection of my allocation discussion, which follows.

ALLOCATION

Although the plan of allocation is not contained in the settlement agreements with Toyota and CADA and has been separately crafted by the plaintiffs, I must determine whether the allocation plan is fair, reasonable and adequate before allowing the settlement proceeds to be distributed, because it is part of the "proposal" within the meaning of Rule 23(e).

The Toyota and CADA Settlement Classes are nationwide classes.  They include approximately 70.7 million individual purchasers and lessees of new motor vehicles manufactured by a defendant, where the purchase or lease was from a U.S. dealer during the period January 1, 2001, through the modified end date of December 31, 2006.

There are three allocation issues:   (1) Are the proposed incentive payments of $750 to each of forty-six individual plaintiffs appropriate?  (2) Is it appropriate to set aside funds for cy pres relief in recognition of those members

of the class who will receive no cash recovery?  (3) Is it appropriate to allocate cash payments only to purchasers in the twenty states that initially obtained state damages class certification?   The plaintiffs say that their plan of allocation will appropriately recognize the extra efforts by the named plaintiffs, provide monetary recovery to those Class Members having the strongest claims against the defendants in the litigated context, and recognize the rest of the class through the proposed cy pres relief.

1.  <u>Incentive Payments</u>.[27]   The $750 incentive payments are designated for forty-six individuals who were deposed in connection with this case.[28]  I conclude that as to forty-five of them, $750 is a reasonable amount reflecting their additional effort and time—time and effort not contributed by other members of the class.[29]

---

[27] The objection filed on behalf of Joey Hutto, Jeanne Finn, Channing Carder, Deborah Colburn, Nancy Carder and Wayne Phillips d/b/a/ American Electric Motor Service challenges the incentive payments.  Objection to Proposed Settlement ¶ 11(e) (Docket Item 1140).

[28] Declaration of Joseph Tabacco ¶ 25 (Docket Item 1132); Order Certifying Settlement Classes for the Purpose of Disseminating Notice at 7 (Docket Item 1123) (Cathy-Ann Accomando, Alison Arrington, Evelyn Auld, Dennis Aylward, William Bagin, Katherine Barrett-Riley, Jack Berke, Arlyne Berke, John Cole, John Cook, Philip Comorski, Cynthia Dale, Hilary Elliot, Anders Field, Ira Gaines, Susan Gray, Lindsay Humphrey (Medigovich), Ronald Jewell, Larry Kindberg, David Kious, Henry Kornegay, Clyde Kozad, Barry Kushner, Susan LaCava, Kenneth Martinez, Ruby McAllister, Peter McIness, Jason Mercer, Donald Mohr, Angels Nemesh, John Nemesh, David Perdue, Randal Peterson, David Phillips, Denise Rosen, Kevin Ruser, Parry Sadoff, Robert Scherzer, Alan Schlesinger, Cynthia Sengel, Jason Sengel, Aubrey Van Spear, David Suddock, Edith Thayer, Elizabeth Weir, James Weir).  Some of these people also served as named class representatives and provided documentation during discovery.

[29] <u>Rodriguez v. West Publishing Co.</u>, 563 F.3d 948, 958 (9th Cir. 2009) (incentive awards "fairly typical in class action cases").  <u>Cf.</u> Sherrie R. Savett, et al., <u>Consumer Class Actions: Class Certification Issues, Including Ethical Considerations and Counsel Fees and Incentive Award Payments to Named Plaintiffs</u>, 936 PLI/Corp. 321 at 340 (1996) (citing fifty-two cases involving incentive awards payments and noting that the normal range of such awards is $1,000 to $5,000).  One of the forty-six, however—David Suddock—was never deposed.  The plaintiffs ask that he be given an incentive payment because he "served as class representative [ ] for the Arizona damages class," Tabacco Decl. at 11 n.5 (Docket Item 1132), and earlier the defendants took the deposition of John Matter, "the previous Arizona class representative."  <u>Id.</u>  "When Mr. Matter no longer wished to serve as class representative, Mr. Suddock quickly volunteered to take his place, ensuring that the Arizona class members had proper representation."  <u>Id.</u>  That
<em>(continued next page)</em>

2.   <u>Cy Pres</u>. The plaintiffs propose setting aside $500,000 of the settlement funds[30] in recognition of the millions of car buyers/lessees who will receive no money from the distribution because the value of their claims is so low, but who nevertheless are bound by the settlement agreement.   That consequence occurs because the defendants insisted on a release from all consumers, at a time when it appeared that the plaintiffs had potential claims in more jurisdictions and over a longer chronological period.   Later, however, my decisions in adversarial disputes narrowed the viable chronological period, and certain states were singled out as having no hope of recovery.[31]

The plaintiffs propose that, through cy pres, this $500,000 be used in some fashion to provide consumer education or anti-fraud enforcement for future car buyers and lessees.[32]   The First Circuit does permit use of cy pres in class actions.[33]   But I have earlier expressed my qualms about using cy pres in this case and reserved judgment pending the fairness hearing.[34]

---

is not an adequate ground for the incentive payment to Mr. Suddock, and therefore I do not approve the incentive payment to him.

[30] They also propose to add to that amount any funds that cannot be distributed, such as may be occasioned, for example, by claimants' failures to cash distributed checks.

[31] <u>See</u> <u>In re New Motor Vehicles Canadian Export Antitrust Litig.</u>, 241 F.R.D. at 79 (decision limiting chronological period for monetary recovery   to April 30, 2003); <u>In re New Motor Vehicles Canadian Export Antitrust Litig.</u>, 235 F.R.D. 127 (D. Me. 2006) (certifying five exemplar state damages classes—Maine, California, New Mexico, Tennessee, Vermont); <u>In re New Motor Vehicles Canadian Export Antitrust Litig.</u>, 241 F.R.D. 77, 83-84 (D. Me. 2007) (supplemental order on certification of state damages classes—adding Arizona, Arkansas, Idaho, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, North Dakota, South Dakota, West Virginia and Wisconsin).

[32] They propose to provide details later.

[33] <u>See</u> <u>In re Pharm. Indus. Average Wholesale Price Litig.</u>, 588 F.3d at 33-36.

[34] <u>See</u> Letter to Federal Trade Commission ¶ 6 (Docket Item 1072-4) ("Does cy pres have any legitimate role to play?"); Procedural Order at 6 (Docket Item 1087) ("Realistically, are there any likely recipients candidates for cy pres distribution under the relevant standards."); Tr. of Proceedings on May 27, 2010 at 55 (Docket Item 1107) ("the presumption should be in terms of the money going back to the people injured, and cy pres should be a fallback").   Objector Theodore Frank has pursued the issue.

Although the plaintiffs make their proposal in good faith,[35] I conclude that cy pres is an inappropriate use of the settlement funds.  First, the value of these claims that will not receive a cash recovery (when divided by the millions of purchasers) is so low that it is negligible; they do not require recompense even by the theoretical relief of cy pres.  Second, despite the plaintiffs' lawyers' attempt to suggest ways to benefit the class members in other jurisdictions and during other periods, the best they can suggest are educational programs or anti-fraud activities that might benefit car buyers and lessees generally.  These really are programs for the car-buying public as a whole, not for the particular consumers in those jurisdictions who were affected by the defendants' activity during the time period in question but will not receive a cash recovery.  Thus, they do not actually provide cy pres relief for those members of the class, as compared to countless others.  Third, the consumers who will obtain payments because of the strength of their state law claims still are not receiving full recompense.[36]

Under these circumstances, I conclude that it is appropriate to award all the money to consumers in those jurisdictions with legitimate state-law recovery opportunities during the narrowed chronological period, even though that decision means that residents of other jurisdictions will receive nothing,

---

[35] This is not a case where cy pres is the only relief and being used to justify fees where no member of the class will receive any recovery.
[36] Full recompense is an ambiguous reference point for a case such as this.  To the extent that the claims could not prevail, any recovery is more than full recompense.  But I use it here in the sense of the settlement value of the case.  Because of the huge expenses of notice and claims administration for such a case, and because of litigation expenses and attorney fees still to be determined, no class member will receive even full settlement value.

not even the intangible benefit (some would say *no* benefit) of cy pres educational or anti-fraud programs.[37]

3.    <u>Cash Payments to Car Buyers and Lessees in Twenty States</u>.  The PRINCIPLES OF AGGREGATE LITIGATION recommend that in reviewing a settlement proposal, a court should address whether "class members are treated equitably (relative to each other) based on their facts and circumstances and are not disadvantaged by the settlement considered as a whole."[38]    Under this standard, this plan of allocation has much to commend it.  In large part, it results in measurable recovery to those who were most injured in a legal sense.  It is rational—based in its chronological scope and its weighting upon the expert analysis the plaintiffs obtained during the course of the litigation and, for the most part, upon judicial resolution of adversarial disputes concerning which states had laws permitting recovery.

But as the PRINCIPLES OF AGGREGATE LITIGATION recognize:  "The court may approve a settlement only if it finds, based on the criteria in subsection (a) [which includes the equitable treatment  just quoted], that the settlement would be fair to the class and to *every substantial segment of the class*."[39]  The Comments add:

> the court should look at whether class members are treated equitably among themselves and whether the settlement accounts for material differences among class members. For instance, an agreement that gives the same monetary remedy to all members of the class, despite significant

---

[37] This is a separate issue from whether cy pres is appropriate for funds left over on account of claimants not cashing their checks or claiming their shares.  <u>See</u> <u>In re Pharm. Indus. Average Wholesale Price Litig.</u>, 588 F.3d at 34.

[38] PRINCIPLES OF AGGREGATE LITIGATION § 3.05(a)(3).

[39] <u>Id</u>. § 3.05(b) (emphasis added).

> differences in the nature of their claims or injuries, may not be fair and reasonable.  In addition, the court should consider whether class members might be disadvantaged by the settlement.  For example, a broad release going beyond the claims that are the subject of the litigation may be inappropriate in light of the nature of the recovery under the proposed settlement.[40]

The PRINCIPLES OF AGGREGATE LITIGATION give similar treatment to lawyers' responsibility:  "A lawyer representing multiple claimants . . . in an aggregate proceeding should seek to advance the common objectives of those claimants," and those objectives include "compensating each claimant appropriately."[41] According to comment f:

> Ideally, the amount of compensation a claimant receives should reflect the merits of the claim itself, including the likelihood that the claimant would prevail at trial and the amount the claimant would win. Meeting this standard in an aggregate proceeding would ensure horizontal equity (similarly situated claimants receive similar amounts) and vertical equity (more deserving claimants receive larger payments than less deserving ones).[42]

I have those principles in mind as I assess the proposed plan of allocation here.  The plan of allocation is drawn largely from rulings that I made as a result of hotly contested adversarial proceedings over the course of this lawsuit.  I ruled previously that there was no nationwide damages claim under federal antitrust law because indirect purchaser claims are foreclosed by Illinois Brick.  But ultimately I certified statewide damages classes under the state antitrust and/or consumer protection laws of twenty states where I concluded that they did not forbid indirect purchaser recovery.  Later, I decided that the damages period ended on April 30, 2003, the date at which the

---

[40] Id. at cmt. b.
[41] Id. § 1.04.
[42] Id. § 1.04 cmt. f.

16

arbitrage opportunities favorable to exporting new vehicles from Canada to the United States substantially diminished. The allocation plan makes funds available to only those Class Members who were in one of the twenty certified statewide damages classes and who purchased in the period January 1, 2001 to April 30, 2003. They are called the "Eligible Claimants," and they represent an estimated 11,352,900 motor vehicles sold or leased.[43] Among the Eligible Claimants, further differentiation is made by weighting their recoveries according to the month and year they purchased, as well as the make and model of the vehicle purchased. The weighting of claims will be based on the economic damages model that the plaintiffs' expert built during litigation from empirical data about sales and other evidence. No challenge has been made to that weighting model, and I find it reasonable in differentiating among purchasers. (I have had intensive exposure to the expert's analysis in dealing with the summary judgment motions and the class certification motions.) Under the plan, for the 438,169 claims filed (approximately four percent of total cash-eligible claims), the plaintiffs stand to gain a measurable recovery— $54-55 on average.[44]

In my August 17, 2010, Order preliminarily approving a settlement class and indicating that with some additional information I would approve notice of the fairness hearing, however, I proceeded on one false premise. I said, incorrectly, that during the progress of this litigation, "the plaintiffs argued

---

[43] Supp. Decl. of Dennis Gilardi Re: Design and Effectiveness of Notice Plan ¶ 19 (Docket Item 1108-3).
[44] Supp. to Pls.' Appl. for Certification of Settlement Classes at 7 (Docket Item 1108); Tr. of Proceedings of February 18, 2011 at 15 (Docket Item 1155).

strenuously for damages in every jurisdiction based upon state law,"[45] using that premise to support my conclusion that car buyers in the remaining twenty states were really the only ones with any hope of a damages claim.  Given the long travel of the case, and my memory of the intensive state-by-state antitrust and consumer protection statutory analyses I had performed some years ago, I had come to believe that the plaintiffs had sought recovery in every jurisdiction that recognized an indirect purchaser claim.  Now I have been corrected.  In response to an objector's argument that Hawaii was unfairly omitted from that group, I understand that the plaintiffs' lawyers made no state law claims or failed to pursue claims for a handful of states.

### (a)    Objector Kevin Luke and Hawaii Purchasers

Kevin Luke, a September 2002 purchaser from Hawaii, has asserted that Hawaii purchasers should be included among the Eligible Claimants who receive a cash recovery.  Objection of Kevin Luke at 1 (Docket Item 1136).  It appears that Hawaii does allow class action lawsuits by indirect purchasers to recover damages,[46] the primary criterion that permits purchasers in the other twenty states to recover in the proposed allocation.[47]

The plaintiffs justify excluding Hawaii from the payment states, however, on the following bases:  (1) The plaintiffs' lawyers had no client there, and could therefore not assert a Hawaii state law claim; (2) Hawaii's indirect

---

[45] In re New Motor Vehicles Canadian Export Antitrust Litig., 269 F.R.D. 80, 89 (D.Me. 2010).

[46] Hawaii Rev. Statutes § 480-13.3; ERIC J. MCCARTHY, INDIRECT PURCHASER LAWSUITS: A STATE-BY-STATE SURVEY 79-85.

[47] There also were some states where I concluded that as a matter of substantive law class recovery was not allowed.  In re New Motor Vehicles Canadian Export Antitrust Litig., 241 F.R.D. at 83-84 (class recovery not permitted in Georgia, Montana and Utah).

purchaser law did not come into effect until almost two-thirds of the way through the class period for which damages can be supported; (3) In this lawsuit claiming that restrictions on cross-border migration of cars would affect U.S. prices, Hawaii is distinct because it is situated in the middle of the Pacific Ocean; and (4) By statute, Hawaii's Attorney General has control over damages claims.[48]

I find the first reason—no client—somewhat perplexing.  I am aware that at the time these settlement agreements were first negotiated, only the injunction claim was proceeding on a national level; otherwise damages claims were proceeding only on a state-by-state basis.[49]  Nevertheless, I note that the plaintiffs did pursue state law damage claims with respect to some states where no named plaintiffs resided.  Perhaps (I do not know) the lawyers had clients in those states even though they did not list them as named plaintiffs.  I am also aware that some courts have dismissed a state law claim where no named plaintiff lives in that state.[50]  But all of that is a separate issue from whether Hawaii residents should share in a settlement that surrenders their state law claims that were neither asserted nor dismissed.

---

[48] They also assert that the Hawaii claim is now time-barred.  But it would not have been time-barred had it been asserted when the plaintiffs first asserted their other state law claims.

[49] In re New Motor Vehicles Canadian Export Antitrust Litig., No. MDL 1532, 2006 WL 623591 (D. Me. Mar. 10, 2006) (certifying federal injunctive relief class); Procedural Order for Class Certification (Docket Item 208); In re New Motor Vehicles Canadian Export Antitrust Litig., 235 F.R.D. 127 (D. Me. 2006) (certifying five exemplar state damages classes).

[50] See In re Packaged Ice Antitrust Litig., No. 08-md-01952, 2011 WL 891169 (E.D. Mich. Mar. 11, 2011).

I am not persuaded by the second reason. It would be a minor adjustment to give claimants from Hawaii a narrower time window for qualifying purchases and leases than those in the other twenty states.

The third reason, Hawaii's mid-ocean location, sounds plausible, but I am not in a position to find, solely as a matter of judicial notice (which is all I have on this record), that the alleged restrictions would not have affected Hawaiian car prices, unlike the remaining twenty states.

It is the fourth reason that gives me the greatest pause. Ultimately, it persuades me that the Hawaii objector cannot succeed on his claim that Hawaii purchasers must be part of the cash allocation, but it also prevents me from finally approving the settlements in their current form that surrenders all Hawaii state law claims.

The Hawaii statutes are clear that a private antitrust damages lawsuit requires notice to the State Attorney General.[51] That office then has the right to take over the lawsuit.[52] A private plaintiff can proceed only if the Attorney General affirmatively consents or fails to act. Two MDL lawsuits have dismissed Hawaii antitrust claims for failure to comply with this provision.[53] The statute also provides that the Attorney General may intervene at a later date, and has been interpreted to "afford[ ] the State an opportunity to

---

[51] "A filed copy of the complaint and all relevant supporting and exculpatory materials in possession of the proposed class representative or its counsel shall be served on the attorney general not later than seven days after filing of the complaint." Hawaii Rev. Statutes § 480-13.3(a)(1).

[52] Id. at § 480-13.3(a)(4).

[53] See In re Flash Memory Antitrust Litig., 643 F. Supp. 2d 1133, 1158 (N.D. Calif. 2009) (antitrust claims under state unfair competition law); In re Chocolate Confectionary Antitrust Litig., 08-mdl-1935, 2010 WL 3749288 (M.D. Pa. September 21, 2010) (same). But see In re Relafen Antitrust Litig., 231 F.R.D. 52 (D. Mass. 2005).

participate in the litigation presumably at any stage in the proceeding.  For example, the private parties could conceivably . . . obtain a favorable settlement and then have the State intervene at the point of the distribution of the proceeds."[54]

I am persuaded that as a result of this statute, the plaintiffs and their lawyers, who have never involved the Attorney General, lacked the capacity to release or settle the Hawaii state law claims on their own.  (The same reasoning applies to objector Luke's attempt to recover for Hawaii residents.)  As a result, on this record I conclude that I cannot approve private settlements that release Hawaii state law claims.[55]  I do not know how this conclusion affects the settlement agreements, which is why I reserve ruling on final approval.

### (b)      Other Jurisdictions[56]

But now, being aware that the plaintiffs' lawyers failed to press state law claims for a handful of other states for which they are releasing all claims, I find it necessary, as a "fiduciary for the class,"[57] to re-examine the allocation

---

[54] Robert F. Miller, Hawaii Antitrust Law Developments 2003, 7 Haw. B.J. 6, 8 (2003) (referring to § 480-13.3(a)(5)(C)).

[55] Luke argues that he does not need the Attorney General for a deceptive practices claim.  I previously have ruled that claims under state deceptive practices laws (unlike unfair competition claims) are not viable for these antitrust claims.  In re New Motor Vehicles Canadian Export Antitrust Litig., 350 F. Supp. 2d at 177.

[56] The Hutto, et al. objection, asserted on behalf of multiple clients residing in different states, is confusing.  Objection (Docket Item 1140).  The objection asserts that the settlement is unfair to Alabama, but does not assert why.  The objection goes on to complain that some Toyota purchasers are not eligible to get a cash payment even though Toyota was the defendant who settled.  I have previously considered and rejected the possibility that only Toyota purchasers should recover because the claims asserted are based on a conspiracy among *all* the defendants.

[57] Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 279–280 (7th Cir. 2002) (Posner, J.); PRINCIPLES OF AGGREGATE LITIGATION § 3.05 cmt. b.

proposal with respect to those jurisdictions.[58]   I am acutely aware of the
practical aspects of class action litigation and settlement that make perfection
an inappropriate goal.  The PRINCIPLES OF AGGREGATE LITIGATION recognize:

> In practice, the ideal is rarely achieved.  Rough justice is
> normal in aggregate proceedings.  In these cases,
> settlements usually involve an element of "damages
> averaging" which occurs when an allocation plan ignores
> some features of claims that might reasonably be expected
> to influence claimants' expected recoveries at trial.[59]

But it is not sufficient to say, as the plaintiffs do, that the cash recovery
limitation to the twenty states can be justified merely because they are the

---

[58] In my Procedural Order of February 18, 2010, I expressed my concern about intra-class
differentials:

> Can typicality and adequate representation be satisfied for the
> proposed 23(b)(3) damage class given the fact that many states
> allow no consumer damages recovery and, in addition, the
> allocation plan of the proposed settlement agreement proposes
> that members of the class who purchased in certain time periods
> or in certain states will receive no recovery at all?

Procedural Order at 4 (Docket Item 1087).  I was satisfied then with proceeding, based upon
my incorrect belief that indirect purchaser recovery had been evaluated under the laws of all
fifty states.

[59] PRINCIPLES OF AGGREGATE LITIGATION § 1.04 cmt. f.  See also RESTATEMENT (THIRD) OF THE LAW
GOVERNING LAWYERS § 128, at 342:

> differences within the class do not necessarily produce conflicts
> requiring that the lawyer for the class not represent some or all
> members of the class or necessitate creation of subclasses.  The
> tasks of a lawyer for a class may include monitoring and
> mediating such differences.

As commentators observe, class counsel "have little incentive to apportion an aggregate
settlement in order to benefit some group members by providing others less than the expected
net values of their claims in individual litigation."  Charles Silver & Lynn Baker, I Cut, You
Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds, 84 VA. L. Rev. 1465,
1535 (1998) Moreover:

> Judges should allow attorneys to incur and help resolve the same
> conflicts in class actions that they are permitted to handle in
> consensual group lawsuits in which attorneys routinely serve as
> both advocates and trustees.  Like other trustees, attorneys in
> charge of consensual group lawsuits balance beneficiaries'
> competing interests subject to a reasonableness constraint when
> deciding how assets will be used.  We think that class counsel
> also should be able to resolve conflicts and should enjoy
> protection from liability akin to what trustees enjoy.

Id. at 1507.  Professor Coffee also notes in The Regulation of Entrepreneurial Litigation:
Balancing Fairness & Efficiency in the Large Class Action, 54 U.Chi. L. Rev. 877, 921 (1987):
that the benefits of creating subclasses with multiple lawyers are often uncertain.

ones that survived "the crucible of litigation."[60]  To survive a crucible, a matter must be subjected to that crucible.  These omitted claims were not subjected to any crucible.  Perhaps there is other sufficient reason why they should not be included in the Eligible Claims for cash distribution, but to date the plaintiffs' lawyers have not given me one—they have not explained to me how they assessed their viability and rejected them on the merits, if they did.

In addition to Hawaii, the plaintiffs did not assert or failed to pursue[61] state law claims for Alabama, Alaska, District of Columbia, Florida, Indiana, Iowa, North Carolina, South Carolina, and Wyoming.  No indirect purchaser recovery is available in Alaska, Indiana, South Carolina, or Wyoming.[62] Alabama, District of Columbia, Florida, Iowa and North Carolina, however, may allow such claims.[63]  Until corrected, I assume that, if asked, the plaintiffs' lawyers will tell me, as they did for Hawaii, that they had no clients in those states on whose behalf they could assert a state law claim, that therefore they could not seek class certification as to those state law claims and could not litigate the claims, but that they can nevertheless settle the claims.

It is true that appellate caselaw supports the proposition that even though a class representative has no authority to *litigate* a claim for the class,

---

[60] Pls.' Supp. Br. in further Support of Mot. for Approval of Plan Allocation at 3 (Docket Item 1164).

[61] I say "failed to purse" because the District of Columbia claims, for example, survived the motion to dismiss indirect purchaser claims, but later the plaintiffs never sought to certify a class for that jurisdiction.

[62] ERIC J. MCCARTHY, INDIRECT PURCHASER LAWSUITS: A STATE-BY-STATE SURVEY 7-13, 99-110, 273-80, 343-50.  See also In Re Dynamic Radom Access Memory (DRAM) Antitrust Litig., 516 F. Supp. 1072, 1107-08 (N.D. Cal. 2007) (concluding no indirect purchaser recovery under Alaska law).

[63] ERIC J. MCCARTHY, INDIRECT PURCHASER LAWSUITS: A STATE-BY-STATE SURVEY at 1-6, 53-58, 59-66, 111-16, 221-228.

he or she can nevertheless *settle* the claim for the class so long as it is based on the same facts, and only the legal theory is different.[64]   That is the case here.  The underlying facts are identical for the federal Sherman Act claim and the state law damages claims.  Only the legal theory is different (and essentially only on the issue of indirect purchaser recovery).  Thus, unlike Hawaii where I recognize the State Attorney General's dispositive authority, I agree with the plaintiffs that there is no bar to their including these claims from residents of other U.S. jurisdictions in the settlement releases that they gave these two defendants.  But then the question becomes whether the allocation is fair when it leaves the residents of these jurisdictions no cash recovery.  The plaintiffs' "crucible of litigation" argument is simply not enough on the information before me now.

## CONCLUSION

Accordingly, I direct that counsel for the plaintiffs provide the court written justification by May 13, 2011, why a fair allocation excludes purchasers in Alabama, District of Columbia, Florida, Iowa, and North Carolina

---

[64] TBK Partners, Ltd. v. Western Union Corp., 675 F.2d 456, 462 (2d Cir. 1982) (quoting Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch., 660 F.2d 9, 18 n.7 (2d Cir. 1981)); accord City P'ship Co., 100 F.3d at 1044 (approving the TBK Partners principle as "well-settled").  See also Nottingham Partners v. Trans-Lux Corp., 925 F.2d 29, 31 (1st Cir. 1991) (enforcing a state court class settlement that released federal claims not brought in the state court action).  The answer is different if it is the facts that differ.  See Nat'l Super Spuds, 660 F.2d at 18 ("If a judgment after trial cannot extinguish claims not asserted in the class action complaint, a judgment approving a settlement in such an action ordinarily should not be able to do so either"); see also Nottingham Partners v. Dana, 564 A.2d 1089, 1106 (Del. 1989); PRINCIPLES OF AGGREGATE LITIGATION § 1.01 cmt. d.  (Contrary to the plaintiffs' assertion, Pls.' Response to the Supplemental Br. of Objector Kevin Luke at 4 (Docket Item 1169), the Second Circuit decision in Nat'l Super Spuds as so construed is not at odds with Matsushita Electric Indus. Co. v. Epstein, 516 U.S. 367, 377 (1996), and Reppert v. Marvin Lumber & Cedar Co., 359 F.3d 53, 58-59 (1st Cir. 2004).)

from the Eligible Claimants who can receive a cash recovery, as well as the effect on the settlements of my ruling about Hawaii state law claims. Any response shall be filed within fourteen days thereafter. Pending my review of those filings, I defer decision on final approval of notice, class certification, the overall settlements, the motion for attorney fees and expenses, and approval of distribution of the settlement funds.

So Ordered.

Dated this 13th day of April, 2011

/s/ D. Brock Hornby
D. Brock Hornby
United States District Judge