UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

IN RE NEW MOTOR VEHICLES          ]
    CANADIAN EXPORT ANTITRUST   ]     DOCKET NO. 2:03-MD-1532-DBH
    LITIGATION                  ]


DECISION AND ORDER ON MOTIONS FOR AN AWARD OF
ATTORNEY FEES AND REIMBURSEMENT OF EXPENSES

This has been an extremely hard-fought multidistrict antitrust class action lawsuit. It has been going on for 8-1/2 years in both this trial court and the Court of Appeals for the First Circuit. The plaintiffs secured settlement agreements early in the litigation with two defendants, Toyota Motor Sales USA Inc. ("Toyota") and Canadian Automobile Dealers Association ("CADA"). The amounts totaled $35.7 million and grew to $37.3 million (in principal and interest as of October 31, 2010). The plaintiffs hoped to use those settlement proceeds in part to fund their further litigation against other defendants, so as to enlarge the total amount available to the class. But in fact, ultimately all other defendants either were dismissed or won summary judgment.

With respect to the settlement funds, I have certified settlement classes, approved the two settlement agreements and, after modification, recently approved a plan of allocation. Class counsel earlier sought expenses in the amount of $6.27 million and fees in the amount of $4.92 million for a total of $11.19 million. Motion for an Award of Attorneys' Fees and Reimbursement of Costs Advanced by Class Counsel (Docket Item 1131). At a fairness hearing on

February 18, 2011, objectors raised two objections to the plaintiffs' counsel's attorney fee request: first, that the settlement agreement contains a clear-sailing provision; second, that I should consider the fees and expenses together and find them too large in what they subtract from the class recovery. In turn, certain objectors have requested fees for the roles that they played at the fairness hearing.

Now that I am satisfied with the plan of allocation, I make this ruling approving and denying fees and expenses as follows. I consider first the two objections to the plaintiffs' requested fees, then conduct the independent review that is my responsibility under Fed. R. Civ. P. 23(h) for all the fee and expense requests.

A clear sailing provision is "one where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling." <u>Weinberger v. Great N. Nekoosa Corp.</u>, 925 F.2d 518, 520 n.1 (1st Cir. 1991). The challenged provision here[1] is

---

[1] The language in the Settlement Agreements that is challenged as a clear sailing provision provides:
> Litigation Expenses From The Escrow Funds. After (a) the Settlement becomes Final and (b) the Toyota Defendants are dismissed from all State Actions, Plaintiffs may, without objection from TMS, but subject to the MDL Court's approval, withdraw monies from the Escrow Funds to defray the litigation expenses, including necessary expenses and expert fees, of prosecuting claims asserted against the Other Defendants. Except for TMS's payment of the Settlement Fund, no Releasee will be liable for any attorneys' fees, costs or expenses of the litigation of the Litigated Actions or of this Settlement, including but not limited to those (a) of any of Plaintiffs' experts, counsel, consultants, agents and representatives; (b) incurred in giving notice; or (c) incurred in administering the Settlement or distributing the Settlement Fund.

Toyota Settlement Agreement ¶ 19 (Docket Item 1043-1) (emphasis added); <u>see also</u> CADA Settlement Agreement ¶ 19 (Docket Item 1043-3).

not the classic clear sailing provision. Instead, it provides a way for the plaintiffs, with court approval, to draw down amounts that might have been needed to fund the litigation. In no way does its language address how to handle the ultimate request for fees and expenses. Even if it were a clear sailing provision, its effect is to counsel extra care in reviewing the attorney fees and expenses. I give that care regardless.

With respect to the second objection, certainly an important part of my review always considers what is taken away from the class recovery in any award I approve. But I do not simply lump fees and expenses together in assessing an award. Every lawsuit is different, and some justifiably create more expenses or more fees, or less of both or either, as the case may be.

I proceed then to my independent review of the requested fees and expenses.

The expense figure is undoubtedly large, but its size is not surprising, since class counsel spent it in their efforts to pursue the broader litigation against a large number of vehicle manufacturers, and the antitrust and economic issues were very complex. In fact, it is only 55% of the amounts that they actually have spent on the overall litigation, because they have allocated the rest of the expenses to the parallel state lawsuits that are pending (MDL counsel and state lawsuit counsel conducted joint discovery pursuant to a plan approved by California Superior Court Judge Richard A. Kramer and me). Joint Coordination Order (Docket Item 110). The attorney fee figure likewise is large in absolute numbers, but not in context. As a percentage of funds, it is

3

13.2%, below average for most litigation of this complexity.  See Robert H. Lande & Joshua P. Davis, *Benefits from Private Antitrust Enforcement: An Analysis of Forty Cases*, 42 U.S.F. L. Rev. 879, Table 7A (July 2008) (Courts in the majority of antitrust class actions studied, which resulted in recoveries of less than $100 million, awarded a contingent fee of 30% or more, median fee was 33.3% and the average 28.2%.).  It is far below the lodestar amount of $45.9 million (reflecting the hours spent and hourly rates).[2]  It is reasonable under the market-mimicking approach I set forth for attorney fees in Nilsen v. York County, 400 F. Supp. 2d 266 (D. Me. 2005).[3]  Overall, the fees and expenses amount to 30% of the settlement amounts, and the plaintiff class therefore will obtain 70% of the recovery.

Given the ultimate outcome of this litigation, the attorneys performed remarkably in obtaining these settlements, and both individual car purchasers and fleet purchasers will recover measurable amounts as a result, amounts they would never have pursued and recovered on their own.  I conclude that the requested fees and expenses for class counsel are reasonable, considered separately and together, and I therefore **GRANT** the motion to approve them.

*Objector Kevin Luke's Attorney Fee Request*

Attorney John J. Pentz filed an objection to the plan of allocation and appeared at the final fairness hearing, representing a car buyer from Hawaii and arguing that Hawaii purchasers should have been included.  Remarkably,

---

[2] Undoubtedly the amount is even higher now, given the demands I imposed in connection with altering the plan of allocation.
[3] See Appendix.

4

he now seeks $376,580 as a result, with no indication of time and expenses actually incurred and no indication of a fee agreement with his client. He claims that because of his argument, I enlarged the settlement class to include the jurisdictions of DC, Hawaii, North Carolina and Iowa, and that he expects car buyers in those jurisdictions will obtain $2,852,878. Of that recovery he requests 13.2%, the amount that class counsel has requested against the entire settlement fund—*i.e.,* $376,580 for his efforts. He seeks to have this amount subtracted from what class counsel would otherwise obtain, not to diminish the recovery of the class members.

I am tempted to reject the request outright, given how brazen it is—a request for $376,580, with no fee agreement, and no statement of hours, rates, or expenses. Attorney Pentz was not responsible for creating the pie or enlarging the pie,[4] only increasing the number who could consume it. He was never appointed to represent a class, and took only minimal risk, namely his time in writing his briefs and coming to Portland, Maine to argue. Although he now seeks credit for benefitting DC, North Carolina and Iowa, in fact his focus was only on Hawaii and he did not argue that the other three jurisdictions should be included until I raised that issue sua sponte in my Order of April 13, 2011. Thereafter, Attorneys General of those jurisdictions filed a response asserting their positions, and subsequently at my direction negotiated a modified notice program to enlarge the class coverage. Even as to Hawaii, the

---

[4] By contrast, in my Order of April 13, 2011, I described how extraordinary class counsel's accomplishment was in obtaining the settlement funds here.

Pentz argument left much to be desired, failing initially to address the Hawaii Attorney General's supervisory role under the Hawaii statutes, and ignoring the significant difference between the migration of Canadian cars across a land border and across an ocean expanse. Attorney Pentz also provided no insight on how to correct notice and include the four additional jurisdictions in the claims process.

Nevertheless, Attorney Pentz accomplished one significant step in representing his client, Hawaii purchaser Kevin Luke. Without his bringing the issue to my attention, I would have missed the fact that certain jurisdictions that do not follow Illinois Brick[5] but instead allow indirect purchaser recoveries were omitted from the list of states whose purchasers could obtain monetary recovery simply because class counsel had no clients from those states. That accomplishment does deserve recognition.

In the absence of any proof of a fee agreement, or any evidence of attorney time, rates and expenses, I conclude that $10,000 is an adequate recompense for what Attorney Pentz did, without giving him a windfall for recoveries that he never sought. That amount will be subtracted from the fees and expenses of class counsel.

***Objector Theodore H. Frank's Attorney Fee Request***

On behalf of Theodore H. Frank, the Center for Class Action Fairness/Greenberg Legal Services challenged the cy pres portion of the proposed settlement allocation by filing legal memoranda and appearing at the

---

[5] Illinois Brick v. Illlinois, 431 U.S. 720 (1977).

fairness hearing. Ultimately I did reject the proposed cy pres proposal and assigned all the cash recovery directly to class members. Frank's lawyers say that in attacking the cy pres proposal, they had disbursements of $973.80 and that their lodestar fees exceed $35,600. They have discounted their fees to $19,000,[6] however, for a total request of $19,973.80. Like Pentz/Luke, they seek payment of this amount from the fees otherwise to be awarded to class counsel.

Anticipating my reaction that I was already disposed to reject the cy pres portion of the settlement allocation without their assistance,[7] Frank's lawyers cite a Seventh Circuit dictum that "objectors must decide whether to object without knowing what objections may be moot because they have already occurred to the judge." Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 288 (7th Cir. 2002).[8] The point is well-taken. Although I had several times signaled my concern about the cy pres proposal, Objector Frank could not be certain that I would reject it finally if no one objected to it. However, the significance of his efforts is sharply reduced under the circumstances, and the issue was neither complex nor subtle. I conclude that an award of $10,000 is

---

[6] Frank's lawyers made other arguments that were unsuccessful.
[7] My decision rejecting the cy pres part of the settlement referred to several previous expressions of skepticism that I had uttered on the proposal. Decision and Order on Proposed Settlements and Plan of Allocation n.34 (Docket Item 1175).
[8] The case is somewhat different from Reynolds in that there "[t]he judge denied a fee to the objectors in part on the ground that he had already decided, *without telling anybody*, not to accept the reversion." Reynolds, 288 F.3d at 288 (emphasis added). In this case, I had signaled my concern about the cy pres proposal several times. Nevertheless, the point remains: the objectors could not be sure that I would reject the cy pres proposal if no one stood up to support my concerns.

sufficient. Because it did enlarge the amount going to class members, it need not be subtracted from the fees I have awarded class counsel.

**CONCLUSION**

I find that reasonable and adequate notice of the maximum amount of attorney fees and expenses that the plaintiffs' attorneys would request was provided to Class Members, informing them of their right to object and appear at the Fairness Hearing.

Class Counsel, on behalf of all the plaintiffs' attorneys, are awarded attorneys' fees of $4,910,000 ($4,920,000 minus $10,000), Kevin Luke is awarded attorney fees and expenses of $10,000, and Theodore Frank is awarded attorney fees and expenses of $10,000, all of which shall be paid out of the Combined Settlement Fund. The total attorney fees represent 13.2% of the gross settlement proceeds including interest earned by the Combined Settlement Fund as of October 31, 2010. Class Counsel, on behalf of all the plaintiffs' attorneys, are awarded reimbursement of expenses in the aggregate amount of $6,270,000, which shall be paid out of the Combined Settlement Fund. These expenses are fair and reasonable, and were necessarily incurred in connection with the prosecution and settlement of the Litigated Actions.

The attorney fees and expenses approved by the Court in this order for class counsel are payable from the Combined Settlement Fund to the Chair of the MDL Executive Committee, Joseph J. Tabacco and Todd A. Seaver of Berman DeValerio, on behalf of all the plaintiffs' attorneys in the Litigated Actions, once the Settlements become Final as provided in Paragraph 9 of the

Settlement Agreements. The Chair of the MDL Executive Committee shall thereafter allocate the Fee and Expense Award to the plaintiffs' attorneys in a fair and equitable manner. In addition, once the Settlements become Final as provided in Paragraph 9 of the Settlement Agreements, Kevin Luke and Theodore Frank shall be paid their attorney fees and expenses directly from the Combined Settlement Fund.

The attorney fees and expenses approved by the Court shall be paid from the Toyota Settlement Fund and CADA Settlement Fund proportionally based on the original amounts deposited into each fund.

**SO ORDERED.**

**DATED THIS 1ST DAY OF FEBRUARY, 2012**

/s/D. Brock Hornby
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

The market-mimicking approach tries to ascertain a market price for legal services "'in light of the risk of nonpayment and the normal rate of compensation in the market at the time.'" Nilsen v. York Cnty., 400 F. Supp. 2d 266, 278 (D. Me. 2005) (citation omitted). The plaintiffs offer contextual market information and conclusions drawn from several sources: (i) the case In re Merry-Go-Round Enterprises, Inc., 244 B.R. 327 (D. Md. 2000), where the court concluded that the "market price" for the legal services supported a 40% fee; (ii) evidence of judicial fee awards in two antitrust class actions where the "market approach" was used in part by the court to determine the contingent fee award; (iii) scaled medical malpractice contingency-fee practice; and (iv) conclusions from empirical studies that offer insight on contingent fees in both class actions and non-class actions.

The main inquiry for the market-mimicking approach is what a private plaintiff would have negotiated at arm's length with the lawyers at the outset of the case. Nilsen, 400 F. Supp. 2d at 276. Of course it is impossible to know the outcome of this hypothetical bargain now, at the end of the case. But the market-mimicking method gives primacy to what "a court can learn about similar bargains." In re Synthroid Mktg. Litig., 264 F.3d 712, 719 (7th Cir. 2001). Under the market-mimicking approach the court should assess the market price considering "'the risk of nonpayment, quality of performance, the amount of work, and the stakes of the case.'" Nilsen, 400 F. Supp. 2d at 276 (citation omitted). The plaintiffs cite In re Merry-Go-Round Enterprises, Inc.,

244 B.R. 327 (D. Md. 2000), where the risk of non-payment and the ensemble of services resembled those here and where the court concluded the "market price" for those services supported a 40% fee.

Another factor to consider when using the market-mimicking approach is "[o]ther judicial fee awards" inasmuch as they "affect the expectations of lawyers, and therefore, what they might agree to in a voluntary negotiation." Nilsen, 400 F. Supp. 2d at 282-83. The plaintiff relies on two antitrust class actions where the court has used a market approach to determine the market price for the legal services. In both cases, the court concluded that a contingent fee of 30% to 40% is the "market rate."

In In re Remeron Direct Purchaser Antitrust Litigation, No. 03-0085, 2005 U.S. Dist. LEXIS 27013 (D.N.J. Nov. 9, 2005), Judge Hochberg used a percentage-of-the-fund method, but required that the method "should approximate the fee which would be negotiated if the lawyer were offering his or her services in the private marketplace." Id. at *44-45. Judge Hochberg also emphasized that the market rate had to take into account the risk of nonpayment, remarking on "the sometimes undesirable characteristics" of contingent-fee antitrust class actions. Id. at *39. Those include "the uncertain nature of the fee, the wholly contingent outlay of large out-of-pocket sums by plaintiffs, and the fact that the risk of failure and nonpayment in an antitrust case are extremely high." Id. The court determined the "market rate" to be "between 30% and 40%." Id. at *46.

In In re Insurance Brokerage Antitrust Litigation, MDL No. 1663, 2009 U.S. Dist. LEXIS 17755 (D.N.J. Feb. 17, 2009), Chief Judge Brown used a multi-factor test in evaluating a percentage-of-the-fund contingent fee request. When he came to the question "whether the requested fee is consistent with a privately negotiated contingent fee in the marketplace," id. at *56-57 (citing 7th Circuit cases), Judge Brown concluded that the market price for privately-negotiated contingent fees is "between 30% and 40%" in non-class, commercial litigation. Id. at *58. Class counsel was seeking an award of 15.9% to 18.9%. Id. at *56. Consequently, the requested fee was below that market rate.[1]

Finally, several academic and government reports are often relied upon by courts as a factor in determining the "market price" for class action contingent fees. See, e.g., In re Cabletron Sys., Inc. Sec. Litig., 239 F.R.D. 30, 40-42 (D.N.H. 2006) (relying on "comprehensive studies evaluating fee awards in class action cases" and collecting those studies). Most relevant here is the

---

[1] I have previously found medical malpractice limits also to be "instructive and persuasive" in some cases where evidence of market rates was slim. Nilsen, 400 F. Supp. 2d at 282. By statute in Maine, medical malpractice contingent fees are limited according to a sliding scale: 33.33% for the first $100,000 of recovery, 25% for the next $100,000, and 20% of any amount over $200,000. Id. at 280. California limits contingency fees to a sliding scale of 40%, 33.33%, and so on. Cal. Bus. & Prof. Code § 6146 (West 2003). Tennessee limits them to 33 1/3%. Tenn. Code Ann. § 29-26-120 (2000). Wisconsin allows 33 1/3% of the first $1,000,000 (or 25% of the first $1,000,000 if liability is stipulated within 180 days) and 25% of any amount in excess of $1,000,000. Wis. Stat. Ann. § 655.013 (West 2004).

    The plaintiffs suggest that if the statutory medical malpractice fee caps in Maine or California were accepted as "market rates" but the recovery amounts scaled appropriately, they would translate to a blended contingent fee of 37.7% under California limits, and 30.5% under Maine limits. (With statutory caps appropriately scaled to this case, for example, California medical malpractice limits would yield the following: 40% of first $25 million = $10 million in fees; 33.33% of the next $25 million (the $12.4 million remainder) = $4.1 million in fees. Total fees = $14.1 million. Blended rate = 37.7%. Under the same scale, the Maine medical malpractice limits would yield the following: 33.33% of the first $25 million = $8.3 million in fees; 25% of the next $25 million (the $12.4 remainder) = $3.1 million in fees. Total fees = $11.4 million. Blended rate = 30.5%.) As a result, facets of medical malpractice contingency-fee practice also support a finding that the market-mimicking rate in this case is 30% to 40%.

study of forty antitrust class actions.  See Robert H. Lande & Joshua P. Davis, *Benefits From Private Antitrust Enforcement: An Analysis of Forty Cases*, 42 U.S.F. L. Rev. 879 (July 2008).  Courts in the majority of antitrust class actions resulting in recoveries of less than $100 million awarded a contingent fee of 30% or more.  The median fee was 33.3% and the average 28.2%.  Id. at Table 7A.

All these sources support class counsel's request here.

D